# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| OTHART DAIRY FARMS, LLC, PAREO FARM, INC., PAREO FARM II, INC., DESERTLAND DAIRY, LLC, DEL ORO DAIRY, LLC, BRIGHT STAR DAIRY, LLC, and SUNSET DAIRY, LLC, individually and on behalf of all others similarly situated, | Case No. _____ |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| vs. | |
| DAIRY FARMERS OF AMERICA, INC., SELECT MILK PRODUCERS, INC., and GREATER SOUTHWEST AGENCY, | |
| Defendants. | |

## TABLE OF CONTENTS

I.      NATURE OF ACTION ................................................................................................. 1

II.     JURISDICTION AND VENUE ................................................................................... 5

III.    PARTIES ...................................................................................................................... 7

   A.   Plaintiffs ....................................................................................................................... 7

   B.   Defendants ................................................................................................................... 8

IV.     AGENTS AND CO-CONSPIRATORS ..................................................................... 9

V.      TRADE AND COMMERCE ...................................................................................... 11

VI.     FACTUAL ALLEGATIONS ..................................................................................... 12

   A.   Background on the Dairy Industry .............................................................................. 12

      1.   Basics of Raw Grade A Milk ................................................................................ 12

      2.   The Southwest Dairy Production Market Is Worth More than $3.5 Billion Annually  13

      3.   There Are No Significant Substitutes for Milk and Milk Products ...................... 13

      4.   The Capper-Volstead Act ..................................................................................... 13

      5.   Milk Balancing and Milk Classes ........................................................................ 15

      6.   Dairy Production in the United States ................................................................... 16

      7.   History of and Background on DFA and Select Milk ........................................... 17
         a.   DFA ............................................................................................................. 17
         b.   Select Milk .................................................................................................. 18

      8.   DFA's Regions ..................................................................................................... 19

      9.   Dairy Industry History .......................................................................................... 21

      10.  Federal Milk Policy and Pricing .......................................................................... 24

      11.  Federal Milk Marketing Orders ............................................................................ 29

   B.   The Structure and Characteristics of the Southwest Dairy Market Render the Conspiracy
        Economically Plausible .............................................................................................. 31

      1.   Milk Is a Commodity ............................................................................................ 31

      2.   The Market Is Characterized by Inelastic Demand ............................................... 31

i

3. The Southwest Dairy Industry Is Highly Concentrated and Has Experienced High Consolidation ................................................................................................ 31

4. The Southwest Dairy Industry Is Characterized by a Lack of Pricing Transparency and Asymmetric Access to Key Market Information ...................................................... 33

5. DFA Has Previously Been Investigated by the Government for Collusive Action and Has Been Repeatedly, Successfully Sued for Violations of the Federal Antitrust Laws ................................................................................................................. 34

   a. DFA's History of Wrongdoing ................................................................ 34

   b. Prior Antitrust Class Litigation Against DFA ...................................... 38

      i. Southeast and Appalachian FMMOs ............................................ 38

      ii. Northeast FMMO .......................................................................... 40

6. Defendants Had and Have Numerous Opportunities to Collude .................................. 43

7. There Are High Barriers to Entry in the Southwest Dairy Market .............................. 45

C. DFA and Select Milk Conspired With One Another to Depress Prices Paid to Southwestern Dairy Farmers .............................................................................. 47

   1. DFA's and Select Milk's Coordination as Part of GSA ................................. 50

D. The Prices Paid to Southwestern Dairy Farmers for Their Raw Grade A Milk Fell Beginning in At Least January 2015 and Have Remained Low. ....................................... 52

E. DFA's and Select Milk's Decreased Pooling of Milk. ....................................................... 56

F. DFA's and Select Milk's Self-Dealing ................................................................................. 61

VII. CLASS ACTION ALLEGATIONS ............................................................................. 63

VIII. ANTITRUST INJURY ................................................................................................... 66

IX. ACTIVE CONCEALMENT ......................................................................................... 67

X. CAUSE OF ACTION .................................................................................................... 70

XI. REQUEST FOR RELIEF .............................................................................................. 72

XII. JURY TRIAL DEMANDED ........................................................................................ 73

Plaintiffs Othart Dairy Farms, LLC, Pareo Farm, Inc., Pareo Farm II, Inc., Desertland Dairy, LLC, Del Oro Dairy, LLC, Bright Star Dairy, LLC, and Sunset Dairy, LLC, ("Plaintiffs"), bring this action on behalf of themselves individually and on behalf of a plaintiff class (the "Class"), pursuant to Rule 23 of the Federal Rules of Civil Procedure consisting of all dairy farmers, whether individuals or entities, who produced Grade A milk and sold Grade A milk independently or directly or through an agent to Defendants, Dairy Farmers of America, Inc. ("DFA") and Select Milk Producers, Inc. ("Select Milk") or Co-Conspirators within DFA's Southwest Area region any time from at least January 1, 2015 until present (the "Class Period"). Plaintiffs also allege claims against Defendant Greater Southwest Agency ("GSA"). Plaintiffs bring this action for treble damages under the antitrust laws of the United States against Defendants, and demand a trial by jury.

## I.  NATURE OF ACTION

1.      Dairy cooperatives are meant to serve dairy-farmer owners.  However, as alleged herein, in the Southwest United States the two largest dairy cooperatives, DFA and Select Milk, have conspired in violation of the Sherman Act to suppress pay to dairy farmers. DFA and Select Milk control at least 75% of the Southwest market, and together have used that control to significantly depress the price dairy farmers receive for their raw milk. The effect of Defendants' conspiracy has been devastating to many dairy farmers, causing numerous farmers to borrow from generations of equity built up in their land, relying on that equity to pay themselves and keep their farms in operation. Many Southwestern dairy farmers have been forced to declare bankruptcy and completely closed their operations.

2.      Upon information and belief, as alleged herein, DFA and Select Milk have conspired with one another to stabilize and depress the prices paid to these cooperatives' farmers

for the raw Grade A milk they produce in several ways, including: (a) unlawfully sharing pricing information though, *inter alia*, their various commercial joint ventures as well as Defendant GSA; (b) driving down take-home pay for dairy farmers through selective and increasingly frequent non-pooling of milk, allowing the cooperatives as entities to market members' milk at higher prices without passing those increases on to farmers; and (c) unlawfully coordinating pricing and pricing-related decisions. Upon information and belief, DFA's and Select Milk's monthly rates to their respective member-farmers – what Plaintiffs and Class members actually receive – are almost always within a few pennies of each other. This would not be the case absent the conspiracy alleged herein.

3.      Since at least January 2015, the prices paid by DFA and Select Milk for the raw Grade A milk their member-farmers have produced have been unlawfully and artificially depressed as a result of the conduct alleged herein, even though these Defendants' revenues and profits have increased. As a direct result of this unlawful conspiracy, the percentage of their revenues that DFA and Select Milk are paying to Plaintiffs and the Class has dwindled.

4.      DFA and Select Milk are organized as member-owned, non-profit dairy cooperatives, obligated to operate for the benefit of their farmer-members. Their members are obligated to deliver all of their milk to the cooperative to market on their behalf. In turn, the cooperatives must market or process their member-farmers' raw Grade A milk to obtain the best possible price for the product. DFA and Select Milk have utterly forsaken this obligation, and have conspired to stabilize, fix, and maintain at artificially depressed rates the raw Grade A milk prices paid to Plaintiffs and Class members.

5.      The vast majority of milk marketed in the Southwest, approximately 85-90%, is marketed via a dairy cooperative. DFA is the largest dairy cooperative both in the Southwest and

nationwide, and Select Milk is the second largest cooperative in the Southwest. The only other cooperative with any significant presence in the Southwest is Co-Conspirator Lone Star Milk Producers. Lone Star, however, markets far less milk than DFA and Select Milk. DFA and Select Milk control at least 75% of all raw Grade A milk market in the Southwest. Accordingly, DFA and Select Milk play a vital role in the Southwest dairy industry. These cooperatives largely control Southwestern dairy farmers' access to the market.

6.     The dairy industry is particularly susceptible to a conspiracy due, at least in part, to a lack of pricing transparency and the complicated way in which milk purchase and sale prices are calculated. As alleged in greater detail herein, although the United States Department of Agriculture (USDA) establishes monthly prices under the Federal Milk Marketing Order ("FMMO") in the Southwest (FMMO No. 126), DFA and Select Milk contract for the sale of their members' milk with their customers at whatever rates are privately negotiated. The FMMO-established prices serve as reference points and do not dictate what the cooperatives pay their members. Often enough, the ultimate purchasers of the raw Grade A milk are joint ventures, subsidiaries, or other affiliates of DFA and Select Milk. Put differently, in many circumstances DFA and Select Milk are selling their members' milk to the cooperatives' own commercial divisions. An inherent conflict exists between DFA and Select Milk and the member-farmers who own these cooperatives. It is the cooperatives themselves, as entities, who are responsible for creating and exploiting this division.

7.     As entities, DFA and Select Milk financially benefit from reducing raw milk prices paid to farmers while maintaining the supply of as much raw milk volume as possible. This is because these cooperatives' commercial operations use raw milk as an input. Cheaper raw milk means they can produce their value-added dairy products (cheese, yogurt, milk powder, etc.) more

3

profitably. Yet, as explained herein, DFA's and Select Milk's processing-side profits fail to make their way back to their member dairy farmers. For just one example, in 2020, DFA as an entity enjoyed EBITDA of approximately $515 million, yet DFA reported that it only paid its member-farmers $46 million, or just 8.9% of DFA's EBITDA. As alleged in greater detail herein, the sums that Defendants DFA and Select Milk have paid their member-farmers for the raw Grade A milk they produced have remained consistently low, even while these cooperatives are enjoying record profits from their commercial divisions. DFA and Select Milk are exploiting their members for cheap milk to supply the cooperatives' commercial divisions, yet failing to pass on the increased commercial revenues to their farmers.

8.     Moreover, by paying dairy producers less, DFA and Select Milk are able to present their annual performance as stable and continuously profitable, thereby portraying their management as successful leaders worthy of high compensation and bonuses. DFA and Select Milk's executives (such as Co-Conspirators Smith and Rodenbaugh) are frequently conflicted, being not only the highest ranking employees of the cooperatives themselves, but also serving on the boards of and/or working for or with joint ventures and even competitors. Upon information and belief, these executives receive outsized compensation for serving in these various capacities.

9.     As the dominant players in the dairy industry in the Southwest, DFA and Select Milk dictate the prices paid to all Southwestern dairy farmers. This, in turn, has caused the entities that control the remaining minority of the market to follow DFA and Select Milk's lead.

10.     DFA and Select Milk may and do pay their members less than the FMMO price. Indeed, DFA and Select Milk deduct numerous costs and expenses from their members' milk checks, with little or no explanation as to how the cooperatives arrive at those calculations or

assessments. These cooperatives are massive, vertically integrated entities that have conspired to artificially depress the rates at which Southwestern dairy farmers are compensated.

11.     Defendants' wrongful and anticompetitive actions had the intended purpose and effect of artificially fixing, depressing, maintaining, and stabilizing the price paid to Plaintiffs and Class members for the raw Grade A milk these farmers produced.

12.     The problems posed by the anticompetitive misconduct of Defendants within the dairy industry and by others across other livestock and poultry sectors have grown so severe that this year, the DOJ and USDA launched an online tool that allows farmers to anonymously report potentially unfair and anticompetitive practices.[1]

13.     As a result of Defendants' unlawful conduct, Plaintiffs and other Class members were artificially underpaid for the raw Grade A milk they produced during the Class Period. Such prices were below the amount Plaintiffs and the Class would have been paid if the price for raw Grade A milk had been determined by a competitive market. Plaintiffs and Class members were therefore directly injured by Defendants' misconduct.

## II.  JURISDICTION AND VENUE

14.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and Class members by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations.

---

[1]   https://www.justice.gov/opa/pr/justice-department-and-us-department-agriculture-launch-online-tool-allowing-farmers-ranchers.

15.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 & 1337, and Sections 4 and 16 of the Clayton Act 15 U.S.C. §§ 15 and 26.

16.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business, or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

17.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) is headquartered and/or incorporated within this District; (b) transacted business in this District; (c) marketed, processed, and/or shipped raw Grade A milk in this District; (d) had substantial contacts with this District; and/or (e) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business in this District.

18.     Defendants market, process, and ship Grade A milk across state lines. Defendants receive substantial payments across state lines from the sale of fluid Grade A milk, and Defendants' business activities that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

19.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

20.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III. PARTIES

**A.    Plaintiffs**

21.    Othart Dairy Farms, LLC ("Othart"), is a New Mexico limited liability company, organized and existing under the laws of the State of New Mexico, and located in Veguita, New Mexico. During all times relevant to the Complaint, Othart marketed its raw Grade A milk through Defendant DFA and was paid artificially depressed prices.

22.    Pareo Farm Inc. and Pareo Farm II Inc. ("Pareo") are domestic profit corporations, organized and existing under the laws of the State of New Mexico, and located in Veguita, New Mexico. In September 2021, Pareo Farm Inc. was forced to sell off its dairy-production assets and ceased to function as a dairy. In March 2022, Pareo Farm II Inc. was forced to sell off its dairy-production assets and ceased to function as a dairy. Before these sales, Pareo marketed its raw Grade A milk through Defendant DFA and was paid artificially depressed prices for the milk it produced.

23.    Desertland Dairy, LLC ("Desertland") is a New Mexico limited liability company, organized and existing under the laws of the State of New Mexico, and located in Vado, New Mexico. During all times relevant to the Complaint, Desertland marketed its raw Grade A milk through Defendant DFA and was paid artificially depressed prices.

24.    Del Oro Dairy, LLC ("Del Oro") is a New Mexico limited liability company, organized and existing under the laws of the State of New Mexico, and located in Mesquite, New Mexico. During all times relevant to the Complaint, Del Oro marketed its raw Grade A milk through Defendant DFA and was paid artificially depressed prices.

25.    Bright Star Dairy, LLC ("Bright Star") is a New Mexico limited liability company, organized and existing under the laws of the State of New Mexico, and located in Mesquite, New

Mexico. During all times relevant to the Complaint, Bright Star marketed its raw Grade A milk through Defendant DFA and was paid artificially depressed prices.

26.     Sunset Dairy, LLC ("Sunset") is a New Mexico limited liability company, organized and existing under the laws of the State of New Mexico, and located in Mesquite, New Mexico. During all times relevant to the Complaint, Sunset marketed its raw Grade A milk through Defendant DFA and was paid artificially depressed prices.

**B.      Defendants**

27.     Defendant Dairy Farmers of America, Inc. ("DFA") is a not-for-profit corporation organized and existing under the laws of the State of Kansas, with its principal place of business at 1405 N. 98th Street, Kansas City, Kansas 66111. DFA's Southwest Area office is located at 3500 William D. Tate Avenue, Suite 100, Grapevine, TX 76051. Pursuant to the Kansas Cooperative Marketing Act, DFA is organized as a "nonprofit, as [it is] not organized to make a profit for [itself] . . . but only for [its] members as producers." K.S.A. § 17-1602(b).

28.     Defendant Select Milk is a not-for-profit marketing cooperative association organized and existing under the laws of the State of New Mexico, with its principal place of business located at 320 W. Hermosa Drive, Artesia, New Mexico 88210. Select Milk was formed in 1994, and is presently composed of 99 dairy farm members. In September 2014, Select Milk merged with Continental Dairy Products (an Ohio-based cooperative), with the combined entity retaining the Select Milk name, and keeping Select Milk's existing headquarters in New Mexico.

29.     Defendant Greater Southwest Agency, Inc. ("GSA") was founded in 1998 by DFA, Select Milk, Lone Star Milk Producers ("Lone Star"), and Zia Milk Producers. As alleged *infra*, Zia Milk Producers ceased to exist in late 2018, with its members joining DFA. Accordingly, GSA

8

is owned by DFA, Select Milk, and Lone Star.[2] Thus, the members of GSA's three cooperative-owners supply nearly 100% of all milk marketed in the Southwest through cooperatives, and therefore, approximately 85-90% of all raw Grade A milk from the Southwest. According to the Texas Comptroller of Public Accounts' website, GSA shares its mailing address with DFA's Southwest Area office, located at 3500 William D. Tate Avenue, Suite 100, Grapevine, TX 76051.

30.     Whenever reference is made to any act of any corporation or cooperative, the allegation means that the cooperative engaged in the act by or through its officers, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the cooperative's business or affairs.

31.     Each Defendant named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

32.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV. AGENTS AND CO-CONSPIRATORS

33.     Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. These include, but are not limited to, Richard "Rick" P. Smith, Dennis Rodenbaugh, Lone Star Milk Producers, Southwestern Cooperative Marketing Agency, the United Dairymen of Arizona, and others. The Defendants are jointly and severally liable for the acts of their Co-Conspirators whether or not named as defendants in this Complaint.

---

[2] Based on publicly-available information, it is unclear if Lone Star remains a member of GSA. At a minimum, Lone Star was part of GSA during at least some of the Class Period alleged herein.

34.     Richard "Rick" P. Smith is DFA's President and Chief Executive Officer, having served in those capacities since 2006. Smith also serves as a director on the boards of Global Dairy Platform, National Milk Producers Federation, National Council of Farmer Cooperatives, and the Innovation Center for U.S. Dairy. It has been announced that effective at the end of 2022, Rodenbaugh will succeed Smith as President and CEO of DFA.

35.     Dennis Rodenbaugh is DFA's Executive Vice President and President of Council Operations and Ingredient Solutions, having joined DFA in 2007. During his tenure with DFA, Rodenbaugh has served in a number of leadership roles, and presently has responsibility for overseeing U.S. milk marketing and farm services, as well as the 24 commercial manufacturing plants and global marketing operations of DFA's Ingredient Solutions Division. Rodenbaugh serves on the board of directors for National Milk Producers Federation, and has been named as Smith's successor in the roles of DFA's President and CEO effective at the end of 2022. In addition, Rodenbaugh serves as Chairman of the Board of Newtrient, a manure-management company jointly owned by several different dairy cooperatives, including Select Milk and Co-Conspirator UDA.

36.     Lone Star Milk Producers ("Lone Star") is a dairy cooperative that was formed in 1997 and is headquartered in Wichita Falls, Texas. According to its website, Lone Star has approximately 125 farmers, including within New Mexico, Texas, Kansas, and Oklahoma, who collectively produce approximately 2.6 billion pounds annually. Like DFA and Select Milk, Lone Star is also a member of both the GSA and the Southwestern Cooperative Marketing Association.

37.     Southwestern Cooperative Marketing Agency ("SCMA," sometimes also referred to as the Southern Cooperatives Marketing Agency) is a marketing agency with three members: DFA, Select Milk, and Lone Star. These members have used SCMA to lobby the federal

government (specifically the USDA) to implement price changes at the FMMO level, and upon information and belief, have used the SCMA as another mechanism for sharing price information to stabilize, fix, and maintain at artificially low the rates paid by DFA and Select Milk to their member-farmers for the Grade A milk those farmers produce. Tim Theisner, who serves as DFA's Chief Operating Officer of the Southwest Area, is a member of the SCMA's Board of Directors (in addition to being manager of GSA and serving on the board of Southwest Cheese, one of the joint ventures between DFA and Select Milk).

38.     United Dairymen of Arizona ("UDA") is the only dairy cooperative that works as a handler in the Arizona FMMO (No. 131). In testimony before the USDA, DFA stated: "[w]e do not pool milk in [the Arizona FMMO] but have an extensive marketing arrangement with the dairy farmer members of United Dairymen of Arizona (UDA) for the purchase of supplemental milk supplies and to provide seasonal balancing services to DFA. UDA markets and pools milk on [the Arizona FMMO]."

39.     The acts alleged herein that were done by each of the Co-Conspirators were fully authorized by each of those Co-Conspirators, or ordered, or done by duly authorized officers, managers, agents, employees, or representatives of each Co-Conspirator while actively engaged in the management direction or control of its affairs. The acts charged in this Class Action Complaint as having been done by Defendants and their Co-Conspirators were authorized, ordered, and/or done by their officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

## V.  TRADE AND COMMERCE

40.     During the Class Period, Defendants DFA and Select Milk, directly or through their subsidiaries or other affiliates, including GSA, marketed and sold raw Grade A milk from their

member-farmers in the Southwest in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

41.     During the Class Period, Defendants DFA and Select Milk collectively controlled a majority of the market for the supply of raw Grade A milk in the Southwest.

42.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected interstate trade and commerce throughout the United States, including within the Southwest and this judicial district, and caused antitrust injury to Plaintiffs and Class members.

## VI. FACTUAL ALLEGATIONS

### A.     Background on the Dairy Industry

#### 1.     Basics of Raw Grade A Milk

43.     Grade A milk is homogenous, fungible, and highly perishable. Dairy farmers produce raw Grade A milk on a daily basis, and it must be transported from their farms to Grade A milk processing facilities nearly every day. Dairy farmers milk their cows at least twice each day. Fluid Grade A milk is typically stored in refrigerated bulk tanks until it is picked up by a milk hauler who transports it in insulated trucks to fluid Grade A milk bottling plants. Fluid Grade A milk bottling plants prepare Grade A milk for human consumption by processing and packaging the raw fluid Grade A milk in bottles or cartons for wholesale or retail sale. Fluid Grade A milk is regularly shipped and sold in interstate commerce.

44.     Dairy farmers must find a buyer that will take their milk regardless of demand. Historically, this frequently placed dairy farmers at the mercy of large milk processors that sought to buy raw milk at the cheapest price.

2. **The Southwest Dairy Production Market Is Worth More than $3.5 Billion Annually**

45.     In 2020, the USDA's Milk Production report showed that annual milk production in the United States was about 223 billion pounds. In 2020, Texas and New Mexico were the fifth and ninth largest milk producing states. In 2020, Texas dairy farmers alone produced nearly 15 billion pounds of milk, and New Mexico dairy farmers alone produced over 8 billion pounds of milk. These 23 billion pounds represent 230 million hundredweight of milk, and suggest an annual market in excess of $3.5 billion.

3. **There Are No Significant Substitutes for Milk and Milk Products**

46.     There are no significant substitutes for milk. Although there are potential substitute products, such as alternative "milk" products derived from plants-based sources like almonds, oats, or soybeans, the characteristics of those products lack the unique characteristics of milk. Milk is distinctive in that it can be both consumed and processed into other foods, such as cheese, milk powder, whey, ice cream, yogurt, and many others. True milk also has more protein than the alternative "milk" products, making milk a unique source of nutrition. Milk is a relatively inexpensive source of protein upon which many American consumers rely.

4. **The Capper-Volstead Act**

47.     In 1922, Congress enacted the Capper-Volstead Act to give farmers greater bargaining power with processors and other corporate handlers of food products. Capper-Volstead was designed to give farmers the legal right to join together in cooperative associations, and provided those cooperatives with limited antitrust immunity "in collectively processing, preparing for market, handling, and marketing" their products and permits organizations to have "marketing agencies in common." Without Capper-Volstead, family farmers would not be able to compete given their lack of bargaining power in dealing with comparatively few, large buyers.

48.     Congress therefore passed Capper-Volstead to help equalize farmers' bargaining power with processors, by encouraging "the formation of agricultural cooperatives intended to countervail the monopsony power then held by the corporate purchasers."[3] Capper-Volstead thus provides that dairy farmers "may act together in associations . . . in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" their milk.[4] Capper-Volstead further provides that these "associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purpose" *as long as* "*such associations are operated for the mutual benefit of the members thereof* . . . ."[5]

49.     DFA and other dairy cooperatives have abused this system. This abuse has led the DOJ to recently comment on the limited antitrust immunity afforded by Capper-Volstead for DFA and similar dairy cooperatives that conspire to depress pay to their farmer-owners:

> *It would be inconsistent with the Act's text and purpose to allow a [cooperative] to use the Act as a shield when it acts as a food processor or exercises monopsony power to harm individual farmers.* With respect to conspiracy claims under Section 1 of the Sherman Act . . . *the Capper-Volstead Act does not protect a cooperative's agreements with non-cooperatives, and it should not protect agreements between cooperatives that have nothing to do with "processing, preparing for market, handling, and marketing" the cooperatives' products.* With respect to monopsony claims under Section 2 of the Sherman Act . . . the range of "predatory" conduct that falls outside the scope of the Act's exemption should be construed broadly to include exclusionary acts, and the totality of the defendant's predatory acts should be considered.[6]

---

[3] *See* Jon Lauck, *Toward an Agrarian Antitrust: A New Direction for Agricultural Law*, 75 N.D. L. REV. 449, 492 & n. 284 (1999), quoting David L. Baumer, *et al.*, *Curdling the Competition: An Economic and Legal Analysis of the Antitrust Exemptions for Agriculture*, 31 VILL. L. REV. 183, 185 (1986).

[4] 7 U.S.C. § 291.

[5] *Id.* (emphasis added).

[6] *See Sitts v. Dairy Farmers of America, Inc., et al.*, No. 2:16-cv-00287-cr, Dkt. No. 285, at 1-2 (D. Vt. July 27, 2020) (Statement of Interest on Behalf of the United States of America) (emphasis added).

5.      **Milk Balancing and Milk Classes**

50.      Milk processors process raw milk purchased from cooperatives, independent dairy farmers, or other supply plants into dairy products for human consumption. Processors process milk into a variety of fluid products, as well as cheeses, ice cream, butter, milk powder, and a slew of other milk products. Milk processing plants then sell the processed milk to retail outlets, such as grocery stores. Milk processors include independent processing plants, processors owned by cooperatives or in joint ventures with cooperatives, and retail supermarket chains that own their own processing plants.

51.      Balancing is the process through which a "balancing plant" accepts excess milk supply so that it may be converted into other dairy products that are less perishable than fluid, drinking milk – products such as butter, nonfat dry milk, cheese, ice cream, sour cream, and yogurt. Access to balancing plants is essential to dairy farmers due to weekly and season variations in fluid Grade A milk supply and demand. When supply of fluid Grade A milk exceeds demand, balancing plants convert bulk supplies of surplus fluid Grade A milk into storable, non-fluid commodities like cheese or powdered milk.

52.      It would be nearly impossible for a dairy farmer to operate in the Southwest market without access to Grade A milk balancing plants.

53.      Defendants control many of the balancing plants in the Southwest. For example, Defendant Select Milk owns Continental Dairy Facilities Southwest, LLC, a balancing plant in Littlefield, Texas. DFA opened its massive Garden City, Kansas balancing plant in 2018.

54.      Federal milk sanitation standards distinguish between milk eligible for use in fluid products, known as Grade A milk, and milk eligible only for manufactured dairy products, known as Grade B milk. Ninety-nine percent of total U.S. milk production involves Grade A milk. The

highest standards are established for Grade A milk because of safety risks associated with fluid milk products. There is no substitute for Grade A milk.

55.     Pursuant to the 1937 Agriculture Act, the Secretary of the USDA classifies Grade A milk into four classes for minimum pricing purposes, based upon the actual end-use of the milk:

> a.  Class I milk is used in beverage milk ("fluid use") products for human consumption, including eggnog and ultra-high temperature milk;
>
> b.  Class II milk is commonly used to manufacture "soft" dairy products, such as ricotta cheese, sour cream, cottage cheese, ice cream, yogurt, and custards;
>
> c.  Class III milk, also known as "cheese milk," is commonly used to manufacture "hard" dairy products, like cheddar cheese, as well as cream cheese and other spreadable cheeses; and
>
> d.  Class IV milk is commonly used to produce butter, nonfat dry milk, and skim milk powder.

**6.     Dairy Production in the United States**

56.     In 2018, DFA nationwide represented over 8,000 farms producing 52.7 billion pounds of milk, by far the largest dairy cooperative in the United States (as well as in the Southwest). Select Milk represented approximately 100 farms producing 7.8 billion pounds of milk. Co-Conspirator Lone Star represented just 1.4% of the farms of DFA and Select Milk, and just 2.6% of the milk produced by DFA and Select Milk in 2018. Upon information and belief, approximately 85-90% of milk produced in the Southwest is marketed through dairy cooperatives.

57.     DFA's 2019 Annual Report shows that DFA markets more milk from the Southwest than any of its other regional areas. The Southwest was first at 14.2 billion pounds; the Northeast second with 13.2 billion, then the Western region was third with 10.0 billion.

7.     **History of and Background on DFA and Select Milk**

a.     **DFA**

58.     DFA was formed in 1998 when Associated Milk Producers, Inc., Mid-America Dairymen, Inc., Milk Marketing, Inc., and Western Dairymen Cooperative, Inc., merged to form the largest cooperative in the United States. Over the years, many other cooperatives merged into DFA, including Independent Cooperative Milk Producers Association, Valley of Virginia Milk Producers Association, Black Hills Milk Producers, California Cooperative Creamery, Dairylea, and Zia Milk Producers.

59.     DFA is by far the largest dairy cooperative in the United States, with approximately 12,500 members,[7] several hundreds of which are in the Southwest. In 2018, DFA's members produced approximately 52.7 billion pounds of milk, over three times as much milk as the second largest cooperative, California Dairies, Inc. DFA controls an overwhelming percentage of the fluid Grade A milk produced within DFA's Southwest region,. DFA is a vertically integrated cooperative that controls not only fluid Grade A milk production, but also marketing, hauling, processing, bottling, and distribution of fluid Grade A milk in the Southwest. DFA has grown so large that in 2018, it opened a "satellite" office in Singapore.

60.     DFA has various private label and proprietary brands of dairy products, including but not limited to Borden, Breakstone's, Cache Valley, Friendly's, Country Fresh, Jilbert Dairy, Hotel Bar, Keller's, Lehigh Valley Dairy Farms, Meadow Gold, T.G. Lee, La Vaquita, Plugra, Kemps, LLC, Garelick Farms, Guida-Seibert Dairy Company, Dairy Maid Dairy, Oakhurst Dairy, Cold Front Distribution, Cumberland Dairy, LLC, and many others.

---

[7] Some farms have multiple members.

### b.  Select Milk

61.     Defendant Select Milk was formed in 1994 in Artesia, New Mexico. Like DFA, Select Milk and its management has invested large sums of their members' money and equity in developing commercial operations, focused on milk hauling, bottling, processing, manufacturing.

62.     In September 2014, Select Milk merged with Continental Dairy Products (an Ohio-based cooperative), with the combined entity retaining the Select Milk name, and keeping Select Milk's existing headquarters in New Mexico. As a result of this combination, Select Milk added "36 large farms in Ohio, Indiana, and Michigan . . . ." After DFA, Select Milk controls by far the second largest percentage of the fluid Grade A milk produced within DFA's Southwest region.

63.     In 2018, Select Milk was the seventh largest dairy cooperative nationwide, producing about 7.8 billion pounds of milk. Select Milk participates in at least 7 joint ventures, has 16 subsidiaries, and owns or operates 8 processing and/or bottling plants. Select Milk's joint ventures include Southwest Cheese (New Mexico, with DFA), Continental Dairy Facilities Southwest (Texas), and Farmers Select (Texas). Select Milk's management is motivated to supply its commercial operations with raw Grade A milk obtained at the lowest possible price.

64.     In 2015, Select Milk acquired a former cotton mill known as the Littlefield Denim Mill, in Littlefield, Texas, and announced it would spend $250 million to convert the facility to a processing plant. Select Milk's Littlefield facility is Continental Dairy Facilities Southwest, a balancing plant where Select Milk processes raw Grade A milk into cream, condensed skimmed milk, unsalted and salted butter, and various milk powders.

65.     In 2012, Select Milk partnered with Coca-Cola, via a joint venture, to form Fairlife, LLC, through which Select Milk processed and sold various "value added" dairy beverages. In January 2020, Coca-Cola acquired the remaining stake in Fairlife. In this one-off situation, Select

Milk has paid or will pay its members installments associated with the profit Select Milk generated through the sale of its share of Fairlife Coca-Cola, though such payments do not offset or eclipse the far larger amount Select Milk has underpaid its farmers as alleged in this Complaint.

### 8.    DFA's Regions

66.     Being the largest dairy cooperative in the nation, DFA is divided into seven areas (Central, Mideast, Mountain, Northeast, Southeast, Western, and the Southwest). DFA's Southwest Area includes all of New Mexico, most of Texas except the eastern portion, the Oklahoma panhandle, eastern Arizona, and southwestern Kansas). Defendants have largely commandeered Southwest milk pricing, limiting the effect and significance of FMMO price "minimums." Thus, this lawsuit involves a geographic market encompassing DFA's Southwest Area. This is detailed in a map of DFA's area regions, from DFA's website:



67.     Within the Southwest, DFA and its affiliates have facilities located in at least, but not limited to, Portales, New Mexico, Clovis, New Mexico, Roswell, New Mexico, Houston, Texas, Schulenburg, Texas, Stephenville, Texas, and Garden City, Kansas.



68.     DFA has numerous subsidiaries in the Southwest, including Creamland Dairies, Inc. (in both New Mexico and Texas), Dean's Dairy (Texas), Gandy's Dairy (Texas), Hygeia Dairy (Texas), and Price's Dairy (Texas). Furthermore, DFA is party to numerous joint ventures throughout the United States, including Southwest Cheese (New Mexico – with Select Milk) and Michigan Cheese (Michigan – also with Select Milk).

69.     Because DFA is the dominant supplier of raw Grade A milk both in the Southwest and nationwide, DFA has forced dairy producers and handlers within the region, including Select Milk and Co-Conspirator Lone Star, to play by DFA's rules and geographic landscape with respect to underpaying farmers.

70.     Dairy farmers do not have substitute markets available for their raw Grade A milk and Southwestern dairy farmers cannot turn to cooperatives, bottlers, or customers outside of the

Southwest as a reasonable substitute to being members of the DFA and/or Select Milk cooperatives.

### 9.    Dairy Industry History

71.    Around the time DFA came into existence in 1998, Texas-based dairy company Suiza Foods ("Suiza") had become the largest fluid milk processor in the United States, owning 67 milk processing plants in 29 states with net sales in excess of $5 billion.  At the same time, the old version of Dean Foods ("Old Dean"), had become the second-largest buyer of raw milk and the second-largest bottler of processed milk in the United States, operating 43 dairy processing plants in 19 states, with net sales of approximately $4.3 billion.

72.    In 2001 therefore, DFA was the largest dairy producer, Suiza was the largest processor, and Old Dean was the second-largest processor. DFA supplied raw milk to Suiza, while independent dairy farmers supplied raw milk to Old Dean. Suiza's supply costs from DFA were much higher than Old Dean's independent sources of milk supply.

73.    In 2001, Suiza and Old Dean announced plans to merge and operate under the merged name of Dean Foods Company. This merger has been described as "a case study in how unchecked mergers beget abusive monopolies that harm both farmers and consumers."  As part of the merger, Suiza and Old Dean agreed to a long-term, exclusive-dealing arrangement in which the new Dean Foods entity would exclusively buy all of its raw milk from DFA (thereby incurring a higher milk supply cost) for 20 years. DFA, in return, agreed that the divested milk processing plants it owned as part of a DOJ-mandated competitive constraint on the merger would not, in fact, compete with the newly-merged Dean Foods. In other words, DFA agreed not to compete with Dean at the processing level in exchange for full supply rights to the combined company.

21

74.     In reviewing the proposed merger, the DOJ expressed concerns relating to post-merger competition: (1) the need for open competition for the supply of raw milk to the newly-created milk processing company; and (2) the need for Dean Foods to divest certain plants to preserve competition at the milk processing level.

75.     The first concern was driven both by an analysis of the then-current state of competition among milk producers, as well as by the fact that DFA was party to a 1977 Consent Decree  limiting its ability to enter into contracts for the sale of raw milk with a duration in excess of one year. To avoid this limitation, the parties to the Suiza-Dean merger made a deceptively limited presentation to the DOJ by disclosing a series of milk supply contracts between DFA and Dean. Those contracts were for one-year terms that would be renewed in successive years if not terminated by the parties. The contracts also contained "competitive pricing clauses" that would allow Dean to purchase milk from lower-cost providers.

76.     However, the parties to the Suiza-Dean merger hid from the DOJ that they had also entered into an unlawful separate agreement – a promissory side note – that imposed the very restriction on competition for raw milk purchases the parties said did not exist. On December 21, 2001, Dean issued a contingent, subordinated promissory note to DFA in the original principal amount of $40 million. This "Side Note" had a 20-year term that bore interest based on the consumer price index. Interest would not be paid in cash, but rather, would be added to the principal amount of the note annually, up to a maximum principal amount of $96 million. This Side Note would become payable only if Dean materially breached or terminated its milk supply agreement with DFA without renewal or replacement. Otherwise, the Side Note would expire in April 2021, without any obligation to pay any portion of the principal or interest.  In other words,

the Side Note effectively created a $96 million penalty if Dean did not purchase its raw milk from DFA, notwithstanding the terms of the relevant supply contracts.

77.     In exchange for this Side Note was a second illegal side agreement that prevented competition between Dean and the processing plants being divested by Dean in the merger – undermining the second concern raised by the DOJ. Under the merger, the parties created a new company, controlled by DFA, which would own the milk processing plants divested in connection with the merger. The parties then also entered into an illegal non-compete agreement through which those divested plants would not compete vigorously with Dean. Put differently, at the same time the merging parties were holding these processing plants out to the DOJ as viable plants that would preserve competition, they had secretly agreed to not vigorously compete. The parties were aware at the time of the merger that some of those plants would close right after the merger.

78.     DFA went to great lengths to avoid detection and handsomely rewarded the members of the conspiracy to keep their loyalty.  This resulted in, inter alia, antitrust class litigation in the Northeast, Southeast, and Appalachian FMMOs, as alleged infra.

79.     On November 12, 2019, Dean Foods initiated bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, Case No. 19-36313. When it filed its bankruptcy petition, Dean Foods issued a press release stating that it was in advanced negotiations with DFA – only DFA – to sell substantially all of its assets to DFA in a bankruptcy process designed to avoid antitrust scrutiny.

80.     On March 31, 2020, Dean announced DFA as the winning bidder for the assets DFA had bid on. The Bankruptcy Court approved DFA to purchase 44 of Dean's 57 fluid milk plants, along with various other assets (including the real estate, inventory, and equipment), for a total value of $433 million. The purchase price consists of $325 million in case and $108 million

in debt forgiveness (owed by Dean to DFA). On May 1, 2020, DFA and Dean closed on the asset sale, rendering DFA both the largest milk producer and the largest milk processor in the United States.[8] DFA now controls supply rights to the legacy Dean plants in perpetuity.

81.     Several of the 44 former Dean facilities that DFA purchased in the bankruptcy sale are located in the Southwest. These include: Dean West II, LLC and DFC Aviation Services, LLC (in Dallas, TX), Fresh Dairy Delivery, LLC (in El Paso, TX), and Gandy's Dairies, LLC (in Lubbock, TX).

82.     DFA's acquisition of the majority of Dean's assets "means that dairy farmers have even fewer processors competing to buy their milk." A farmer and former DFA board member stated: "As a producer, I'm concerned about DFA making this large a purchase. . . . It puts a lot of the control of the fluid market in the hands of one co-op. That sends a little fear as far as the milk price goes, because they can literally dictate what they pay for milk."

83.     Commentators have further highlighted that DFA's acquisition of most of Dean's assets "would exacerbate DFA's conflict of interest between its processing operations and its members, since processing operations reap higher profits the less they pay farmers for milk. . . . *[A] fair share of processing profits 'never seems to make it to the farmers.'*"

**10.     Federal Milk Policy and Pricing**

84.     There is an old adage in the dairy industry: "only five people in the world know how milk is priced in the U.S., and four of them are dead." Milk pricing in the United States is

---

[8] On the evening the sale of Dean's assets to DFA closed, DFA and the DOJ consented to the divestiture of three of the 44 legacy Dean plants within 30 days, one plant each in Illinois, Wisconsin, and Massachusetts. *See United States v. Dairy Farmers of America, Inc., et al.*, No. 1:20-cv-2658 (N.D. Ill.), ECF No. 4 (May 1, 2020). The plants in Illinois and Wisconsin were divested, while DFA retained the Massachusetts plant as no bids were submitted therefor.

amongst the most complicated commodity pricing regimes in all of agriculture. DFA and Select Milk have exploited this complication.

85.     Each month, USDA's milk market administrators calculate minimum prices pursuant to USDA formulae for each of the four classes of Grade A milk marketed in each of the geographic regions, known as FMMOs. The different Class prices are derived from different component values, which are in turn, derived from several commodity prices. Several steps are involved in determining farm-level milk prices for farmers pooling on an FMMO. As alleged herein, FMMO prices serve as reference points. ***DFA and Select Milk are not obligated to and do not pay their members the FMMO-established prices.*** Nevertheless, an understanding of the FMMO pricing regime is helpful.

86.     First, each week, through mandatory price reporting, dairy manufacturers report to the USDA the value and sales volume of wholesale butter, cheddar cheese, nonfat dry milk, and dry whey. As vertically-integrated entities with massive commercial operations, DFA and Select Milk would be among the many "dairy manufacturers" who report such values.

87.     Second, these weekly reported prices are used to determine two-week and monthly weighted average commodity values. The two-week prices are used to determine advanced pricing factors for pricing both fluid milk and cultured products. The monthly weighted average commodity prices are used to determine both the component value and the classified value of milk. The two-week and monthly prices use "end-product pricing" formulae to determine the "classified value." The following chart shows an example of the end-product pricing formulae, as the cheese price is used to determine the protein value, which is used to determine the classified value for

milk used to produce cheese, which then goes to the FMMO revenue sharing pool, which is then used to determine the farm-level regulated minimum milk price in that FMMO[9]:

## Figure 2. Commodity Value Flows in Pricing



88.     Until recently, Class I prices were calculated by using the higher of Class III and Class IV advanced pricing factors. However, as of May 1, 2019, the Class I skim milk price formula became the average of the monthly Class III and Class IV advanced skim pricing factors plus 74 cents per cwt and including the applicable adjusted Class I differential. Class I prices share a common base value, but vary by particular area. This is due to the Class I differential, which varies due to specific supply and demand fundamentals of Class I fluid (drinking) milk.

89.     As noted herein, the Southwest FMMO No. 126 (which differs from DFA's Southwest region, the focus of this lawsuit) uses multiple component pricing, which is designed to arrive at a milk price that is derived from the end products made from the milk. The basic

---

[9] *See* https://www.fb.org/market-intel/how-milk-is-priced-in-federal-milk-marketing-orders-a-primer.

formula for multiple component pricing is: Component Value = Yield x (Commodity Price – Make Allowance). This is where the "Yield" is how much of the commodity can be made from the milk;[10] the "Commodity Price" is the value of the end product, based on USDA surveys; and the "Make Allowance" is the manufacturing cost of processing the milk into the end commodity. The component values are then used to determine the minimum prices for the FMMO, which again, serve as reference points but do not represent what the cooperatives pay their members. There are four different components involved: (1) butterfat, which derives its value from the price of butter; (2) nonfat solids, which derive their value from the nonfat dry milk price; (3) protein, which derives its value from cheese and butterfat prices; and other solids, which derive their value from the dry whey price. Importantly, the "Yield" and "Make Allowance" inputs are fixed and can only be changed through a rulemaking proceeding. Only the "Commodity Price" changes, on a monthly basis.[11]

90.     As noted above, each week, large manufacturers are required to report data on sales transactions for cheddar cheese, dry whey, nonfat dry milk, and butter, which data are then aggregated and published in the National Dairy Products Sales Report.

91.     The component and classified values are used in the final step of milk pricing – the revenue sharing pools. Here, the handler's value of the milk is the handler's (for present purposes, DFA or Select Milk) obligation to the pool, from which the component value of the milk is

---

[10]   The question is how much product can be made from one pound of the component that is priced. For example, the butterfat price = (butter price – butter MA) x butterfat yield, where yield is 1.211, the pounds of butter that can be made from 1 pound of butterfat. Because butter is about 20% water, 1 pound of butterfat results in approximately 1.2 pounds of butter.

[11]   "Make Allowances" are the processing credits designed to reflect the average processing costs associated with producing cheese, butter, nonfat dry milk, and/or dry whey. "Yield Factors" represent the volume of the finished commodity produced from processing one pound of the component.

deducted. The handler has the right to draw from the pool based on the components it has pooled. The residual, if positive, is distributed based on pounds of milk pooled and plant location. If the residual is negative, then pooled handlers must pay to the pool based on pounds of milk pooled and plant location.

92.     The value to the producer of the milk is then based on the components of the pool, and is based on the announced component prices for fat, protein, or other solids. The equity payment from the FMMO pool is called the producer price differential, or "PPD." The PPD is defined as the difference between the handler value and the component (or producer) value, divided by total pounds in the FMMO pool. PPD is adjusted to plant location before it is paid to the producer.

93.     The percent of usage of each Class of milk is used to develop the FMMO price. For example, as an approximation (and keeping in mind that obligations to the FMMO pool are component-based), assuming all milk remained in the FMMO pool for a given month, if Class I milk was valued at $22.00 and comprised 50% of the market for the month, Class II milk was valued at $21.00 and comprised 12.5% of the market for the month, Class III milk was valued at $20.00 and comprised 25% of the market for the month, and Class IV milk was valued at $19.00 and comprised 12.5% of the market for the month, the statistical uniform price for that FMMO pool for that month would be:

(22.00 x .5) + (21.00 x .125) + (20.00 x .25) + (19.00 x .125) = $21.00 per cwt[12]

94.     In an unrestrained market, Southwestern dairy farmers, such as Plaintiffs and other members of the proposed Class, would be able to obtain a price for their raw Grade A milk that

---

[12] "Cwt" is the abbreviation for hundredweight.

would reflect actual market conditions and help to sustain raw Grade A milk production in the Southwest. However, Defendants' illegal conspiracy has substantially restrained competition, forcing farmers to increasingly join DFA or Select Milk. In so doing, Defendants have depressed and fixed at artificially low prices the prices dairy farmers receive for the raw Grade A milk they produce.

### 11.    Federal Milk Marketing Orders

95.    Before Congress established the FMMO system in the 1930s, milk dealers (now referred to as "handlers") became the main agents for moving farmers' milk into areas of larger consumption. Before the FMMO system was created, no standard pricing systems existed, meaning handlers controlled the price that farmers received. Since milk is highly perishable, local handlers "were perceived as having asymmetric market power over producers that resulted in unfair buying practices." FMMOs were therefore designed to level the playing field by returning some market power to farmer-producers.

96.    There are presently 11 FMMOs. The Southwest FMMO, No. 126, covers all of New Mexico and Texas, and a small portion of the southwest corner of Colorado. DFA's Southwest region, the relevant geographic market, covers all of New Mexico, the majority of Texas excluding the eastern portion of the state, the eastern portion of Arizona, the Oklahoma panhandle, and the southwestern corner of Kansas. It does not include any portion of Colorado. As noted elsewhere, this Complaint focuses on the actual prices that dairy farmers are receiving from DFA and Select, which have been artificially depressed through Defendants' conduct.

97.    Historically (but not always anymore, as explained below), Class I fluid milk receives the highest minimum price under the FMMO system. Surplus fluid milk, used for Classes II to IV, was typically priced lower than fluid milk. This is designed to prevent excess supply from

depressing the price of milk to dairy farmers to the point where supply could become endangered and so that Class I handlers can obtain all of the milk they require.

98.     The minimum blend price for an order is based upon the end uses of all Grade A milk pooled on that order. For example, if 60% of all Grade A milk pooled on a FMMO was used as Class I milk and the remaining 40% was used as Class III milk, the minimum blend price for all Grade A milk pooled on the FMMO would consist of the Class I price for 60% and the Class III price for 40%. If the Class I price is $2.00 per pound and the Class III price is $1.50 per pound, the minimum blend price would be $1.80 per pound.

99.     Due to seasonal and other variations in Grade A milk production and demand and uneven distribution of dairy farmers throughout the United States, Class I utilization, historically the highest valued use of Grade A milk in the USDA pricing scheme, varies between orders. Class I, fluid use consumption, is lower in the Southwest than in most other areas of the country, while Class III (cheese use) is higher in this region than in most others.

100.     Unlike other handlers, such as distributing and supply plants, dairy cooperatives like DFA and Select Milk may pay their producer members in whatever manner the cooperative determines, and are not obligated to pay the FMMO minimum prices. However, milk from cooperatives is classified and pooled (assuming the milk is pooled, as discussed *infra*) like milk from other handlers. Put differently, assuming the cooperative pools its milk for a given month in a given FMMO, the cooperative assumes certain financial rights and obligations towards the pool (*i.e.*, the right to draw money from the pool or the obligation to pay money to the pool). Just how DFA and Select Milk calculate the costs and expenses they pass on to their members—which need not be reported to the USDA and which appear, if at all, only as summary line item deductions on Class members' pay statements—is unclear and Defendants exploit this to their advantage.

B.     **The Structure and Characteristics of the Southwest Dairy Market Render the Conspiracy Economically Plausible**

1.     **Milk Is a Commodity**

101.    Raw Grade A milk is a highly-perishable commodity product with little to no product differentiation among producer-farmers, as recognized by the USDA and numerous other authoritative sources. After a milk hauler or transportation service collects milk from a dairy farm, the milk is typically comingled and stored together in factory sites, processors, or other collective facilities. There is no need to separate the raw Grade A milk based on the specific farmer-producer.

2.     **The Market Is Characterized by Inelastic Demand**

102.    Consumer demand for raw Grade A milk is relatively unaffected by price because milk is historically considered to be an inexpensive good, such that even when prices fluctuate, milk comprises a relatively small share of consumers' budgets. This inelasticity is a critical long-running factor that influences raw Grade A milk output such that even small changes in supply can result in large price fluctuations.

3.     **The Southwest Dairy Industry Is Highly Concentrated and Has Experienced High Consolidation**

103.    According to USDA data, from 1997 to 2017, the total number of U.S. dairy farms decreased by more than half (from 125,041 to 54,599), while the number of dairy cows per farm more than doubled (from 73 to 175).[13] In 1975, in the FMMO No. 126, there were 4,006 producers averaging 2,283 pounds of milk per day. In 1995, there were 2,071 producers average 8,685 pounds per day. In 2020, there were 448 producers averaging 71,135 pounds per day.[14] In other words,

---

[13] *See* https://www.gao.gov/assets/gao-19-695r.pdf at 3. Reference to FMMO No. 126 is made as public data is not available for DFA's Southwest region.

[14] https://www.dallasma.com/file_map/sum/Stat7595.xlw; https://www.dallasma.com/fd?file_map=sum&downfile=2020+Statistical+Summary.pdf at 24.

over the last 45 years, the number of producers in FMMO No. 126 has fallen by nearly 90%, while the amount of milk each dairy farm produces has increased nearly 35-fold. More and more dairy farms, both nationwide and in the Southwest, are going out of business, often due to Defendants' anticompetitive misconduct.



104.    Similarly, there has been tremendous consolidation of dairy cooperatives. In 1964, there were 1,244 dairy cooperatives in the United States. In 2017, there were 118.[15] The U.S. Government Accountability Office has concluded that this consolidation has resulted in "competing interests" and "power imbalances," and that "dairy cooperatives' investments in processing facilities and the mechanisms used to finance those investments" can lead to "lower earnings in the short term, while potentially reducing market access for farmers outside the cooperative."[16] Indeed, the Government Accountability Office's 2019 report "found that the consolidation of dairy cooperatives can affect farmers' control of those cooperatives and that

---

[15] https://www.gao.gov/assets/gao-19-695r.pdf at 3-4.
[16] *Id.* at 5-6.

cooperatives' investments in dairy processing can affect farmers' earnings. ***In particular, farmers' control of cooperatives may be affected by the expansion of cooperatives to include competing interests and by voting structures that may create power imbalances.***"[17]

      **4.**    **The Southwest Dairy Industry Is Characterized by a Lack of Pricing Transparency and Asymmetric Access to Key Market Information**

     105.    As cooperatives, regardless of whether DFA and Select Milk do or do not pool milk for a given month (discussed *infra*), they are not required to pay their members the FMMO prices. Instead, DFA and Select Milk may first deduct various costs and expenses from their members' milk checks. That is, DFA and Select Milk get to pay themselves first before paying their members.

     106.    Although DFA's and Select Milk's members' monthly pay statements sometimes break out certain purported costs and expenses that the cooperatives are deducting, the calculation is nebulous at best. DFA and Select Milk do not share with their members specific information on, *inter alia*, what price DFA and Select Milk received for the milk they sold each month, specific terms of contracts or agreements with customers (including often enough, those cooperatives' own subsidiaries, affiliates, or joint ventures), and/or any breakdown of how the various costs and expenses are determined or what the members' money specifically went to.

     107.    Accordingly, DFA's and Select Milk's pricing is not transparent, and they preclude their members from access to critical market information. These cooperatives hold a significant advantage over their members as they have easier access to resources and market information.

---

[17] *Id.* at 4 (emphasis added).

**5.** **DFA Has Previously Been Investigated by the Government for Collusive Action and Has Been Repeatedly, Successfully Sued for Violations of the Federal Antitrust Laws**

      **a.** **DFA's History of Wrongdoing**

108.    In the mid-1970s, the DOJ filed antitrust actions against three dairy cooperatives: Associated Milk Producers, Inc., Dairymen, Inc., and Mid-America Dairymen, Inc., for violations of §§ 1 and 2 of the Sherman Act. *See U.S. v. Associated Milk Producers, Inc.*, No. 72-cv-49 (W.D. Tex. Feb. 1, 1972); *U.S. v. Dairymen, Inc.*, No. 73-cv-7364 (W.D. Ky. Mar. 29, 1973); and *U.S. v. Mid-America Dairymen, Inc.*, No. 73-cv-681 (W.D. Mo. Dec. 27, 1973). By these actions, the DOJ sought to address these cooperatives having entered into contracts and agreements to monopolize trade in the raw milk market. The DOJ alleged that these cooperatives accomplished their monopolies by: (1) requiring processors to contract for a set quantity of raw milk for a 12-month period and penalizing processors for failing to do so; and (2) entering into membership agreements that unreasonably restricted the rights of members to withdraw and market their milk in a freely competitive manner. Judgment was entered against each of these cooperatives, enjoining them from entering into or enforcing agreements for a term in excess of one year.

109.    In 1977, the U.S. District Court for the Western District of Missouri entered a consent decree against Mid-America Dairymen, Inc. This Consent Decree enjoined and restrained Mid-America Dairymen, Inc. from:

    a.  Using threats or coercion to induce any producer to execute or refrain from terminating a membership and marketing agreement with Mid-America Dairymen, Inc., or to deliver milk to Mid-America;

    b.  Qualifying for participation in federal milk marketing order pools with a purpose of suppressing the uniform price paid to producers participating in a federal milk marketing pool in order to force, coerce, or induce such producers who are not members of Mid-America to join Mid-America or to cease selling milk in competition with Mid-America;

c. Entering into or enforcing any contract or agreement with another cooperative or association of producers to qualify milk for participation in federal milk marketing order pools with a purpose of suppressing the uniform price paid to producers participating in a federal milk marketing order pool in order to force, coerce, or induce such producers who are not members of Mid-America Dairymen, Inc. to join Mid-America or such other cooperative or association or cease selling milk in competition with Mid-America or such other cooperative or association;

d. Entering into or enforcing any milk sales agreement containing a term in excess of one year; and

e. Joining, contributing anything of value to, or participating in any organization or association that directly or indirectly engages in or enforces any act that Mid-America Dairymen, Inc. is prohibited by the final judgment from engaging in or enforcing, or which is contrary to or inconsistent with any provision of the final judgment.

110. On January 1, 1998, DFA was created as a new marketing cooperative from the merger of four competing dairy cooperatives, Associated Milk Producers, Inc., Mid-America Dairymen, Inc., Milk Marketing, Inc., and Western Dairymen Cooperative, Inc. DFA has been bound by the 1977 Consent Decree since its formation. In June 2019, as part of the DOJ's initiative to terminate "legacy" antitrust judgments, the Consent Decree was terminated.

111. Within two years of its formation, DFA had become the largest dairy cooperative in the United States. Today, DFA remains the largest dairy cooperative and raw milk producer in the United States, and its market share has only grown. DFA's market dominance is even greater in the Southwest, as alleged herein. In 2018, DFA had revenue of $13.6 billion.

112. DFA's dominance of the dairy industry is not limited to its control of milk supply. Through various transactions, partnerships, joint ventures, and contractual relationships, DFA has expanded its dominance of the entire milk supply chain. DFA is a fully vertically integrated business, controlling everything from production, to processing, to delivery. In many of the geographic markets in which DFA operates—including the Southwestern United States—DFA dominates two critical product markets: production and processing/commercial operations.

113.     In 2019, DFA owned or controlled 42 manufacturing facilities with over 6,000 employees. DFA exports its products worldwide. DFA divides its business into two segments. The first is "Milk Marketing," which directs the marketing of DFA's member-producers' milk. The second is "Commercial Investments" or "Commercial Operations" which consists of a nationwide network of owned and affiliated dairy product manufacturers that process DFA's member-producers' milk into value-added dairy products. DFA's Commercial Investments segment participates in joint venture partnerships and affiliate relationships with leading food manufacturing companies.[18]

114.     DFA's "Milk Marketing" and "Commercial Investments" business segments are inherently conflicted. The Milk Marketing segment should, under normal circumstances, seek to obtain the highest possible price for DFA's member-farmers' milk. The Commercial Investments segment, however, benefits from lower raw milk prices, because those operations use raw milk as an input. In other words, DFA's Commercial Investments business segment is more profitable when raw milk prices are lower.

115.     DFA has itself previously recognized this conflict. For example, in an October 2000 memorandum, Co-Conspirator Rick Smith wrote to DFA's former Chief Executive Officer, Gary Hanman, that "just like in operating fluid plants, there is a conflict of interest in selling your own milk to your own manufacturing facilities." In another lawsuit, Smith testified that when operating a fluid milk plant that is its own processor, one wants to buy raw milk at the cheapest price, but a cooperative acting on behalf of its farmers selling raw milk would want to sell the raw milk at the highest possible price.[19]

---

[18] *See Sitts v. Dairy Farmers of America, Inc.*, 417 F. Supp. 3d 433, 443 (D. Vt. 2019).
[19] *See Sitts v. Dairy Farmers of America, Inc., et al.*, 417 F. Supp. 3d 433, 458 (D. Vt. 2019).

116.    Based on DFA's national sales figures, which are all that is available,[20] DFA's Annual Reports show that DFA's Average Sales Price (per cwt) remained consistently between $5.00 and $6.00 more per cwt than the average price paid to member-farmers between 2015 and 2018. That gap jumped to over $6.00 in 2019, and to over $10.00 in 2020[21]:

| Year | Average Sales Price ($ Per Hundredweight) | Average Price Paid to Members ($ Per Hundredweight) | Difference |
|---|---|---|---|
| 2015 | 22.26 | 17.18 | 5.08 |
| 2016 | 21.61 | 16.22 | 5.39 |
| 2017 | 22.81 | 17.57 | 5.24 |
| 2018 | 21.13 | 16.04 | 5.09 |
| 2019 | 24.75 | 18.46 | 6.29 |
| 2020 | 28.29 | 17.79 | *10.50* |
| Total | 23.48 | 17.21 | |

117.    In this way, any decreases in raw milk prices paid by processors are passed through to DFA's members, and DFA's financial performance as a raw milk cooperative depends only on the volume of raw milk sold by DFA members, but not the raw milk prices themselves. On the other hand, reducing raw milk prices directly increases DFA's profit per unit as a processor through DFA's commercial operations. Thus, DFA as an entity financially benefits from reducing raw milk prices while maintaining as much raw milk volume as possible.

118.    As evidenced by its commitment to its private label and proprietary brands, joint ventures, and other affiliates, subsidiaries, and "strategic alliances," DFA, as a vertically-integrated entity, is heavily invested in the success of its commercial operations. Yet the success

---

[20] Plaintiffs have found no publicly available, comparable summary sales and rates information for Select Milk. This further underscores Select Milk's lack of pricing transparency.

[21] *See* DFA's 2015-2020 Annual Reports.

and profitability of DFA's commercial operations is directly impacted by the main input cost of those operations: the supply of raw Grade A milk. Again, DFA's commercial operations generate the most revenue when DFA's member-farmers are paid less. As alleged herein, although DFA's commercial operations have proven successful, DFA has simply not passed those increased revenues on to its member-farmers.

### b.   Prior Antitrust Class Litigation Against DFA

119.   In 2007, two class action lawsuits alleging violations of the federal antitrust laws were filed against DFA and Dean.[22]

### i.   Southeast and Appalachian FMMOs

120.   In *Sweetwater Valley Farm, Inc., et al. v. Dean Foods Co., et al.*, No. 2:07-cv-208 (E.D. Tenn.),[23] a class of dairy farmers alleged that DFA, Dean, and other dairy marketing service providers conspired to control the milk supply chain and prices for milk in the Southeast and Appalachian FMMOs by requiring farmers to use DFA-controlled marketing agencies in exchange for access to processing plants, punishing cooperatives and processors, and other misconduct.

121.   The Southeast plaintiffs alleged that DFA and the other defendants operated "an unlawful cartel that refuse[d] to compete for the purchase of Grade A milk," that "foreclose[d] access to fluid Grade A milk bottling plants and processors," and that "fixe[d] prices for Grade A milk paid to Southeast dairy farmers." *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 937 (E.D. Tenn. 2008). The plaintiffs alleged that DFA controlled 90% of the Grade A milk

---

[22] Also in 2007, a class of retailers filed a lawsuit alleging that DFA and Dean had violated Section 1 of the Sherman Act by, among other things, entering into the illegal side agreements in the Suiza/Old Dean merger as alleged above. *See Food Lion v. Dean Foods Co., et al.*, No. 2:07-cv-188 (E.D. Tenn.). This matter settled on undisclosed terms in March 2017.

[23] Later re-captioned *In re Southeastern Milk Antitrust Litigation*, MDL No. 1899 (E.D. Tenn.).

produced in the Southeast, and that it owned and operated its own hauling companies, processing plants, and distribution centers. *Id.* at 938. The plaintiffs further alleged that DFA and the other defendants effectuated this misconduct through a slew of different mechanisms, including, *inter alia*: (1) requiring independent farmers to market their milk through a DFA-owned subsidiary (Dairy Marketing Services ("DMS")) instead of directly to bottlers and processors, like Dean Foods; (2) that DFA along with two other defendants controlled most of the balancing plants in the Southeast; (3) that defendants used full supply agreements, in violation of the 1977 Consent Decree described *supra*, to force independent dairy cooperatives to join DFA or market their Grade A milk through DFA-dominated entities; and (4) to force independent dairy farmers to market their Grade A milk through DMS (again, an arm of DFA).

122.    Because DFA controlled access to the market, DFA's member-farmers had no choice but to pay inappropriate fees and charges for services performed by the DFA-controlled Southern Marketing Agency. Because the DFA-controlled DMS and Southern Marketing Agency marketed nearly all the Grade A milk produced and processed in the Southeast, this permitted the defendants to monitor the prices paid to all dairy farmers by each of the processing defendants (DFA, Dean, and one other). The plaintiffs alleged that the defendants then used that information to fix and stabilize over-order premiums at lower levels than what would have prevailed in a competitive market. *Id.* at 938-39.

123.    The Court ultimately denied the majority of the defendants' motions for summary judgment. *See In re Southeastern Milk Antitrust Litig.*, 801 F. Supp. 2d 705 (E.D. Tenn. 2011). Shortly after that decision, the plaintiffs reached a $140 million settlement with Dean Foods. *See In re Southeastern Milk Antitrust Litig.*, No. 2:08-md-1000, 2011 WL 3878332 (E.D. Tenn. Aug. 31, 2011). The class plaintiffs later reached another settlement worth $158.6 million with DFA

and certain other defendants in 2013. *See In re Southeastern Milk Antitrust Litig.*, No. 2:08-md-1000, 2013 WL 2155379 (E.D. Tenn. May 17, 2013).

124.     Although key differences exist between Plaintiffs' lawsuit and the *Southeastern* action (including the time period, geographic market, non-DFA Defendants and Co-Conspirators, and the specific mechanisms through which Defendants effectuated their conspiracy), the existence and success of the *Southeastern* litigation underscores the recidivist nature of DFA's misconduct, as well as DFA's nationwide control over the dairy market.

### ii. Northeast FMMO

125.     A second class action was filed by farmers concerning the Northeast FMMO, *Allen v. Dairy Farmers of America, et al.*, No. 2:09-cv-230 (D. Vt.). The plaintiffs alleged that DFA's marketing agent (DMS), acting on behalf of DFA, marketed around 80% of the milk marketed to bottling plants in the Northeast on behalf of 9,000 Northeast dairy farmers.[24]

126.     The plaintiffs alleged that DFA created both monopsony and monopoly power in the Northeast's milk distribution system by tying up access to milk bottling plants in the Northeastern United States through unlawful exclusive supply agreements and then using that monopsony power to force independent farmers to join DFA or to market their raw milk through DMS. Having secured that dominant market power, as it has here in the Southwest, DFA used that power "to reduce fluid raw milk prices paid to its members and other class members relative to what would have prevailed in a competitive market," thereby resulting in higher profits to DFA and for DFA's customers, with whom DFA conspired. The plaintiffs further alleged that the monopsonization/monopolization conspiracy "eliminated competition by and between

---

[24] *See Allen v. Dairy Farmers of American, Inc., et al.*, 748 F. Supp. 2d 323, 330-31 (D. Vt. 2010).

Defendants" and "fixed at artificially low levels" the fluid raw milk prices that farmers would otherwise receive in a competitive market.[25]

127. The Court denied the defendants' motion for summary judgment, concluding, *inter alia*, that "Plaintiffs have cited sufficient evidence of the alleged conspiracy's anticompetitive activities to survive summary judgment. This evidence includes the use of full supply agreements and most favored nations clauses, sizable payments for non-competition for certain independent suppliers, evidence of uniformity of prices, evidence that over-order premiums were higher in other markets, the sharing of pricing data among competitors, and evidence that dairy farmers did not readily shift their cooperative or processor affiliations . . . ." *Allen v. Dairy Farmers of America, Inc., et al.*, No. 09-cv-230, 2014 WL 2610613, at *14 (D. Vt. June 11, 2014).

128. The class in *Allen* eventually settled for $30 million with Dean in 2011 and $50 million with DFA in 2013. *See Allen v. Dairy Farmers of America, Inc.*, No. 09-cv-230, 2016 WL 3208947 (D. Vt. June 7, 2016). The class settlement in *Allen* also included various forms of injunctive relief, including, *inter alia*: (a) precluding DFA from entering into any new full-supply agreements for the sale of raw Grade A milk in FMMO No. 1; (2) imposing restrictions on DFA's ability to terminate marketing agreements with its members and affording those members additional rights concerning termination; (c) establishing farmer representative positions, including a "Farmer Ombudsperson" in the Northeast; (d) mandating the release of certain information upon request; (e) requiring DFA to be more financially transparent; and (f) establishing an Audit Committee of the DFA Board.

---

[25] *Id.*

129.     Although key differences exist between Plaintiffs' lawsuit and the *Allen* action (including the time period, geographic market, non-DFA Defendants and Co-Conspirators, and the specific mechanisms through which Defendants effectuated their conspiracy), the existence and success of the *Allen* action underscores the recidivist nature of DFA's misconduct, as well as DFA's nationwide control over the dairy market.

130.     A group of 116 dairy farmers who opted out of those settlements in *Allen* continued to pursue their claims in *Sitts v. Dairy Farmers of America, Inc.*, No. 2:16-cv-287 (D. Vt.). The *Sitts* opt out action settled on the eve of trial in autumn 2020, for undisclosed terms.

131.     In *Sitts*, DFA asserted that DFA's cooperative status precludes antitrust liability under Capper-Volstead.[26] In July 2020, the DOJ submitted a "Statement of Interest" clarifying the government's position concerning the applicability of Capper-Volstead's limitation of liability. *See Sitts v. Dairy Farmers of America, Inc., et al.*, No. 16-cv-287, ECF No. 285 (D. Vt. July 27, 2020). The DOJ cautioned that it sought "to ensure that antitrust exemptions, including the Capper-Volstead Act . . . are not interpreted more broadly than necessary . . . ." *Id.* at 0. The DOJ eviscerated DFA's position:

> **It would be inconsistent with the Act's text and purpose to allow a defendant to use the Act as a shield when it acts as a food processor or exercises monopsony power to harm individual farmers. With respect to conspiracy claims under Section 1 of the Sherman Act . . . the Capper-Volstead Act does not protect a cooperative's agreements with non-cooperatives, and it should not protect agreements between cooperatives that have nothing to do with "processing, preparing for market, handling, and marketing" the cooperatives' products.**

*Id.* at 1-2.

---

[26] For example, the District of Vermont noted at the summary judgment stage that the court needed to apply antitrust principles concerning monopsonies against the backdrop of Capper-Volstead because the case involved agricultural cooperatives. *Sitts v. Dairy Farmers of America, In., et al.*, 417 F. Supp. 3d 433, 462-63 (D. Vt. 2019).

### 6. Defendants Had and Have Numerous Opportunities to Collude

132. DFA and Select Milk, along with Lone Star, created and control Defendant GSA. DFA and Select Milk use GSA, an entity for whose existence and "services" they charge their members a monthly fee, to facilitate information exchange and further their conspiracy.

133. In 2009 testimony before the U.S. House of Representatives Committee on Agriculture's Subcommittee on Livestock, Dairy, and Poultry, Brad Bouma, Select Milk's then-President and a GSA Board Member, was specifically asked about GSA. He stated:

> We work very closely with all of the cooperatives in the area. We all sit in the same room on a monthly basis, and we understand what our production coming at us is, and how we need to work through the marketplace to manage that production. . . . When you have complete cooperation of producers from Florida, all the way back to the Texas, New Mexico State line, you can sit in the room and discuss how this milk needs to move versus having Federal Order hearings and trying to find ways to raise differentials, or put in hauling credits, or do different things.[27]

134. Bouma continued that what makes GSA "unique is that virtually all of the milk produced in [the Southwest] is jointly marketed in a highly coordinated fashion," and that "[b]y working with other producers and gaining the trust of our buyers, GSA has succeeded in managing the milk marketing in [the Southwest] for a decade without the need for a single milk marketing order hearing for Southwest Milk Marketing Area issues. No other order can say that."[28]

135. Furthermore, DFA and Select Milk not only have numerous facilities and locations within close geographic proximity to each other, they participate in mutual joint ventures (including Southwest Cheese and Portales Dairy Products in New Mexico). Accordingly, DFA

---

[27] https://www.govinfo.gov/content/pkg/CHRG-111hhrg53102/html/CHRG-111hhrg53102.htm.

[28] *Id.*

and Select Milk maintain significant and closely-aligned presences throughout the Southwestern United States.

136.    DFA and Select Milk are also dominant members of several trade associations. These include National Milk Producers Federation, Texas Association of Dairymen, Dairy MAX, and the Dairy Products Institute of Texas. Membership in these trade associations provide important opportunities for DFA and Select Milk to meet and collude with one another.

137.    The National Milk Producers Federation ("NMPF") was formed in 1916 as "a forum for dairy producers and the cooperatives they own to participate in public policy discussions." Its website states that NMPF "addresses policies concerning milk pricing, domestic and international market development, agriculture credit and taxation, environmental issues, food safety and health, animal welfare, product standards and labeling, and research and biotechnology." NMPF's members include most of the largest dairy cooperatives in the nation, including other large cooperatives such as Agri-Mark, California Dairies, Foremost Farms, Land O'Lakes, Northwest Dairy Association, Prairie Farms, Southeast Milk, Inc., and many others.

138.    According to its website, NMPF's Chairman is Randy Mooney (DFA), and other members of the Executive Committee include Co-Conspirator Rodenbaugh, and Melvin Medeiros (DFA). Co-Conspirator UDA's Craig Caballero also sits on NMPF's Executive Committee. NMPF's Board of Directors has 56 members, 22 of which are from DFA (including Co-Conspirators Smith and Rodenbaugh), with Co-Conspirators Lone Star and UDA each having 1 member.

139.    Texas Association of Dairymen ("TAD") was founded in 1991 and bills itself as "the advocate and unified voice for the dairy industry in Texas." Its website further provides that TAD "advocates on the industry's behalf with the Texas Legislature and other governmental and

regulatory bodies," and that it "maintains a proactive and aggressive legislative and political agenda." TAD's members are DFA, Select Milk, and Hilmar Cheese Group. TAD states that "Cooperatives pay fees to TAD per hundred pounds of milk produced each month by each cooperative's individual dairy farmers." TAD has five officers – three from Select Milk and two from DFA. TAD has eight full directorships; five belong to DFA.

140.    Dairy MAX was founded in 1995 to represent dairy farmers in Texas, western Oklahoma, New Mexico, and southwest Kansas. In 2018, the former Western Dairy Association (representing producers in Colorado, Wyoming, and Montana), joined Dairy MAX. DFA controls 20 of the 27 director positions, while Co-Conspirator Lone Star holds one.

141.    The Dairy Products Institute of Texas ("DPIT") was formed "to unite processing, manufacturing and vendor firms into an organization . . . to promote and advance the welfare of the dairy industry generally and especially the dairy industry of Texas . . . ." DPIT has 20 directorships; four are held by DFA, two by Select Milk (one of which is through Continental Dairy Facilities SW LLC), one by Co-Conspirator Lone Star, one by a representative from Hilmar Cheese (whom is the third member of TAD), and one by a representative from Dairy MAX.

### 7.    There Are High Barriers to Entry in the Southwest Dairy Market

142.    There are significant barriers to entering the Southwest raw Grade A milk market. The primary barriers to entry are capital cost, risk, and market concentration. A new entrant faces a costly startup requiring significant financial investment and industry resources.

143.    DFA and Select Milk are vertically-integrated, billion-dollar entities. They control an overwhelming portion of the supply of raw Grade A milk in the Southwest. Upon information and belief, only approximately 10-15% of raw Grade A milk sold in the Southwest is represented by independent farmers who are not members of any cooperative. Because of the market

concentration in the Southwest, it is very difficult for a farmer to sell their milk directly to an end customer without participating in either DFA's or Select Milk's cooperative. Upon information and belief, DFA and Select Milk control at least 75% of all raw Grade A milk in the Southwest.

144.    Within the last 20 years, a group of farmers attempted to leave the DFA cooperative and start their own, but were forced to return to DFA. Zia Milk Producers, headquartered in Roswell, New Mexico, worked as a cooperative in the Southwest, having participated in the Greater Southwest Agency along with DFA and Select Milk since its inception in 2002. On December 1, 2018, Zia ceased to exist as a cooperative, and its then-16 members left to join DFA, bringing annually another one billion pounds under the control of DFA. At the time, Zia was the 25th largest dairy cooperative in the United States.

145.    DFA has resorted to other measures to ensure that its members cannot leave the cooperative, or if they do, farmers have reported that "DFA retaliates against any farmers who complain or try to escape its clutches." For example, DFA used its control over local milk haulers to prevent one independent New York dairyman from doing business with anyone else. Another individual alleged that milk inspectors controlled by DFA threatened him and many other farmers with health care violations if they dared to raise questions about DFA's business practices. Another dairy farmer, who had been a DFA member for approximately 10 years, tried to leave for another cooperative in the Northeast, Agri-Mark. But after promising negotiations, Agri-Mark suddenly went silent, and the farmer was told that Agri-Mark and DFA had an unwritten agreement not to work with each other's farmers.

146.    Upon information and belief, DFA and Select Milk have engaged in this type of anticompetitive misconduct in the Southwest. For example, Plaintiffs believe that these Defendants have reached agreements, whether formal or informal, written or unwritten, with various

processors and/or customers in the Southwest who could elect to purchase their raw Grade A milk directly from farmers, through which those processors and/or customers have agreed to purchase their raw Grade A milk only through Defendants DFA and Select Milk. This arrangement has precluded Plaintiffs and members of the Class from selling their milk directly to potential customers and forced them to market their milk through DFA and/or Select Milk.

147.    It is extremely difficult for a dairy farmer to sell their milk independently, without being a member of a cooperative. Forming a new cooperative – Zia having already failed – would require millions of dollars in financial investment for plants, infrastructure, and logistics. It would also require the development of relationships with end customers, which DFA and Select Milk already have. A new entrant would likely need to raise substantial capital through a variety of considered means, such as borrowing from multiple banks and taking advantage of government tax credit programs. Extensive feasibility studies would also be important to help assess the economic viability of a new cooperative, especially given the concentration in the Southwest.

148.    Again, finding and obtaining appropriate customers is another major challenge in the Southwest dairy industry. A new cooperative, or a farmer who attempts to sell their milk directly to a buyer would face difficult competition against the massive, already-established DFA and Select Milk cooperatives to contract with buyers.

C.    **DFA and Select Milk Conspired With One Another to Depress Prices Paid to Southwestern Dairy Farmers.**

149.    Upon information and belief, Defendants DFA and Select Milk, including through their control of Defendant GSA, conspired and colluded to fix the prices paid to Southwestern dairy farmers for the raw Grade A milk they produced in the United States beginning in at least January 2015.

47

150.    As alleged herein, DFA and Select Milk are huge, vertically-integrated companies with substantial commercial operations. The chief input cost for these commercial operations is the supply of raw Grade A milk. DFA and Select Milk, as entities, are therefore incentivized to pay dairy farmers as little as possible for the raw Grade A milk they produce.

151.    As alleged above, from 2011 to approximately the end of 2014, the Class I and uniform statistical prices in FMMO No. 126 increased significantly. Although these FMMO prices do not reflect what DFA and Select Milk actually paid their members, they underscore that Southwestern dairy farmers were receiving higher rates for the milk they produced during this earlier time period. These high prices made it difficult for DFA and Select Milk to manage risk, plan for production, and maximize revenues for their commercial divisions. Moving forward, therefore, DFA and Select Milk operated in a coordinated and lockstep manner, even though this was contrary to the fundamental reason why both of these cooperatives exist, to maximize the member-farmers' returns.

152.    Defendants, particularly DFA, Select Milk, and the members of GSA (DFA, Select Milk, and Co-Conspirator Lone Star), market the vast majority of the raw Grade A milk marketed, sold to, or purchased by processors, bottlers, and manufacturers in the Southwest and can therefore monitor the prices paid to all dairy farmers by each of the milk processors, bottlers, manufacturers, joint ventures, and/or Co-Conspirators. Defendants use this information to fix, stabilize, and maintain the prices paid to Southwestern dairy farmers at prices lower than what would have prevailed in a competitive market. These arrangements, established by Defendants, further reduce the incentive for processors, bottlers, manufacturers, joint ventures, and/or Co-Conspirators to compete for Southwest dairy farmers' Grade A milk by offering higher prices, either to attract

better and more efficient dairy farmers, or to retain dairy farmers who might otherwise sell their raw Grade A milk elsewhere.

153.    Moreover, upon information and benefit, Defendants DFA, Select Milk, and GSA share common employees, including, but not limited to, their joint ventures. Such common employees further facilitate the exchange of pricing information between DFA and Select Milk, and allow these Defendants to monitor and enforce compliance with their conspiracy.

154.    Furthermore, DFA and Select Milk both sell milk to their shared joint venture in New Mexico, Southwest Cheese. DFA and Select Milk will therefore inherently know what each is selling their milk for, and what the rate paid to each other's farmers is.

155.    Indeed, Defendants DFA and Select Milk participate together in numerous joint ventures and partnerships, which provide further opportunity for these cooperatives to exchange pricing information and therefore, to depress the prices paid to dairy farmers. These include at least:

a. **Southwest Cheese** – DFA, Select Milk, and Glanbia (of Ireland), co-own Southwest Cheese, in Clovis, New Mexico, as a joint venture. This is a large cheese and whey operation, including a $140 million expansion in 2015 that increased capacity by 30%. Even before the expansion, Southwest Cheese processed over 220 truckloads of milk per day, making it one of the largest single site manufacturers of premium quality cheese and whey protein in the world.

b. **Michigan Cheese –** DFA, Select Milk, and Glanbia built and own together as a joint venture a $470 million "state-of-the-art cheese and whey plant" in St. Johns, Michigan. Glanbia has referred to DFA and Select Milk as its "US milk partners." According to Glanbia, the St. Johns plant is a "nearly 400,000-square-foot facility [that] will process over 2.9bn pounds of milk from local farmers into more than 300m pounds of superior quality block cheese and 20m pounds of value-added whey protein powders each year."

c. **Portales Dairy Products, LLC** – at least DFA and Select Milk own or are otherwise affiliated with Portales Dairy Products, LLC, in Portales, New Mexico, which is a manufacturer of dried dairy ingredients. According to the

New Mexico Secretary of State's online Business Search, Portales Dairy Products, LLC is headquartered at DFA's former headquarters in Kansas City, Kansas, and DFA is Portales Dairy Products' "Manager."

156.     DFA has acknowledged that, despite its obligation to function for the benefit of its members, DFA is conflicted due to its vertical integration. For example, DFA's 2018 and 2019 Annual Reports provide, in relevant part: "[t]he profitability of our affiliates can be impacted by the price of raw milk." In other words, DFA's and Select Milk's affiliates, joint ventures, and subsidiaries fare better when the cooperatives' members fare worse.

### 1.      DFA's and Select Milk's Coordination as Part of GSA

157.     Each month, DFA's and Select Milk's members are assessed a fee that shows on their payment invoices as "GSA Operating Cost." This is one of the many costs or fees that DFA assesses to its members *after* the members' milk is marketed and sold, but *before* the member receives their compensation.

158.     Upon information and belief, DFA and Select Milk utilize GSA as a mechanism for the exchange of information, such as prices paid to member-producers, those member-producers' costs, and other information that directly informs what DFA and Select Milk pay their members. The monthly rate that DFA and Select Milk pay their member-farmers is always within pennies per hundredweight. Given differing cost structures of each entity, such a result is unlikely absent collusion.

159.     As a further example of collusion, on or around October 1, 2020, both DFA and Select Milk began to impose flexible maximum production amounts on their members, a program they referred to as GSA's "Tiered Pricing Program." This is sometimes referred to as a "production base," a daily limit on milk production. Under this arrangement, DFA and Select only pay an individual dairy or member the "full" price for the milk produced by that member (which, as

alleged herein, is not so "full" at all) up to a certain amount (*e.g.*, 100,000 pounds of milk per day). This "limit" varies by member or dairy. However, if an individual member produces above that "limit," DFA and Select Milk will not refuse to accept and market the overage. Instead, for any amount produced over the "base," DFA and Select Milk impose a considerable market diversion assessment. That is, the member who produced above the production base will be paid significantly less for the excess milk delivered and marketed. The timing and similarity between these "production base" regimes serves as additional proof that DFA and Select Milk have conspired to depress their members' milk checks.

160.    Moreover, DFA and Select Milk still market the milk produced above an individual member's production base for the full amount *for the entity itself*. Thus, although the cooperatives impose hefty market diversion assessments on the member who produced above their base, the cooperative as an entity still receives the full amount from whoever they sell the milk to.

161.    Defendants DFA and Select Milk had the means and opportunity to manipulate and coordinate to suppress the prices paid to farmers for the raw Grade A milk they produced.

162.    Upon information and belief, DFA and Select Milk use different formulae and calculations for determining what each member will receive for their milk each month. One cooperative begins with a higher initial price, but deducts greater expenses. The other cooperative begins with a lower initial price, but deducts fewer costs. Upon information and belief, during the Class Period, the rates DFA and Select Milk paid to their members each month is nearly always within just a few pennies of each other. Despite facially different calculation methods, that DFA and Select Milk arrive at nearly the same rate each month serves as further proof of their conspiracy to suppress Plaintiffs' and Class members' milk checks.

163.     Defendants' actions have the intended purpose and effect of depressing the prices paid to Plaintiffs and Class members for the raw Grade A milk they have produced.

**D.     The Prices Paid to Southwestern Dairy Farmers for Their Raw Grade A Milk Fell Beginning in At Least January 2015 and Have Remained Low.**

164.     Where a dairy cooperative makes money only from marketing the raw Grade A milk of its member-farmers, and does not participate in any other lines of business, the cooperative will be motivated to secure the highest possible price for its member-farmers' milk.

165.     A cooperative that is also invested in dairy processing and manufacturing operations is, however, conflicted. Processing and manufacturing activities benefit from lower raw milk prices, because those operations use raw milk as an input.

166.     As discussed herein, each month in the Southwest FMMO No. 126, the USDA announces monthly class and component prices. These prices are not the actual price that DFA and Select Milk pay to their members, but serve as an estimate of the market prices based on a variety of factors. DFA and Select Milk are not obligated to pay—and do not pay—their members these FMMO minimum prices. Rather, DFA and Select Milk contract with milk purchasers at privately-negotiated prices, which prices are typically not disclosed to members. Before paying their members for the raw Grade A milk they produced, DFA and Select Milk deduct hazy costs and expenses. Nevertheless, the FMMO's prices are instructive for the purpose of indicating that the prices paid to Southwestern dairy farmers since at least January 2015 have remained low compared to the previous several years.

167.     The USDA publishes a Mailbox Milk Price report. Mailbox milk prices include "over-order premiums; quality, component, breed, and volume premiums; payouts from state-run over-order pricing pools; payments from super pool organizations or marketing agencies in

common; payouts from programs offering seasonal production bonuses; and, monthly distributions of cooperative earnings. Annual distributions of cooperative profits/earnings or equity repayments are not included."

168.     Using this publicly-available information, one can compare, for example, the New Mexico monthly mailbox milk price with the component value of milk using average pool component tests in FMMO No. 126. One can also compare New Mexico monthly mailbox milk prices to the sum of the component value of milk and the FMMO No. 126 PPD, denoted below as Statistical Uniform Price at Component Tests:

| Period | New Mexico Mailbox Milk Price Minus Component Value of Milk (FMMO No. 126) | New Mexico Mailbox Milk Price Minus Statistical Uniform Price at Component Tests (FMMO No. 126) |
|---|---|---|
| 2005-2009 | -$1.09/cwt | -$2.35/cwt |
| 2010-2014 | -$0.97/cwt | -$2.54/cwt |
| 2015-2019 | -$2.07/cwt | -$3.00/cwt |
| 2020-2022 | -$4.24/cwt | -$2.98/cwt |

169.     This data demonstrates that during the Class Period, New Mexico mailbox milk prices were substantially lower relative to the commodity value of milk based on average component tests in FMMO No. 126 versus the previous period, from 2005 to 2014. The same trends are observed when comparing the New Mexico mailbox milk prices to the FMMO No. 126 statistical uniform price at pool average component tests.

170.     Furthermore, from 2011 to approximately the end of 2014, as shown below, both the Class I and uniform statistical prices for FMMO No. 126 increased considerably. The statistical uniform price in January 2011 was $16.24; in September 2014, the statistical uniform price was $25.80.

171.   Beginning in at least January 2015 through 2020, however, both the Class I and uniform statistical prices in FMMO No. 126 decreased dramatically. For example, the May 2020 uniform statistical price was just $13.02.



172.   DFA's EBITDA (earnings before interest, taxes, depreciation, and amortization) increased every year from 2015 to 2020. However, the percentage of EBITDA that DFA distributed to its members has decreased to just 8.9% in 2020[29]:

| Year | Adjusted EBITDA | Cash Distributed to Members | Percentage of EBITDA Distributed to Members |
|---|---|---|---|
| 2015 | $175 million | $35 million | 20% |
| 2016 | $238 million | $42 million | 17.6% |
| 2017 | $240 million | $60 million | 25% |
| 2018 | $241 million | $56 million | 23.2% |
| 2019 | $318 million | $60 million | 18.9% |
| 2020 | $515 million | $46 million | *8.9%* |

---

[29] This data is excerpted from DFA's Annual Reports; this is the amount of cash DFA says it has distributed to its members in each of the last six years. The actual amounts may be lower.

DFA's EBITDA has soared—it goes up each year and nearly tripled from 2015 to 2020—and yet the amount going to members is stagnant or declining.

173.    DFA's sales prices are only publicly available nationally. This chart[30] further shows the disconnect between the price DFA receives and what DFA actually pays its members:



174.    As this chart demonstrates, from 2015 through 2019, the difference between DFA's average sales price and the average price DFA paid to its members remained relatively consistent. Then in 2020, the gap between the two prices significantly expanded, with DFA netting over $10.00 per cwt more than what DFA paid to its member-farmers.

175.    As noted above, comparable information for Select Milk does not appear to be publicly available, which further underscores the lack of available data and price transparency.

---

[30] *See* DFA's 2015-2020 Annual Reports.

**E.      DFA's and Select Milk's Decreased Pooling of Milk.**

176.    Under the FMMO structure, each pooled handler (processor) pays to the pool based on the class in which they used the milk. This is called the classified value of milk. Each handler then draws money from the pool based on the pool-wide utilization of milk by class. This is conceptually done in two steps. First, each handler draws from the pool the component value of milk, which is the product of butterfat, protein, and other solids pounds pooled and their respective, USDA-announced prices. Second, if any funds are left in the pool, they are paid as a positive Producer Price Differential ("PPD"), based on the location of plants that received the producer's milk. The PPD is therefore an accounting measure that distributes the surplus or withdraws the deficit between the classified value of milk (the funds paid to the pool) and the component value of milk (funds paid to the producers from the pool based on protein, butterfat, and other solids in the milk they marketed). The PPD is the same for all farmers in a given FMMO, subject to location differentials. Normally the PPD is a positive number, as Class I milk, used in beverage products, typically carries a higher price than Class III, such that the extra money can be paid to farmers as a premium. Class III price is a linear function of butterfat, protein, and other solids prices, and reflects the value of milk in commodity cheddar cheese and dry whey products. Class I milk price is set before the start of the month, while Class III milk price is set after the month is over. When the Class III milk price rallies during the month, the Class III price may end up being higher than the Class I price, which may result in a negative PPD, where the money paid to producers will be lower than the commodity value of milk.

177.    The commodity value of milk may also exceed the classified value of milk when the spread between Class III (cheese) and Class IV (milk powder) prices is large, most common

when cheese demand and value are high, but demand and value for milk powder are low. This situation can also lead to negative PPDs, as was the case in 2020 and early 2021.

178.    Processors that convert milk to beverage milk products (Class I handlers) must always remain pooled. Other processors (*i.e.*, those producing yogurt, cheese, whey, butter, or milk powder products) may choose to pool, or may opt out of the pool. Processors can maximize their return to participation in the FMMO pool when they pool as much milk as they are eligible for in those months when their payments to the pool (the classified value of milk) is lower than the sum of the component value of milk and the PPD at the plant location. When the payments to the pool exceed draws from the pool, processors will maximize their returns from the FMMO system by partially depooling some of the eligible milk. How much milk gets depooled depends on the FMMO's depooling rules, as well as the outlook for net draws from the pool in forthcoming months.

179.    The decision to pool is made by a handler (such as DFA and Select Milk) after all class prices for the current month are known. Thus, the decision to not participate in the market pool is strongly influenced by the relative position of the class prices to the uniform price (utilization of weighted average of Class I through Class IV prices, as set forth in ¶¶88-94, *supra*). A Class II, III, or IV price that exceeds the uniform price predicts reduced pooling of that class.

180.    Each FMMO has its own rules concerning depooling. For example, some FMMOs prohibit those that do not pool from returning to the FMMO for a given amount of time before they can participate again. Some FMMOs mandate that certain percentages of milk must be pooled in higher-demand times of the year. Where a cooperative operates in multiple FMMOs (like DFA and Select Milk), that cooperative may make its decision to not pool its milk on a FMMO-by-FMMO, and plant-by-plant basis (which has the effect of a class-by-class basis).

181.    The USDA does not maintain data on milk that is not pooled. This significantly clouds the real numbers on production and usage of milk in a FMMO, adding another layer of complication and blurriness to how DFA and Select Milk calculate the rates paid to their members for the raw Grade A milk they produce.

182.    One analyst commented that some depooling processors "were 'double-dipping' and finding loopholes in their contracts to avoid paying farmers the full value of their milk while also making more profit. . . . 'They keep all the money from high cheese prices, and then they turn around and they pay the producers just as if they were pooled.'"

183.    In FMMO No. 126, a handler (like DFA or Select Milk) is able to make a decision on whether to pool its milk on a monthly basis, and when a handler elects to not pool milk for a given month, it is not restricted from reentering the pool in following months.

184.    Under federal regulations, as applicable to the Southwest (which again, uses multiple component pricing), the FMMO No. 126 market administrator (and on a national basis, the Agricultural Marketing Service) must announce the following prices by no later than the 5th day of the month: (a) Class II price; (b) Class II butterfat price; (c) Class III price; (d) Class IV price; (e) butterfat price; (f) protein price; and (g) other solids price. By the 23rd day of the preceding month, the FMMO No. 126 market administrator (and nationally, the Agricultural Marketing Service) must announce the Class I price and the Class I butterfat price.[31] For example, the May 2022 Class I (fluid) milk price will be announced in April 2022.

185.    The cooperatives' decision whether to remain in the pool or to not pool for a given month is therefore made *after* the FMMO publishes the prices for all Class prices for the month.

_____

[31] *See* 7 C.F.R. §1000.53(a)-(b).

Thus, DFA and Select Milk have advance knowledge of what those prices will be before they decide whether to keep those Classes' milk in the pool or not each month.

186.    Again, a handler may only elect not to pool Class II, Class III, and Class IV milk; Class I fluid milk must always remain in the pool. In the Southwest FMMO No. 126, the amount of Class II-IV milk that a handler can decide to pool or not pool is equal to the amount of Class I milk that handler pools in the same month. In other words, if a handler pooled five truckloads of Class I milk in March, the same handler would have the ability to pool or not pool up to five truckloads of Class II-IV milk in March. The handler may elect to pool less than the full five truckloads; the 1:1 ratio is a ceiling, not a requirement.

187.    A handler is most incentivized to not pool milk when either: (1) the FMMO's prices for a particular month for Class II, Class III, or Class IV (in reality, usually Class III, but sometimes Class IV) are higher than the Class I price; or (2) when there is a wide spread between the Class III and the Class IV price.

188.    When high priced milk is not pooled, this drives down the uniform statistical price of the milk remaining in the pool. However, the entity that did not pool some or all of its Class II-IV milk for that month (*i.e.*, DFA and Select Milk) will be able to negotiate higher prices for the milk they did not pool.

189.    A hypothetical is illustrative. If the blend price for a given month was $16.50 and the calculated Class III price was $16.25, then the difference between these two prices, the PPD, is 25 cents. This amount would be added to the Class III price to get the announced minimum price of $16.50. Sales to Class III cheese plants would recognize the increased price of 25 cents from the PPD, and there would be no incentive to leave a cheese plant to chase higher prices at a fluid bottling plant. As noted above, cooperatives acting as handlers (like DFA and Select Milk) are not

required to pay their farmers the FMMO minimum statistical price, and are able to exclude costs and expenses from these rates before paying their farmers.

190.    On the other hand, when the Class III price is higher than the blend price, then a negative PPD exists. Again hypothetically, if the calculated Class III price was $16.50, but there were not enough total sales to pay for all milk sold and the component value of milk exceeded the classified value of milk, then the FMMO would declare a negative PPD, and participating farmers would be guaranteed the final minimum price of $16.50 minus whatever the negative PPD amount is.

191.    If milk is not pooled, then the plant or organization that has depooled must decide what to pay the producers. They could pay the Class III minimum to their producers, who will then get a higher price than they would get if they were in the pool, because the PPD is negative. Or they could pay the uniform blend price that the producers would have received anyways, saving the plant money.

192.    However, while the dairy producers selling to the depooled plant could potentially receive higher prices, the rest of the producers in the FMMO will not be similarly treated. Because the Class III milk did not get sent to the pool, other producers in the FMMO would receive a decreased uniform price, potentially substantially below what the producer would have received if the depooled Class III milk had remained in the FMMO.

193.    In May 2019, the pricing formula of Class I milk changed, using an average of skim Class III and skim Class IV plus 74 cents, rather than the "higher of" skim Class III or skim Class IV. When a large spread exists between a higher Class III milk price and a lower Class IV milk price, the new formula will lower the Class I price as compared to the prior formula. In turn, this

reduces the PPD, thereby incentivizing depooling. In the second half of 2019, the Class IV price was significantly lower than the Class III price, and depooling of Class III milk was significant.

194.    In 2019, almost half of the milk in the Southwest FMMO was in Class III (48%). Because of this large amount of Class III milk, there was also a significant amount of depooled milk in the final months of 2019 as cheese prices were increasing. Indeed, during the first seven months of 2021, 93% of all Class III milk in the Southwest FMMO was depooled.

195.    By jointly electing not to pool milk, DFA and Select Milk are: (1) driving down the prices Plaintiffs and Class members receive for the milk they produce; and (2) garnering greater profits on their depooled milk for their commercial operations without passing those increased revenues to their members. DFA and Select Milk's depooling is part of their overall conspiracy to suppress pay to dairy farmers and benefit DFA and Select Milk's executives through increased profits to downstream processing operations.

## F.    DFA's and Select Milk's Self-Dealing

196.    DFA and Select Milk are not operating for the benefit of their members. These cooperatives' executives have numerous conflicts that raise the question of where the cooperatives' record profits are going.

197.    For example, as alleged above, Co-Conspirator Rodenbaugh serves as Chairman of the Board of Newtrient, a manure-management company jointly owned by several different dairy cooperatives, including Select Milk and Co-Conspirator UDA. Randy Mooney, who has served as Chairman of DFA's Board of Directors since 2010 and is a member of DFA's Executive Committee, serves on the board of Hiland Dairy, which is owned by another cooperative, Prairie Farms (which is one of the top 10 largest dairy processors in the United States).

198.    Another egregious example of DFA executive conflicts is Alan Bernon, who is President and CEO of DFA's Dairy Brands Division. Mr. Bernon is the founder of private equity firm, Sequel Holdings LP, which focuses on "acquiring, operating and managing middle market manufacturing businesses, with a primary focus on food and beverage." Sequel Holdings owns Chairmans Foods, which produces queso, macaroni and cheese, and various other products that use dairy products. Sequel owned Chairmans in 2017 when Chairmans purchased the queso/cheese manufacturing company Charley & Sons. Sequel also previously owned Lakeview Farms, which it sold in June 2021. Lakeview makes various products, several of which involve milk, such as sour cream (its first product), as well as crema and cheese products. In fact, Bernon's family's business was Garelick Farms in Massachusetts (which, as noted above, is now owned by DFA after Dean Foods' bankruptcy). Bernon was President of Garelick in 1997 when they sold the business to Suiza.

199.    Select Milk's co-founder and longtime CEO, Michael McCloskey, has similar conflicts. For example, McCloskey is Chairman and co-founder of Fair Oaks Farms in Indiana, which "brands and processes its own bottled milk, gourmet cheese, and ice cream." Mr. McCloskey also served as Chairman of the Southwest Cheese joint venture, and was a longtime member of the board of NMPF. McCloskey also controls Driftwood B&S / PR LLC ("Driftwood"), incorporated in Puerto Rico. In 2021, a journalist filed a Freedom of Information Act requested with the USDA seeking information relating to the Dairy Checkoff Program concerning Driftwood, as well as several other entities related to McCloskey. These entities included Keystone Dairy Holdings in Nevada, Lake State Dairy Center, a nonprofit in Fair Oaks, Indiana, and Newtrient. One of the other entities for which the journalist sought records is AMP Americas, which is a renewable gas company that partners with dairy farmers across the United

States and presumably works with all sorts of dairy operations. One of AMP Americas' business units is Renewable Dairy Fuels, based in Fair Oaks, Indiana. Another of the entities for which the journalist sought FOIA information was MTR-Schertz 1518 Management Company, aka Schertz 1518 Ltd., which is developing a 550-acre neighborhood outside of San Antonio, Texas. According to the Texas Comptroller of Public Accounts, MTR-Schertz is directed by McCloskey and another Select Milk executive, Rance Miles. MTR-Schertz is the general partner on the development project. As another example, McCloskey owns a shell company in Delaware, formed in 2003, and called General Manager LLC. The company that owns General Manager LLC incorporated in New Mexico in May 2018, and lists McCloskey, DFA, and John Wilson (a now-retired DFA Senior Vice President and Chief Fluid Milk Marketing Officer) as managers.

200.    DFA's annual reports make clear that although the cooperative as an entity is making money hand-over-fist, those profits are not being passed down to members. It does not appear that Select Milk shares this information in even summary form. Through their various joint ventures, affiliates, and subsidiaries, through their expansion and focus on the profitability of their commercial operations, and as evidenced by the examples of director and executive conflicts, it appears that DFA and Select Milk are being run as oligarchies.

## VII.    CLASS ACTION ALLEGATIONS

201.    Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class:

> All dairy farmers, whether individuals or entities, who produced raw Grade A milk within the Southwestern United States, as defined by DFA's Southwest Area region, composed of all of New Mexico, most of Texas (except the far eastern part of that state), the eastern portion of Arizona, the Oklahoma panhandle, and southwestern Kansas, and sold raw Grade A milk independently or directly or

through an agent to Defendants or Co-Conspirators within the Southwestern United States during any time from at least January 1, 2015 to the present. The following persons are excluded from the Class: (a) Defendants; and (b) Defendants' co-conspirators.

202. **Class Period**: The Class Period is presently defined as at least January 1, 2015, through the present. Additional discovery may reveal that the conduct alleged in this Complaint commenced at an earlier time, and Plaintiffs reserve all rights to amend this Complaint as appropriate.

203. **Class Identity**: The Class is readily identifiable and is one for which records should exist.

204. **Numerosity**: Plaintiffs do not know the precise number of members of the proposed Class because such information presently is in the exclusive control of Defendants, due to the privatized nature of raw Grade A milk sales from producer-farmers. Plaintiffs believe that due to the nature of the trade and commerce involved, there are at least hundreds of Class members geographically dispersed across several states throughout the Southwestern United States, such that joinder of all class members is impracticable.

205. **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs are dairy farmers who produce Grade A milk in the Southwest and, independently or directly or through an agent, sold fluid Grade A milk to Defendants and their Co-Conspirators in the Southwest, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

206. **Common Questions Predominate**: There are questions of law and fact common to the Class, including, but not limited to:

A. Whether Defendants and their co-conspirators engaged in an agreement, combination, and/or conspiracy to fix, stabilize, maintain, and/or artificially lower the prices paid to Southwestern dairy farmers for raw Grade A milk;

B. The identity of the participants of the alleged conspiracy;

C. The duration of the conspiracy alleged herein and the acts performed by Defendants and their Co-Conspirators in furtherance of the conspiracy;

D. Whether the alleged conspiracy violated the federal antitrust laws, including specifically Section 1 of the Sherman Act 15 U.S.C. § 1;

E. Whether the conduct of Defendants and their Co-Conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and other Class members;

F. The effect(s) of Defendants' alleged conspiracy on the prices paid to Plaintiffs and other Class members for their raw Grade A milk during the Class Period;

G. Whether Plaintiffs and other Class members are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

H. In addition to injunctive relief, the appropriate classwide measure of damages, including whether Plaintiffs and other Class members are entitled to: (1) monetary relief, including treble damages, as well as the appropriate class-wide measure of damages; (2) interest from the date they should have received all monies rightfully owed; and (3) attorneys' fees and costs, and any other relief the Court deems just and reasonable.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

207. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who produced and sold Grade A milk independently or directly or through an agent to Defendants and their Co-Conspirators, and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

208.   **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Furthermore, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

209.   The Class is readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

210.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

211.   Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII.   ANTITRUST INJURY

212.   Defendants' anticompetitive conduct has had the following effects, among others:

      a.   Competition among Defendants and their Co-Conspirators for prices paid to Class members has been restrained or eliminated with respect to raw Grade A milk;

b.   The prices paid to Class members for the raw Grade A milk they have produced have been fixed, depressed, stabilized, and/or maintained at artificially low levels; and

c.   Southwest dairy farmers have been deprived of free and open competition.

213.   During the Class Period, Plaintiffs and Class members were artificially underpaid by Defendants for their raw Grade A milk.

214.   By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having been paid lower prices for raw Grade A milk than they would have been paid in the absence of Defendants' illegal contract, combination, and/or conspiracy, and as a result, have suffered damages.

215.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX. ACTIVE CONCEALMENT

216.   Plaintiffs and Class members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for raw Grade A milk in the Southwest.

217.   Throughout the Class Period set forth in this Complaint, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and Class members.

218.     The combination and conspiracy alleged herein was fraudulently concealed by Defendants through various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of telephone or in-person meetings at trade association meetings (and elsewhere) to prevent the existence of written records (including, but again not limited to, through Defendant GSA), limiting any explicit reference to competitor or supply restraint communications on documents and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including Southwestern dairy farmers).

219.     Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Raw Grade A milk produced and sold in the Southwest is not exempt from antitrust regulation, and thus, before the onset of the COVID-19 pandemic in or about March and April 2020, Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of the prices paid for raw Grade A milk in the Southwest before the onset of the COVID-19 pandemic in or about March and April 2020, when the statistical uniform price and Class I milk prices in the Southwest FMMO No. 126 at first plummeted further and then somewhat recovered (although still remaining depressed by virtue of Defendants' misconduct), even as the effects of the pandemic continued.

220.     In addition, Defendants have acted affirmatively to conceal their wrongful conduct from Plaintiffs and Class members. As alleged above, beginning in at least January 2015, after the FMMO No. 126 Class I and uniform statistical prices for milk had been rising, these prices fell precipitously, and have remained low. Defendants have publicly, affirmatively, and falsely stated that these price declines have been due to market oversupply, foreign milk production, and decreased fluid milk consumption. For example, Randy Mooney, DFA's Chairman of the Board

and Member of the Executive Committee testified to a House Agricultural Subcommittee in May 2016 that "times are tough," "[f]ollowing the record high prices and margins of 2014, the industry expanded by approximately 58,000 cows," "[a]s a result of the additional milking cows and improved productivity, and that milk production in the U.S. grew by 2.6 billion pounds between 2014 and 2015." Mooney continued that "[s]ince April 2015, [European Union] dairy farmers have increased milk output," which "milk is displacing U.S.-produced dairy products domestically and abroad," resulting in "larger inventories here at home, and U.S. producers enduring a longer period of depressed dairy market prices." In June 2016, a newspaper paraphrased DFA as having said that "with unprecedented oversupply and the downfall of overseas demand, finding customers costs more." In March 2018, a DFA spokesperson stated that "[f]rom a pricing perspective, across the U.S., dairy farmers are facing weak economic conditions in 2018 and we expect a continued imbalance between global dairy supply and demand levels to result in a challenging financial year."

221.    Although market oversupply and increased foreign production may exist, and fluid milk consumption has decreased, these issues are not alone responsible for the dramatic depression in prices paid to Plaintiffs and Class members. The conspiracy alleged herein is the primary cause. Defendants' statements were pretexts used to cover up the conspiracy alleged herein; Defendants affirmatively made misleading statements during the relevant period to falsely portray a competitive market for raw Grade A milk in the Southwest, when in fact, these price decreases were the result of collusive conduct between Defendants, which was undisclosed at the time.

222.    Plaintiffs exercised reasonable diligence. Plaintiffs and Class members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence

because of the deceptive practices and techniques of secrecy employed by Defendants and their Co-Conspirators to conceal their combination.

223.    By virtue of the fraudulent concealment of the wrongful conduct by Defendants and their Co-Conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## X.  CAUSE OF ACTION

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

224.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

225.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2015 (further investigation and discovery may reveal an earlier date), and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their Co-Conspirators entered into a continuing agreement, understanding, and/or conspiracy to fix, reduce, stabilize, or maintain at artificially depressed values the sums paid for raw Grade A milk in the Southwest, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The misconduct alleged herein constitutes a *per se* violation of Section 1 of the Sherman Act. In the alternative, this misconduct violations Section 1 of the Sherman Act by virtue of the rule of reason.

226.    In formulating and carrying out the alleged agreement, understanding, and/or conspiracy, Defendants and their Co-Conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth herein, and the following, among others: fixing, reducing, stabilizing, and maintaining at artificially depressed values the sums paid for raw Grade A milk in the Southwest.

227.     The combination and conspiracy alleged herein has had the following effects, among others:

    a.   Price competition in the purchase of raw Grade A milk in the Southwest has been restrained, suppressed, and/or eliminated;

    b.   Prices for raw Grade A milk sold independently or directly or through an agent to DFA, Select Milk, or their Co-Conspirators within DFA's Southwest Area have been fixed, depressed, maintained, and stabilized at artificially low, noncompetitive levels throughout the United States; and

    c.   Those who sold raw Grade A milk independently or directly or through an agent to DFA, Select Milk, or their Co-Conspirators within DFA's Southwest Area have been deprived of the benefits of free and open competition.

228.     The Capper-Volstead Act grants dairy cooperatives, like Defendants DFA and Select Milk, limited antitrust immunity with respect to price-fixing agreements with other dairy cooperatives, "provided, however, that such associations are operated for the mutual benefit of the members thereof." 7 U.S.C. § 291. During the Class Period, Defendants were not operated for the mutual benefit of their members and were, therefore, outside the scope of Capper-Volstead's grant of antitrust immunity. Defendants' management engaged in activities that reduced the sums paid to Plaintiffs and Class members for their raw Grade A milk, to maximize Defendants' market share and Defendants' revenue for commercial operations and joint ventures. Defendants are not entitled to the limitation of liability offered by Capper-Volstead.

229.     Plaintiffs and Class members have been injured and will continue to be injured in their businesses and property by being paid less for raw Grade A milk sold independently or directly or through an agent to DFA, Select Milk, or their Co-Conspirators within DFA's Southwest Area than they would have been paid and will be paid in the absence of the combination and conspiracy.

230.    Plaintiffs and Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## XI. REQUEST FOR RELIEF

231.    WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows:

a.  The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

b.  The unlawful conduct, conspiracy, and/or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

c.  Plaintiffs and the Class recover damages, to the maximum extent allowed under the Sherman Act, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled;

d.  Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

e.  Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of a company's information;

f.  Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

g.  Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

h.  Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XII.   JURY TRIAL DEMANDED

232.   Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 4, 2022                         /s/ *Mark T. Baker*
                                             Mark T. Baker (Bar No. 16831)
                                             **PEIFER, HANSON, MULLINS & BAKER, P.A.**
                                             20 First Plaza, Suite 725
                                             Albuquerque, NM 87102
                                             Telephone: (505) 247-4800
                                             Facsimile: (505) 243-6458
                                             mbaker@peiferlaw.com

                                             W. Joseph Bruckner (admission *pro hac vice* forthcoming)
                                             Brian D. Clark (admission *pro hac vice* forthcoming)
                                             Stephen J. Teti (admission *pro hac vice* forthcoming)
                                             **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
                                             100 Washington Avenue South, Suite 2200
                                             Minneapolis, MN 55401
                                             Telephone:  (612) 339-6900
                                             Facsimile:  (612) 339-0981
                                             wjbruckner@locklaw.com
                                             bdclark@locklaw.com
                                             sjteti@locklaw.com

                                             Steve W. Berman (admission *pro hac vice* forthcoming)
                                             **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                             1301 Second Avenue, Suite 2000
                                             Seattle, Washington 98101
                                             Telephone: (206) 623-7292
                                             Facsimile:  (206) 623-0594
                                             steve@hbsslaw.com

                                             Shana E. Scarlett (admission *pro hac vice* forthcoming)
                                             **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                             715 Hearst Avenue, Suite 202
                                             Berkeley, California 94710
                                             Telephone: (510) 725-3000
                                             Facsimile:  (510) 725-3001
                                             shanas@hbsslaw.com

                                             Elaine T. Byszewski (admission *pro hac vice*
                                             forthcoming)
                                             **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                             301 North Lake Avenue, Suite 920
                                             Pasadena, CA 91101
                                             Telephone: (213) 330-7150
                                             Facsimile: (213) 330-7152
                                             elaine@hbsslaw.com

                                             *Attorneys for Plaintiffs*

74