# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

OTHART DAIRY FARMS, LLC, PAREO
FARM, INC., PAREO FARM II, INC.,
DESERTLAND DAIRY, LLC, DEL ORO
DAIRY, LLC, BRIGHT STAR DAIRY,
LLC, and SUNSET DAIRY, LLC,
individually and on behalf of all others
similarly situated,

        Plaintiffs,

v.

DAIRY FARMERS OF AMERICA, INC.,
SELECT MILK PRODUCERS, INC., and
GREATER SOUTHWEST AGENCY,

 Defendants.

Case No. 2:22-cv-00251-MIS-SMV

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

# I.    INTRODUCTION[1]

Plaintiffs are dairy farmers who have brought a single-count antitrust lawsuit against their own farmer-owned organization for allegedly conspiring with other dairy farmer-owned organizations to lower the price that the dairy farmer owners receive for their raw milk. Both Defendant Dairy Farmers of America, Inc. ("DFA Co-op") and Defendant Select Milk Producers, Inc. ("Select Co-op") are agricultural cooperatives that are 100% owned and controlled by their respective dairy farmer members, including Plaintiffs, who are all current or former members of the DFA Co-op. Plaintiffs' lawsuit boils down to the claim that these two dairy cooperatives, wholly-owned and controlled by their dairy farmer members, made an unlawful agreement to underpay themselves, i.e., their owner/member farmers, for their raw milk. This purported agreement is economically nonsensical. It makes absolutely no sense for cooperatives, individually or in combination, to pay themselves less money for the raw milk they produce.

Plaintiffs also fail to allege facts sufficient to support their conclusory conspiracy claim, *i.e*., facts that *tend to exclude the possibility of independent action* by the DFA and Select Co-ops. They simply allege no facts to support an agreement, and what they do allege is entirely consistent with lawful, unilateral conduct. Plaintiffs concede that milk prices are heavily regulated. They also concede that dairy cooperatives, like all agricultural cooperatives, are granted special treatment under the law. They agree that the Capper-Volstead Act, 7 U.S.C. § 291, enacted in 1922 ("CV Act") promotes the formation and operation of agricultural cooperatives by creating an exemption from antitrust liability to allow farmers to communicate

---

[1] Solely for the purposes of this motion, Defendants assume, as they must, the truth of Plaintiffs' allegations.

and coordinate about collectively marketing, handling, processing, and preparing their products for market. This applies to communications and coordination among (1) farmers within a cooperative, (2) separate cooperatives, and (3) cooperatives' joint marketing agencies. Plaintiffs further admit that lower raw milk prices are to be expected, even in the absence of an agreement, in market conditions of oversupply and decreased demand for fluid milk.

Rather than allege facts that support the existence of a conspiracy, Plaintiffs instead recite (1) a lengthy but irrelevant history of the DFA Co-op's defense of prior, unrelated lawsuits in different regions of the country having no connection to the Select Co-op, (2) lawful and legislatively encouraged joint marketing activities between the DFA and Select Co-ops, through their legislatively permitted joint marketing agency, Defendant Greater Southwest Agency, Inc. ("GSA"), which Plaintiffs do not appear to challenge, and (3) the existence of supposedly "similar" actions by the DFA and Select Co-ops in response to joint marketing activities and larger market forces. None of that satisfies Plaintiffs' burden to plead facts sufficient to show a plausible price fixing agreement.

In short, Plaintiffs' central theory is both contrary to economic logic and unsupported by the factual allegations the antitrust laws require. Their allegations also show that any claim is time-barred, and they fail to plead facts to support equitable tolling under the fraudulent concealment doctrine. The Court should dismiss Plaintiffs' Complaint.

## II. BACKGROUND[2]

### A. What Dairy Farmers Do

Dairy farmers run farms that produce raw milk. That means they buy and raise cows, feed them, house them, and generally tend to their needs—including milking them on a regular basis. Farmers then must sell that milk to willing buyers and must get the milk to the buyers in a timely fashion. They must comply with many federal and state regulatory requirements.

### B. What Dairy Processors Do

Processors operate plants that take raw milk and process it into a variety of different products for sale. Some processors make raw milk into the kind of milk that ends up in supermarket refrigerators, known as Fluid Grade A milk (*see* Compl. ¶ 43); others make cheese, yogurt, and dried whey powders. (*See id.* ¶¶ 46, 50.) Processors generally pay different prices depending on what they do with the raw milk they buy. (*Id.* ¶ 50)

Many different entities process milk. Some large supermarkets do their own processing. Some farmers have their own processing plants. Some cooperatives own processing facilities. And some processing plants are independent operations. (*Id.*)

### C. Supply and Demand

Sales of milk are subject to the law of supply and demand, just like any other agricultural commodities—which Plaintiffs admit has at times caused raw milk prices to drop. (*See id.* ¶¶ 7, 44, 51, 88, 102, 171, 220–221.) Milk production has been shifting to the Southwest region,

---

[2] The Court may consider matters of public record and documents referenced in the Complaint for which the authenticity of the documents is not in question without converting a motion to dismiss to a motion for summary judgment. *See Seale v. Peacock*, 32 F.4th 1011, 1016 n.2 (10th Cir. 2022) (public records may be considered on Rule 12(b)(6) motion); *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir. 2005) ("[A] document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute.").

where milk production is up,[3] all while demand for fluid milk has continued to decrease over time. Meanwhile, at the global level, output of milk in the European Union is on the rise. (*See id.* ¶¶ 220–221.) Plaintiffs even concede that overproduction occurs within the DFA and Select Co-ops (milk production exceeds sales), which requires Defendants to take steps to equitably address raw milk overproduction. (*See id.* ¶¶ 159, 160.)

### D. Why Dairy Cooperatives?

Dairy farmers vary in many ways. Some farmers (like the named Plaintiffs) run large farms that produce high volumes of milk. Others run small operations. Dairy cooperatives are organizations that band together the operations of separate farmers. Co-ops exist to let individual farmers gain efficiencies and provide important services to their member farmers and to the dairy market as a whole, and most, but not all, dairy farmers choose to join one. Dairy cooperatives help to equalize their farmers' bargaining power with that of the large processors who purchase raw milk. Through cooperative marketing, dairy cooperatives like the DFA and Select Co-ops enable their members to capitalize on efficiencies of larger scale, while still maintaining independent ownership of their farms.

Dairy cooperatives also centralize the important duties of collecting milk from the farm, testing it, delivering it to customers, and negotiating the terms of sale with the processor. While individual farmers might be entirely reliant on a single processor to purchase their raw milk, farmers in a cooperative have more marketing options and mitigate their marketing risks across large numbers of buyers and farmers. This is particularly true if the cooperative owns processing

---

[3] *See* ERS, *Profits, Costs, and the Changing Structure of Dairy Farming* (Sept. 2007), https://www.ers.usda.gov/webdocs/publications/45868/11138_err47_1_.pdf?v=480.8, at iii (discussing the dominance of large farms in the Southwestern states and the shifting of milk production to New Mexico); ERS, Dairy Data, *Fluid beverage milk sales quantities by product (millions of pounds)* (last updated Aug. 31, 2021), https://www.ers.usda.gov/webdocs /DataFiles/48685/fluidmilk.xlsx?v=1412 (noting continued decrease in annual fluid milk sales).

plants, which provides at least two significant benefits to farmer members. It helps assure there is a place to take members' milk, even when there is excess supply. (*See id.* ¶ 51.) And it provides a hedge against fluctuations in short-term milk prices, by providing a form of long-term investment that provides profits that cooperatives then pass on to their farmer owner-members.[4]

For over a century, the law has recognized that agricultural co-ops serve a societal good: Congress in 1914 included a provision in the Clayton Act, 15 U.S.C. § 17, exempting non-profit agricultural co-ops from the reach of the Sherman Act. *See Bell v. Fur Breeders Agric. Co-op.*, 348 F.3d 1224, 1231 (10th Cir. 2003). In 1922, Congress passed the CV Act, which extended the exemption and permitted co-ops to raise capital through stock offering. *Id.*; (*see also* Compl. ¶ 45). The CV Act and other antitrust exemptions for agriculture expressly allow co-ops to communicate about, and even coordinate on, pricing of agricultural commodities (like milk), including with other co-ops through common marketing agencies. *Treasure Valley Potato Bargaining Assoc. v. Ore-Ida Foods, Inc.*, 497 F.2d 203 (9th Cir. 1974) (defining the term "marketing" broadly and finding a common marketing agency need not sell product but can coordinate co-ops' sharing of information and pricing decisions). The CV Act also expressly recognizes that co-ops may own and operate processing facilities. *See* 7 U.S.C. § 291; *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 28 (1962) ("Capper-Volstead Act is specific in permitting concerted efforts by farmers in the processing, preparing for market, and marketing of their products.").

---

[4] *See* RD Cooperative Information Report 55, *Co-ops 101: An Introduction to Cooperatives*, at 42 (U.S.D.A. rev. Nov. 2012), https://www.rd.usda.gov/files/cir55.pdf ("Other such associations add further value to member production by processing or manufacturing member products into other more valuable products" allowing members to "extend control of their products – and realize additional margins – through processing, distribution and sale").

### E. Who Owns Dairy Co-ops?

Dairy co-ops are owned 100% by those farmers who join them. (*See* Compl. ¶¶ 27–28.) Plaintiffs concede that they are current or former members of the DFA Co-op (no Plaintiff is affiliated with the Select Co-op). Thus, Plaintiffs are suing their fellow DFA Co-op owners (and, effectively, themselves). This is beyond question a farmer vs. farmer lawsuit. No "DFA" or "Select" (or even GSA) exists separate from the assets owned by their respective farmer-members and farmers thus bear all costs of this litigation. Plaintiffs also concede that Defendant co-ops are organizations that exist for the benefit of their farmer-owners. (*See id*.) They pass through to their farmer-owners the proceeds of all the milk they sell, minus their expenses. Because farmers—including Plaintiffs—own the co-op, co-op members separately receive "[a]nnual distributions of cooperative profits/earnings or equity repayments not reflected in the mailbox price" that farmers receive for their raw milk sales. (*Id.* ¶ 167.) As Plaintiffs acknowledge, both the DFA and Select Co-ops have made significant investments in, among other things, buying and building processing facilities (which are ultimately owned by the co-ops' dairy farmer member-owners), of which relatively few exist in the Southwestern United States. (*Id.* ¶¶ 58–65.) Plaintiffs concede both that they have no information about the amount of profits/earnings or equity repayments the Select Co-op makes to its members (*id*. ¶ 167), and that the Select Co-op "has paid or will pay its members . . . the profits Select Milk generated" through a co-op-specific investment like "the sale of its share of Fairlife to Coca Cola." (*Id.* ¶ 65.) Plaintiffs similarly make no allegations that ties GSA to the setting of pay prices.

### F. The Price(s) of Milk

The Complaint discusses two separate types of raw milk prices: (1) prices that processors pay for the raw milk they buy; and (2) prices that dairy farmers receive for the raw milk they sell.

Generally, the price that processors pay for raw milk is regulated.[5]  The federal government sets the price based on certain formulas, and processors must pay at least that price, which can differ depending on the milk's end use, along with any negotiated premiums above that price.

The money farmers receive for their raw milk is often called the "mailbox price."  (*See* Compl. ¶ 167 (describing components of "mailbox price" published by the USDA).)  The mailbox price is a regulated price based on the weighted average of all regulated prices (often called the blend price), plus any additional amount above that price which that farmer (or its cooperative) negotiated with the processor to whom it sold its raw milk, less permitted deductions, such as lab testing or hauling services.  (*See id.* ¶ 98 (calculating a sample minimum blend price).)  For farmers who belong to co-ops, the mailbox price is based upon the money the co-op receives—payments from processors (the regulated price plus any service charges or premiums negotiated by the co-op and/or any marketing agency).[6]  Because farmers—including Plaintiffs—own the co-op, they also receive any profits that the co-op makes after deducting the costs of the various services the co-op provides and from the investments the co-op makes, including processing plants.[7]

## III.    LEGAL STANDARDS

**Pleading an Unlawful Agreement Under Sherman Act Section 1.**  To state a claim for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs must allege sufficient facts

---

[5] *See* U.S. DEP'T OF AGRIC., *Agricultural Marketing Service*, "Federal Milk Marketing Orders," https://www.ams.usda.gov/rules-regulations/moa/dairy (last visited May 31, 2022) (describing how milk prices are calculated under the federal system); (*see also* Compl. ¶¶ 85–91 (same).)

[6] USDA Federal Milk Marketing Orders, 7 C.F.R. § 1000.50 (2019).

[7] *See* RD Cooperative Information Report 55, *Co-ops 101: An Introduction to Cooperatives*, at 10 (U.S.D.A. rev. Nov. 2012), https://www.rd.usda.gov/files/cir55.pdf ("The people who use a cooperative own it."); *id.* at 9 ("Members . . . benefit by sharing the earnings on business conducted on a cooperative basis.").

that, if taken as true, show that Defendants (1) participated in an agreement that (2) unreasonably restrained trade. *Law v. NCAA*, 134 F.3d 1010, 1016 (10th Cir. 1998). When making such allegations, "[t]he use of antitrust buzz words does not supply the factual circumstances necessary to support [a plaintiff's] conclusory allegations." *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026 (10th Cir. 1992).

A proper Section 1 claim requires a plaintiff to plead sufficient facts to support the existence of an agreement that would be unlawful under the antitrust laws. *Id*. at 1027. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires plaintiffs to allege sufficient facts to support a claim that is facially ***plausible*** and not merely speculative. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564–70 (2007); *accord Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179 (10th Cir. 2019); *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1248 (10th Cir. 2008). "The critical question is, assuming the truth of all well-pleaded facts . . . and drawing all reasonable inferences therefrom in the light most favorable to [P]laintiffs," whether the complaint "raise[s] a right to relief above the speculative level." *Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*, No. 08-cv-00513-CMA-KMT, 2009 WL 2596493, at *2 (D. Colo. Aug. 21, 2009).

Plaintiffs' allegations must also "tend to exclude the possibility" of independent action. *Llacua*, 930 F.3d at 1179 (citing *Twombly*, 550 U.S. at 554). "When a complaint alleges 'facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 1177 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Critically, "[a]n inference of conspiracy is impermissible if the defendants 'had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations.'" *Id.* at 1179-80 (citing *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 596 (1986)). When a complaint "encompass[es] scenarios under which the defendants conspired to engage in parallel conduct *and* those in which they did not," it falls short of establishing "that the plaintiff would be entitled to relief, even if all of the allegations were true." *Robbins*, 519 F.3d at 1248 (italics in original). "If an inference of such an agreement may be drawn from highly ambiguous evidence, there is considerable danger that [important distinctions between independent and concerted action] will be seriously eroded." *Llacua* 930 F.3d at 1179 (internal citations omitted).

**Fraudulent Concealment.** Rule 9(b) of the Federal Rules of Civil Procedure requires plaintiffs alleging fraud (including fraudulent concealment as a basis to toll the statute of limitations) to plead the fraud with heightened particularity, meaning that they must "set forth the time, place and contents of the [alleged fraud], the identity of the party [committing the alleged fraud] and the consequences thereof." *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1078 (D. Kan. 2009) (citing *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000)); *see also Plastic Packaging Corp. v. Sun Chem. Corp.*, 136 F. Supp. 2d 1201, 1203 (D. Kan. 2001) ("[P]laintiff[s] must set out the 'who, what, where, and when' of the alleged fraud.").

**The Capper-Volstead Act.** Plaintiffs devote a portion of their Complaint to a description of the CV Act. (Compl. ¶¶47-49.) They do not, however, purport to state a claim under the CV Act because there is no private right of action under that statute. *See, e.g., Growers 1-7 v. Ocean Spray Cranberries, Inc.*, No. 12-12016-RWZ, 2014 WL 1764533, at *2 (D. Mass. May 2, 2014) ("The CVA's text is permissive. If a cooperative complies with the statutory conditions, then its members enjoy the limited antitrust immunity; if they do not comply, then they are not immune. Neither scenario involves a 'violation.' Plaintiffs cannot sue defendants for failing to do something the law does not obligate them to do."). The CV Act

explicitly permits farmers to band together in cooperatives and to use joint marketing agencies for certain purposes, such as joint marketing of raw milk to processors, without running afoul of the antitrust laws. *See* 7 U.S.C. § 291.

Plaintiffs' Complaint alleges an agreement to fix *the price paid to farmers*. While the CV Act's shield from antitrust liability does not extend to such agreements, the protections afforded by the CV Act for collective marketing activities expressly permit and encourage the collaboration of the DFA and Select Co-ops in the joint marketing of raw milk, including through GSA. As the Tenth Circuit recognized in *Llacua*, the "regulatory overlay is a critical backdrop that provides relevant economic context" to the challenged conduct. *Llacua*, 930 F.3d at 1181 (rejecting inference of conspiracy on motion to dismiss where regulations "explicitly and specifically authorize[] associations to coordinate with members"). Here, the CV Act's regulatory overlay encourages dairy farmers to join cooperatives, cooperatives to combine with other cooperatives, and cooperatives to use joint marketing agencies to gain efficiencies and to improve the bargaining power of dairy farmers. *See* 7 U.S.C. § 291; *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1182 (8th Cir. 1982) (under the CV Act, "[c]ooperatives may combine with each other to do together what they may lawfully do individually"); *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1039–40, 1043 (2d Cir. 1980) (CV Act permits cooperatives to have marketing agencies in common noting that "Congress wanted and expected farmers to be represented by strong and effective cooperatives, so extensively organized as to be representative of individual commodities."). And the CV Act and other statutes exempting agricultural cooperatives from the antitrust laws[8] encourage communications among cooperatives to

---

[8] *See, e.g.*, Cooperative Marketing Act of 1926, 7 U.S.C. § 455 (providing that agricultural cooperatives may legally acquire and exchange pricing, production, and marketing data).

exchange pricing, production, and marketing data. *See Treasure Valley*, 497 F.2d at 214–16 (holding that collective efforts in "supplying market information" are encompassed by the CV Act).

## IV.    ARGUMENT

### A.    Plaintiffs Fail to State a Sherman Act Section 1 Conspiracy Claim

Plaintiffs' 74-page Complaint boils down to a single antitrust claim: that Defendants and supposed "Co-Conspirators" consciously agreed for "at least" the last seven plus years to depress the price of milk that their own member-farmers receive. (*See* Compl. ¶¶ 1, 212–215, 224–230.) This claim is beyond counter-intuitive; it is economically perverse. It is largely fueled by two mistakes: (1) a dogged determination to pretend that the DFA and Select Co-ops somehow have existences other than as farmer-owned cooperatives (though Plaintiffs admit that is what they are); and (2) a fascination with ancient allegations about the DFA Co-op from geographic regions having nothing to do with the market for milk in the Southwest.[9]

Even if Plaintiffs' theory made economic sense (and it does not), Plaintiffs do not plead facts showing the existence of any agreement among the DFA and Select Co-ops to suppress their own pay prices or any involvement at all by GSA in the setting of pay prices. Plainitffs' irrelevant digressions do not satisfy their obligation to plead an antitrust conspiracy that is both plausible and more compelling (and more rational) than competing inferences. To the contrary,

---

[9] (*See, e.g.*, Compl. ¶¶ 108–109 (DOJ investigation into defunct predecessor firms in 1970s and resulting consent decree), ¶¶ 119–124 (*In re Southeastern Milk Antitrust Litigation* multidistrict litigation and related individual actions concerning the Southeastern region and the Appalachian FMMOs), ¶¶ 125–128 (*Allen v. Dairy Farmers of Am.* (D. Vt.) and resulting settlements concerning the Northeast region FMMOs), ¶¶ 130–131, 113 n.18, 115 n.19 (*Allen* opt-out plaintiffs' suit and resulting settlements in *Sitts v. Dairy Farmers of Am., Inc.* (D. Vt.)).)

the Complaint fails to allege anything more than a bald conclusion that an agreement exists. The Court should dismiss the Complaint for failure to state a claim.

### 1. Plaintiffs Fail to Plead a Price-Fixing Agreement Between the DFA Co-op and the Select Co-op with the Required Specificity

While the Complaint's allegations are voluminous, the facts alleged about the supposed unlawful price-fixing agreement are sparse, and do not "plausibly allege an agreement to fix [prices]." *Llacua*, 930 F.3d at 1175.[10] The Complaint does not point to any direct evidence of an agreement among the DFA and Select Co-ops to fix farmer pay prices. Instead Plaintiffs rely entirely on circumstantial allegations, trying to create an inference of an unlawful price-fixing agreement.[11] But the circumstantial evidence on which Plaintiffs rely is just as consistent with Defendants' independent economic interests as it is with an inference of collusion. *See Llacua*, 930 F.3d at 1180 ("[A] claim of conspiracy predicated on parallel conduct" is insufficient when "common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for the defendants' common behavior.").

---

[10] Rather than provide factual allegations regarding the purported agreement at issue, the Complaint spends pages discussing events not even involving the Select Co-op or GSA, that allegedly happened decades ago, in geographic regions far from the Southwest, while also relating the unremarkable fact that the DFA and Select Co-ops are among the owners of a joint marketing agency, GSA, that negotiates milk sales to processors. None of those allegations contributes anything to a claim of an unlawful agreement in the Southwest between the DFA and Select Co-ops to fix the prices that their farmer-members receive; they are merely an attempt to distract from what Plaintiffs must but have failed to plead.

[11] Plaintiffs *do not challenge* two other related sets of prices: (1) the government-mandated minimum prices processors must pay for raw milk; and (2) the actual prices the co-ops charged to processers for raw milk. The former is a federally regulated price, and cannot be the subject of an antitrust claim of unfair pricing. *Keogh v. Chi. & N.W.Ry Co.,* 260 U.S. 156, 163–64 (1922). The latter price, by Plaintiffs' admission, determines the cooperatives' top line receipts, not the price they pay to farmers. (*See* Compl. ¶¶ 89, 100.)

It is not remotely enough for Plaintiffs to allege, in conclusory fashion, that "Defendants and their Co-Conspirators" participated in an alleged "conspiracy to fix, stabilize, or maintain at artificially depressed values the sums paid for raw Grade A milk in the Southwest." (*See* Compl. ¶¶ 33, 138, 140–141, 197.) Plaintiffs must, but fail to, specify *who* did *what* that constituted the supposed agreement, much less *why*. *See Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, 691 F. App'x 515, 520 (10th Cir. 2017) (affirming dismissal of Section 1 claim where there were no allegations detailing who specifically conspired, what was agreed to, or why defendant "agreed to harm itself"); *see also Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1047 (9th Cir. 2008) (citing *Twombly*, 550 U.S. at 553).

**Who**. Plaintiffs do not allege who agreed with whom to fix farmers' pay prices. They do not allege any specific action by any specific individual, or even by any Defendant. This type of group pleading is impermissible. *Bristow*, 691 F. App'x at 519 ("[I]t is 'particularly important' to 'make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her . . .'" in complex cases against multiple defendants) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)); *New Mexico ex rel. Foy v. Vanderbilt Cap. Advisors, LLC*, No. CIV 09-0178 RB/MEH, 2009 WL 3672921, at \*4 (D.N.M. Apr. 13, 2009) (Brack, J.) (quoting *Robbins*, 519 F.3d at 1250) ("The Tenth Circuit has admonished all plaintiffs that . . . the Court will not speculate as to what acts a particular defendant is alleged to have committed.").

**What**. Plaintiffs also fail to allege what the alleged co-conspirators did to constitute the necessary agreement to fix farmer pay prices. Plaintiffs state that raw milk prices are depressed, but they never connect those allegations to any specific allegations about actions the Defendants supposedly took. They must do so to state a claim. *See, e.g.*, *In re Milk Prods. Antitrust Litig.,*

No. 3-96-458, 84 F. Supp. 2d 1016, 1020 (D. Minn. Sept. 30, 1997) (quoting *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1048 (D. Minn. 1992)) ("In the antitrust conspiracy context, however, general allegations of a conspiracy will not suffice; the claim must include a statement of 'the facts constituting the conspiracy, its object and accomplishment.'").

**Why.** Plaintiffs' Complaint fails to allege any plausible reason why cooperatives, which are owned 100% by their farmer-members, (Comp. ¶ 4), would be motivated to harm those same farmers—member-owners who elect cooperative leadership and democratically set and guide cooperative policy. *See Bristow*, 691 F. App'x at 519 (dismissal affirmed because "there are no allegations detailing . . . why [an alleged coconspirator] agreed to harm itself"); *Llacua*, 930 F.3d at 1181 (same); *see also Bell*, 348 F.3d at 1235 (noting that cooperative business decisions made for the benefit of the cooperative as a whole may not satisfy every member). These pleading requirements are not technicalities. Without providing the kind of factual allegations the law requires, Plaintiffs have failed to meet their burden of pleading facts that tend to exclude the possibility of lawful, independent action by the Defendants. *See Llacua*, 930 F.3d at 1179; *In re Milk Prods.*, 84 F.Supp.2d at 1020; *Bristow*, 691 F. App'x at 520.

### 2. Plaintiffs' Allegations of Parallel Conduct Fail to Raise a Plausible Inference of an Unlawful Agreement

Because the Complaint does not allege any direct evidence to support the existence of an unlawful agreement to fix prices, Plaintiffs ask the Court to infer an anticompetitive agreement between the DFA and Select Co-ops from a hodgepodge of circumstantial evidence allegations claiming similar actions by the two cooperatives. Circumstantial evidence can be a proper basis on which to base a conspiracy claim only if the alleged conduct is not equally likely the result of independent action. *Llacua*, 930 F.3d at 1175, 1180 ("[A] claim of conspiracy predicated on

14

parallel conduct" is insufficient when "common experience of the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative for the defendants' common behavior."). Plaintiffs' purported circumstantial evidence is equally consistent with independent action here.

Plaintiffs appear to base their circumstantial case on the following allegations of similar or parallel conduct: (i) the amounts that the DFA and Select Co-ops pay their farmer-members are "always within pennies per hundredweight"[12]; (ii) both co-ops "began to impose flexible maximum production amounts on their members" in or around October 2020 in response to GSA's "Tiered Pricing Program"; and (iii) the two co-ops have on occasions "jointly elect[ed] not to pool milk," and the frequency of non-pooling[13] of milk has increased, which has purportedly "driven down" the prices paid to Plaintiffs and the putative class members. (*See* Compl. ¶¶ 2, 158, 159, 162, 176-195.) Even accepting the accuracy of these allegations for the purposes of this motion, they do not support the existence of concerted action (as opposed to independent conduct) required to state a Section 1 claim.

**First**, Plaintiffs' estimates of a "few-pennies" difference in rates do not support an inference that the DFA and Select Co-ops jointly agreed to fix the net price that each co-op pays to its farmers. As a threshold matter, it is unclear that Plaintiffs have actually even alleged parallel pricing, given the large volumes of milk at issue[14] and Plaintiffs' admission that they

---

[12] Elsewhere Plaintiffs are less certain that this is "always" the case, as they allege that pay prices are "almost always" and "nearly always" within a few cents. (*See* Compl. ¶¶ 2, 162.)

[13] *See infra* n.17, for a description of "pooling" of milk.

[14] Plaintiffs' entire argument is misleading because "a few pennies" per hundredweight is actually a substantial difference. Plaintiffs are farmers who produce huge volumes of milk per month so those "pennies" add up to many dollars in the aggregate. The difference of just two cents could amount to a difference in pay price of thousands of dollars per year. *See* U.S. DEP'T

have not included "[a]nnual distributions of cooperative profits/earnings or equity repayments" in their assessment of the mailbox price paid to member-farms. (*Id*. ¶ 167.) But even if Plaintiffs did plead such parallelism, it is not enough to nudge them over the line from conceivable to plausible. *Twombly*, 550 U.S. at 570. Black-letter Supreme Court and Tenth Circuit law is clear that "[w]here circumstantial evidence is just 'as consistent with' unilateral action as with concerted action, it 'does not, standing alone, support an inference of antitrust conspiracy.'" *Llacua*, 930 F.3d at 1180 (citing *Matsushita*, 475 U.S. at 588).

The Complaint makes clear that similar or even matching mailbox prices are consistent with independent, unilateral action. The DFA and Select Co-ops pool and then jointly market their milk through their legally permitted marketing agency, GSA. (Compl. ¶¶ 133-34, 152.) Given that the revenue the DFA and Select Co-ops receive for the sale of their respective members' raw milk comes from the same pooled GSA sales and expenses, one would ***expect*** the prices paid to the farmers would be similar across the two co-ops. (*Id.*) Thus, even assuming that Plaintiffs have pled matching mailbox prices (they did not),[15] such parallelism "is consistent with other, equally plausible explanations"—indeed, far more reasonable explanations. *Llacua*, 930 F.3d at 1179-80. Under such circumstances, an inference of conspiracy is simply "impermissible." *Id.* at 1179.[16]

---

OF AGRIC., NAT'L AGRICULTURAL STATISTICS SERVICE, 2021 State Agriculture Overview: New Mexico,

https://www.nass.usda.gov/Quick_Stats/Ag_Overview/stateOverview.php?state=NEW%20MEX ICO (last visited May 31, 2022); NASS, *Milk Production* (U.S.D.A. Feb. 2020), https://www.nass.usda.gov/Publications/Todays_Reports/reports/mkpr0220.pdf.

[15] *See infra* Section IV.A.3.

[16] Plaintiffs' theory here is equally "impermissible" given that Defendants have no logical motive to conspire to reduce payments the farmer-members who own and control them. *See, e.g.*, *supra* Section IV.A; *see also Llacua*, 930 F.3d at 1179–80 ("An inference of conspiracy is impermissible if the defendants 'had no rational economic motive to conspire'. . . .").

Plaintiffs also concede that the DFA and Select Co-ops use "facially different calculation methods" to set the amount that farmers receive for the raw Grade A milk they have produced. (*Id.* ¶¶ 162-163.) Plaintiffs do not plead any *facts* (as opposed to conclusory allegations) showing that the two co-ops make these calculations in concert, or that they make anything other than *unilateral* decisions on what to pay their farmer-members. *Llacua*, 930 F.3d at 1180. Parties are allowed to conduct market research and react to market intelligence; such conscious parallelism is not unlawful even if it results in identical pricing. *See, e.g.*, *Twombly*, 550 U.S. at 553–54 (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)) ("Even 'conscious parallelism,' a common reaction of "firms in a concentrated market [that] recognize[e] their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.'"); *Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1256 (10th Cir. 2006) (citation and quotation marks omitted) ("'[U]nilateral conduct, regardless of its anti-competitive effects, is not prohibited' by § 1 of the Sherman Act."). In the absence of allegations tending to exclude the possibility of unilateral action , a bare allegation that their prices were "nearly always within just a few pennies of each other" is not sufficient to infer an unlawful agreement. (*See* Compl. ¶ 162.)

Indeed, Plaintiffs concede that the methodology by which the Defendant co-ops arrive at these similar results is "unclear." (*Id*. ¶ 100.) Admitting that they do not know gives the game away. Mere speculation that Defendants must be acting in concert is not enough to state an antitrust claim, nor are conclusory allegations such as "Defendants exploit this to their advantage." *Id*.; *see Allergy Rsch. Grp LLC v. Rez Candles Inc.*, No. 2:21-CV-73-TC-JCB, 2022 WL 1004214, at \*3 (D. Utah Apr. 4, 2022) (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983))

("[*Twombly*] emphasized that a district court has 'the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'"). Without any factual allegation that the DFA and Select Co-ops (and potentially others) *made an agreement between them* on what they were going to pay to their members, "[the] complaint does not disclose the existence of a pricing agreement . . . ." *TV Comm'ns Network, Inc.*, 964 F.2d at 1027.

**Second**, Plaintiffs' vague allegations regarding the "timing and similarity" between the DFA and Select Co-ops' use of "flexible maximum production amounts on their members," (Compl. ¶ 159), without more, are also insufficient to infer that the two co-ops entered into a price-fixing agreement. With raw milk supply exceeding demand in the Southwest, the timing and similarity of the Defendants' measures are equally as consistent with unilateral action as they are with an inference of an illegal agreement. (*Id.* ¶¶ 220–221.) Plaintiffs also concede the co-ops adopted those actions in response to a marketing plan implemented by GSA as a marketing agency in common. (*Id*. ¶ 159.) Plaintiffs fail to plead any facts to shed light on why the "timing and similarity" of the alleged production base regimes suggest an unlawful agreement. They do not allege any facts to exclude an "obvious alternative explanation," *Twombly*, 550 U.S. at 568, such as the two co-ops responding to similar market challenges—"market oversupply, foreign milk production, and decreased fluid milk consumption." (Compl. ¶ 220.) Both the DFA and Select Co-ops each had an obvious independent economic motivation, acting in the interest of their member-owners, to address those market-wide problems. GSA as the agency responsible for marketing the milk of the two co-ops would have that same interest. "[A]mbiguous conduct that is as consistent with permissible competition as with illegal conspiracy does not by itself support an inference of antitrust conspiracy under Sherman Act

section 1." *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 858 (10th Cir. 1999) (internal citations omitted).

**Finally**, Plaintiffs rely on alleged parallel conduct based on the co-ops' "non-pooling" of milk.[17] The Complaint begins with a threadbare allegation that Defendants engaged in "selective and increasingly frequent non-pooling of milk," (Compl. ¶ 2), and it summarily concludes that "depooling is part of their overall conspiracy to suppress pay to dairy farmers." (*Id.* ¶ 195.) Putting aside that decisions on pooling and depooling are "marketing" decisions that would fall squarely within the CV Act and other exemptions even if made jointly by co-ops (*see Treasure Valley*, 497 F.2d at 214–16), the Complaint does not explain any relationship between milk pooling and mailbox prices, and it offers no support for the existence of an alleged price-fixing agreement. Plaintiffs concede that pooling of milk is not a relevant factor when co-ops decide what to pay their producer-owners. (*Id.* ¶ 105.) And they further concede that co-ops are free to make decisions to pool or not pool their milk, with the exception of Class I fluid milk. (*See id.* ¶¶ 178, 186, 191.) Significantly, Plaintiffs even concede that market conditions incentivized depooling during the period complained of, that depooling was beneficial for farmers whose milk was depooled (*id.* ¶¶ 192-95), and, as such, depooling was in each Defendant's independent, economic self-interest and that of its respective memberships. Quite simply, the Complaint does not plead facts that show that the Defendants' pooling choices were anything other than

---

[17] "Pooling" refers to the practice of participating in the market-wide pool of the revenues from the sale of raw milk (here Federal Milk Marketing Order 126) by affiliating sales with that Order and drawing money from that pool in accordance with US Department of Agriculture regulations. "Market-wide pooling is how dairy farmers share in the benefits arising from the classified pricing of milk." U.S. DEP'T OF AGRICULTURE, *Federal Milk Marketing Order Pooling Provisions*, at 1, https://www.ams.usda.gov/sites/default/files/media/InformationonPoolingProvisionsforFederalO rders5and7.pdf. "Depooling" is the practice of disaffiliating the milk from that marketwide pool.

"consistent with independent action."  *See Matsushita,* 475 U.S. at 588; *see also Twombly*, 550 U.S. at 556 ("[L]awful parallel conduct fails to bespeak unlawful agreement.").

In sum, Plaintiffs' allegations, at best, merely describe two dairy cooperatives, facing challenging market circumstances, taking similar approaches in their independent self-interests in response to those challenges.  As such, an inference of conspiracy is impermissible here as a matter of law.  *Matsushita.*, 475 U.S. at 596-97; *see also Llacua*, 930 F.3d at 1179–80.

### 3.  Plaintiffs' Allegations About Other Market Circumstances Do Not Breathe Life into a Non-Existent Price-Fixing Claim

Finally, Plaintiffs try to bolster their insufficient allegations of parallel conduct with a kitchen-sink offering of other allegations about participation in lawful joint ventures and trade associations or the structure of the raw milk market that, they say, make a price-fixing agreement plausible.  These allegations add nothing to Plaintiffs' non-existent price-fixing claim.

Plaintiffs assert that the Court should infer that the DFA and Select Co-ops exchanged mailbox price information because they participated in joint ventures and in GSA, their common marketing agency, as well as trade associations.  (Compl. ¶¶ 152–155, 158.)  But Plaintiffs do not provide *any* evidence that the DFA and Select Co-ops exchanged information about how much to pay their respective farmers or that GSA was involved in such discussions.  They claim only that Defendants worked together in multiple settings that deal with the price they would charge processors for their members' milk.  *Id.*  The exchange of that type of price information adds nothing to Plaintiffs' otherwise non-existent price-fixing claim and is explicitly exempt from antitrust liability under the CV Act and other statutes because it increases cooperatives' bargaining power as against processors.  *See supra* Sections II.D & III.

Participation in joint ventures (like GSA, Southwest Cheese, Michigan Cheese, and Portales Dairy Products, LLC (Compl. ¶ 155)), and trade associations is "equally likely" a result

of the co-ops' mandate to improve their farmer-members' bargaining power, including by allowing members to expand processing capacity for their cheeses, whey proteins, and dried dairy ingredients. *Llacua*, 930 F.3d at 1178 ("[A] trade association is not by its nature a walking antitrust conspiracy."); *Twombly*, 550 U.S. at 567 n.12 ("belong[ing] to the same trade guild as one[s'] . . . competitors" does not render conspiracy plausible). These joint activities are explicitly encouraged under the CV Act and other laws because they increase cooperatives' bargaining power and are in cooperatives' independent economic self-interest. *Compare, e.g.*, (Compl. ¶¶ 155-56) *with, e.g.*, *Plant Oil Powered Diesel Fuel Sys. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1194-95 (D.N.M. 2011) (Browning, J.) (plausibility standard not met where alleged conduct was in line with regular participation in a standard-setting organization); *Llacua*, 930 F.3d at 1181 ("[R]egulatory overlay is a critical backdrop that provides relevant economic context to the Association Defendants' and Rancher Defendants' alleged conduct."); *and id.* at 1175 (plausibility standard not met where plaintiffs alleged acts "equally likely to result from independent, lawful action based on . . . regulations that established the process of hiring foreign shepherds and set the minimum wage").

Beyond that, Plaintiffs complain about an allegedly widening gap between the DFA Co-op members' mailbox prices and the co-op's revenues over the years, but cite only ***national*** (not Southwest) DFA Co-op revenue figures. (*Id.* ¶¶ 172–175.) They never explain how the purported national DFA Co-op gap shows a price-fixing agreement in the Southwest with the Select Co-op.[18] And they concede they have no information whatsoever as to Select's revenues and profit-sharing as to any geographic region. (*Id.* ¶ 175.)

---

[18] Likewise, Plaintiffs baldly assert that the DFA Co-op has retaliated against farmers in the Northeast who "try to escape its clutches." (Compl. ¶¶ 144–145.) Again, Plaintiffs'

Plaintiffs appear to wish that the DFA Co-op's management had taken some different actions, or that its employees had been paid less.[19]  While every cooperative member has rights and remedies available through the governance of their cooperative, including bylaws and membership agreements, such grievances do not find a home under the antitrust laws.  The Court should not allow claims about farmer-members' dissatisfaction with the choices made by democratically elected cooperative leadership to proceed under the guise of an antitrust price-fixing claim.  As the Supreme Court noted: "[i]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery . . . but quite another to forget that proceeding to antitrust discovery can be expensive."  *Twombly*, 550 U.S. at 558.

Thus, because Plaintiffs' "antitrust claim relies solely on circumstantial facts of parallel behavior, the conspiracy is not plausible [because] in light of common economic experience[,] the alleged conduct is equally likely to result from independent action."  *Llacua*, 930 F.3d at 1175.

### 4.    Plaintiffs Fail To Plead Facts Tying GSA to A Price Fixing Agreement

Plaintiffs have failed to plead any substantive allegations as to GSA.  In particular, Plaintiffs plead no facts claiming that GSA took any steps to fix or depress "mailbox prices."

The Complaint alleges only one GSA function, that it marketed and sold pooled raw Grade A milk of the associations that own GSA.  (Compl. ¶ 40.)  The Complaint states no direct evidence of any agreement by GSA to conspire with anyone to depress the prices paid to dairy

---

unsubstantiated anecdotes about dairy farmers in the Northeast (*id.* ¶ 145) say nothing about a supposed price-fixing agreement between the DFA and Select Co-ops "*in the Southwest*," the relevant geographic market that they have alleged.  (*Id.* ¶ 146 (emphasis added).)

[19]  Plaintiffs make no factual allegations as to what any of Defendants' executives are compensated or how any supposed conflict of interest relates to the summarily claimed price-fixing agreement between the DFA and Select Co-ops.

farmers. The Complaint also states no circumstantial evidence of any such agreement as it lays out no connection between the alleged function that GSA performed and the alleged agreement to fix the prices paid to farmers. In fact, there is a complete disconnect between the services GSA is alleged to have performed and the alleged antitrust violation. There is no allegation in the Complaint that ties the alleged underpaying of farmers for their raw milk to the marketing or sale services (of the raw Grade A milk) performed by GSA.

Plaintiffs concede that GSA is a joint dairy marketing agent. (Compl. ¶¶ 132–134.) It negotiates with milk processors to set a price they will pay to GSA for milk. GSA then distributes the proceeds from those sales, to the DFA and Select Co-ops. Plaintiffs do not allege that GSA sets the price that either co-op pays to its farmer-members. They do not allege, even perfunctorily, that GSA agreed or took any steps to suppress the price that any co-op pays to any farmers. They do not even allege that GSA is involved in deciding how much Plaintiffs are charged for GSA's services. Instead, the Complaint alleges that other Defendants charge their members for GSA's services. (*Id*. ¶ 157.) Thus, there is literally nothing in the Complaint that even tangentially ties GSA to the alleged conspiracy to fix prices paid to farmers.

### B. Plaintiffs' Antitrust Claim Is Time-Barred

Plaintiffs can recover damages under the antitrust laws only if they file suit within four years after the cause of action accrued, plus any additional number of years during which the statute of limitations was tolled. 15 U.S.C. § 15(b); *see Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). Generally, "a cause of action [for an antitrust claim] accrues [] when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp.*, 401 U.S. at 338. The Supreme Court has explained that "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date." *Id*. at 339. Here, Plaintiffs bring a single cause of action

23

based on an agreement that allegedly occurred more than seven years ago, "at least as early as January 1, 2015." (Compl. ¶ 225.) Plaintiffs do not adequately plead any basis to toll the statute of limitations for an agreement beginning in January 2015, that would otherwise have run in January 2019. The Court should dismiss Plaintiffs' claim as time-barred.

### 1. Plaintiffs' Mere Mention of Unrelated Conduct in 2020 Cannot Bring Plaintiffs' Claims within the Statute of Limitations

Plaintiffs attempt to bring their claim within the statute of limitations by making a generalized allegation about the similarity and timing of tiered pricing programs in 2020 during the pandemic. (*See* Compl. ¶ 159.) But as explained above, this conduct is at least equally consistent with independent business judgment in response to oversupply and a marketing program already adopted by GSA. Moreover, this allegation is divorced from the heart of the complaint—that the price of milk paid to farmer-members has been depressed since January 2015, while the DFA Co-op's revenues and profits have increased. (*See id.* ¶ 173.)[20] Indeed, Plaintiffs allege that dairy market results in 2020 were very different from the 2015–2019 time period. (*See id.* ¶ 174.) Accordingly, Plaintiffs' peripheral mention of programs adopted due to market forces in 2020 does not bring their claim within the statute of limitations.[21]

### 2. The Complaint Provides No Basis for Tolling the Statute of Limitations

Plaintiffs are aware of their time-bar problem and try to plead fraudulent concealment to avoid it. But antitrust plaintiffs must plead fraudulent concealment with particularity under Fed

---

[20] Tellingly, Plaintiffs admit they have no information as to the Select Co-op's revenues and profits for any period, let alone how those revenues and profits correlate to the prices the Select Co-op paid its members in the Southwest. (Compl. ¶ 175.)

[21] Even if the Court determined that the pricing programs adopted around October 2020 stated a plausible claim, this would be the only conduct complained about within the statute of limitations, and thus, any claim based on prior conduct relating to an alleged conspiracy made "at least" by January 2015 would be time barred.

R. Civ. P. 9(b), to support three elements: (1) affirmative acts of concealment by the defendant; (2) successful concealment from the plaintiff; *and* (3) plaintiff's due diligence until discovery of the facts. *See*, *e.g.*, *In re Aluminium Phosphide Antitrust Litig.*, 905 F. Supp. 1457, 1469 (D. Kan. 1995). Plaintiffs' barebones fraudulent concealment allegations woefully fail to meet this standard.

### a.  The Complaint Does Not Allege Any Affirmative Acts to Conceal the Alleged Conduct

Plaintiffs' allegation that the conspiracy was, "by its very nature, . . . self-concealing" (Compl. ¶ 219) is not enough to plead fraudulent concealment in the Tenth Circuit. *See King & King Enters. v. Champlin Petroleum Co.*, 446 F. Supp. 906, 913 (E.D. Okla. 1978) (collecting cases). Courts in this Circuit have consistently required allegations of an affirmative act to fraudulently conceal the alleged conduct to toll the statute of limitations, rather than a simple failure to disclose. *See*, *e.g.*, *id.* ("[M]ere failure to disclose the existence of a cause of action does not constitute fraudulent concealment."). Attributing lower milk prices to market factors (*see* Compl. ¶¶ 220-21 (quoting public statements by the DFA Co-op representatives regarding the imbalances between global dairy supply and demand levels in the context of milk pricing)) instead of "confessing" to a price-fixing conspiracy also does not constitute an affirmative act of concealment. *In re Aluminium Phosphide Antitrust Litig.*, 905 F. Supp. at 1470; *see also King & King Enters.*, 446 F. Supp. at 912. As one court has noted, to hold otherwise "would effectively nullify the statute of limitations in these cases." *See In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d at 1022–23 (no fraudulent concealment where defendants attributed their high profits to various factors).

The complexity of milk pricing (Compl. ¶¶ 105-107, 219) also cannot sustain a claim of fraudulent concealment. *See*, *e.g.*, *Atchison, Topeka & Santa Fe Ry. v. Chevron U.S.A.*, 896 F.2d

561 (Temp. Emer. Ct. App. 1989) (complex pricing mechanisms not sufficient to "justify tolling the statute of limitations period on the basis of fraudulent concealment"); *Ashland Oil Co. of California v. Union Oil Co. of California*, 567 F.2d 984, 988 (Temp. Emer. Ct. App. 1977) (same); *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1143 (Fed. Cir. 1996) (failure to reveal pricing decision did not constitute fraudulent concealment). Such treatment is particularly appropriate where, as here, the named Plaintiffs are sophisticated business owners who operate some of the largest farms in the Southwest.

Plaintiffs cannot meet the stringent fraudulent concealment pleading standard with vague claims of "secret meetings" and "surreptitious communications" (Compl. ¶ 218) without factual allegations regarding the who, what, when, and why regarding these phantom occurrences; such threadbare assertions do not meet Rule 9(b)'s heightened pleading standard. *See In re Urethane Antitrust Litig.*, 409 F. Supp. 2d 1275, 1285 (D. Kan. 2006) (allegations that defendants "met secretly to discuss prices, customers, and markets," without alleging "who met or when or where those meetings took place"); *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d at 1078 (dismissing fraudulent concealment allegations in part where class plaintiffs provided no details about the alleged meetings where defendants supposedly gave false and pretextual reasons for prices); *see also In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 774 (D. Minn. 2020) (dismissing virtually identical allegations).

### b. Plaintiffs Did Not Exercise Due Diligence

Plaintiffs fail to plead *any facts* alleging that they exercised the requisite due diligence in investigating their seven-plus year old claim. *See King & King Enters.*, 657 F.2d at 1154–55; *Crowe v. Servin*, 723 F. App'x 595, 597 (10th Cir. 2018). Instead, Plaintiffs parrot legal conclusions, such as that they "exercised reasonable due diligence" (Compl. ¶ 222), but such conclusory statements are insufficient. *See Staley v. Gilead Scis., Inc.*, No. 19-cv-02573-EMC,

2021 WL 4972628, at \*19 (N.D. Cal. Mar. 12, 2021) (complaint deficient where plaintiffs alleged in conclusory terms that defendants affirmatively concealed their misconduct and that they could not have discovered the conduct until another set of plaintiffs filed suit). Because Plaintiffs' claim accrued by "at least . . . 2015" (Compl. ¶ 166) and they did not file it within the four-year limitation period, 15 U.S.C. § 15b, their claim is time-barred and the Court should dismiss it.

## V.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion and dismiss Plaintiffs' Complaint.

Pursuant to D.N.M.LR-Civ. 7.1(a), Defendants' counsel conferred in good faith with Plaintiffs' counsel on May 25, 2022 and determined that Plaintiffs oppose this motion.

Dated: May 31, 2022                    Respectfully submitted,

                                       RODEY, DICKASON, SLOAN, AKIN, &
                                       ROBB, P.A.

                                           /s/ Andrew G. Schultz
                                       Andrew G. Schultz
                                       Linda M. Vanzi
                                       Melanie Stambaugh
                                       Alexandra R. Waleko
                                       Post Office Box 1888
                                       Albuquerque, NM 87103
                                       Telephone: (505) 765-5900
                                       Facsimile   (505) 768-7395
                                       Email:     aschultz@rodey.com
                                                  lvanzi@rodey.com
                                                  mstambaugh@rodey.com
                                                  awaleko@rodey.com

Alfred C. Pfeiffer, Jr. (admitted *pro hac vice*)
Sarah M. Ray (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: 1.415.391.0600
Facsimile: 1.415.395.8095
al.pfeiffer@lw.com
sarah.ray@lw.com

W. Todd Miller (admitted *pro hac vice*)
BAKER & MILLER PLLC
2401 Pennsylvania Ave., N.W. #300
Washington, D.C. 20037
Telephone: 1.202.663.7822
Facsimile: 1.202.663.7849
tmiller@bakerandmiller.com

***Attorneys for Defendant Dairy Farmers of America, Inc.***


 /s/ Gene Creely
Gene Creely
Dalva Moellenberg
Anthony Trujillo
GALLAGHER & KENNEDY
1239 Paseo de Peralta
Santa Fe, NM 87501
Telephone: 1.505.982.9523
gene.creely@gknet.com
dlm@gknet.com
ajt@gknet.com

Tim Hardwicke (admitted *pro hac vice*)
Brian Borchard (admitted *pro hac vice*)
GOODSMITH GREGG & UNRUH LLP
150 S. Wacker Suite 3150
Chicago, IL 60606
Telephone: (312) 322-1981
Facsimile: (312) 322-0056
thardwicke@ggulaw.com
bborchard@ggulaw.com

*Attorneys for Defendant Select Milk Producers, Inc.*

 /s/ Douglas A. Baker
Douglas A. Baker
Atkinson, Baker & Rodriguez, P.C.
201 Third St.  NW, Suite 1850
Albuquerque, NM 87102
Telephone: 1.505.764.8111
Facsimile: 1.505.764.8374
dbaker@abrfirm.com

*Attorney for Defendant Greater Southwest Agency*