## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

OTHART DAIRY FARMS, LLC, PAREO
FARM II, INC., DESERTLAND DAIRY,
LLC, DEL ORO DAIRY, LLC, BRIGHT
STAR DAIRY, LLC, and SUNSET DAIRY,
LLC, individually and on behalf of all others
similarly situated,

     Plaintiffs,

v.                                                                  No. 2:22-cv-00251-MIS-DLM

DAIRY FARMERS OF AMERICA, INC.,
SELECT MILK PRODUCERS, INC., and
GREATER SOUTHWEST AGENCY,

     Defendants.

### ORDER
### DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

**THIS MATTER** is before the Court on Defendants' Motion to Dismiss Plaintiffs'

Complaint, filed May 31, 2022, by Defendants Dairy Farmers of America, Inc. ("DFA"); Select

Milk Producers, Inc. ("Select Milk"); and Greater Southwest Agency ("GSA") (collectively

"Defendants"). ECF No. 38. Plaintiffs Othart Dairy Farms, LLC; Pareo Farm, Inc.; Pareo Farm

II, Inc.; Desertland Dairy, LLC; Del Oro Dairy, LLC; Brightstar Dairy, LLC; and Sunset Dairy,

LLC (collectively "Plaintiffs") responded, ECF No. 45, and Defendants replied, ECF No. 47.

Upon due consideration of the parties' submissions, the record, and the relevant law the Court

will **DENY** the Motion.

## I.    FACTUAL BACKGROUND[1]

Plaintiffs are all dairy farmers in New Mexico who are currently, or have been until recently, members of DFA. Compl. (ECF No. 1) ¶¶ 21-26. Defendants DFA and Select Milk are not-for-profit dairy cooperatives operating in the Southwest, including New Mexico, who also provide milk processing to their members. *Id.* ¶¶ 27-28. DFA, Select Milk, and Lone Star Milk Producers—a dairy cooperative not a party in this suit—co-own GSA for the purposes of jointly marketing milk. *Id.* ¶ 29. GSA markets nearly 100% of raw milk processed by cooperatives in the Southwest and 85-90% of all raw milk produced in the Southwest. *Id.*

Without getting into the deeper complexities of milk pricing—which are set out in great detail in the Complaint, *see id.* ¶¶ 43-118, 176-95—a short explanation will be helpful when considering Plaintiffs' price-fixing allegations and Defendants' Motion. Milk has a blend of common characteristics—a fungible commodity with inelastic demand that is highly perishable and must be collected twice daily—that gives raw milk buyers lopsided power in pricing barring some artificial re-balancing of the market. *Id.* ¶¶ 43-44, 101-02. Dairy cooperatives operate as member-owned marketers so that producers may collectively participate in the dairy market. *Id.* ¶ 4. Before milk is sold in retail outlets, it must be processed into either fluid drinking milk or some other dairy product, meaning that dairy farmers must have access to processors in order to have access to the dairy market. *Id.* ¶¶ 50-52. Cooperatives can also be—and Defendants are— vertically integrated so that milk production, marketing, hauling, processing, bottling, and distribution are centralized in a single entity. *Id.* ¶¶ 59, 61. Milk processors, such as Defendants, are also called "handlers" when pricing and selling milk. *See id.* ¶¶ 95, 100.

---

[1]    The Court accepts the truth of all well-pleaded factual allegations in Plaintiffs' Complaint and draws all reasonable inferences in Plaintiffs' favor for the purposes of this Motion.

The USDA establishes monthly minimum prices for each of four classes of Grade A raw milk in each geographic region, known as a Federal Milk Marketing Order ("FMMO), through a shared revenue process called "pooling." *Id.* ¶¶ 6, 85. New Mexico and much of DFA's Southwest region is under FMMO No. 126. *Id.* ¶ 96. Because a dairy cooperative participates as a single processor in pooling, the FMMO-established minimum price serves as a market indicator, but it does not obligate DFA or Select Milk to pay their members that rate. *Id.* ¶ 85.

Before the revenue sharing process occurs, the four classes of raw milk each have a different use and "component value" based on ratios of milk components (fats, proteins, non-fat solids and other solids). *Id.* ¶¶ 85, 89. Each week, handlers, such as Defendants DFA and Select Milk, mandatorily report volume of sales and their value to the USDA. *Id.* ¶¶ 86-87. To arrive at the milk prices for Southwest FMMO No. 126, the USDA then determines the next month's component values for Class II-IV as a linear relationship between "yield" (fixed estimated quantity of end product) and the difference between "commodity price" (weighted monthly average of the end product) and "make allowance" (fixed estimated cost of processing the milk). *Id.* ¶¶ 86-90. Class I, fluid drinking milk, price is calculated using pricing factors determined in Classes III and IV.[2] *Id.* ¶¶ 87-88.

Once the USDA determines component values for the month, all participating handlers go through pooling. *Id.* ¶ 176. First, handlers pay into the pool based on their use of milk components. *Id.* They then have a right to draw from the pool as much as they contributed, meaning handler value is equal to their contribution to the pool. *Id.* ¶ 91. The residual after sales determines whether the handlers' equity is positive or negative. *Id.* ¶¶ 91-92, 176. Equity is

---

[2] Class III milk is used to produce hard cheeses and spreadable cheeses, while Class IV milk is used to manufacture butter and dry milk products. *Id.* ¶ 55.

collectively determined for all handlers participating in an FMMO, each receiving the same base equity with adjustments based on location of their plant. *Id.* ¶ 176.

Handlers can increase their equity compared to competitors by selectively pooling. *See id.* ¶¶ 188-95. The USDA sets Class I milk price for FMMO No. 126 at the beginning of each month, and all other classes at the end of the month, with the potential, for example, that Class III (cheese) ends higher than Class I (fluid milk) and creates a negative equity. *Id.* ¶ 176. Processors must always pool Class I milk, but at the end of each month, they may choose to pool Classes II-IV equal to the amount of Class I milk they pooled. *See id.* ¶¶ 176-87. The Southwest dairy market is unusual in that there is greater demand for cheese than fluid dairy, i.e., Class III has higher sales volume than Class I. *Id.* ¶ 99. For example, in 2021, 93% of Class III milk was de-pooled for seven months, which drove down prices that farmers receive for raw milk and thereby increased revenue for vertically integrated operations. *Id.* ¶¶ 194-95.

Dairy cooperatives are unique from other handlers, such as supply plants or distributors, because their vertical structure integrates distribution and processing into a single entity, meaning the FMMO component prices set the market they participate in, but they are not obligated to pay members based on the established component prices. *Id.* ¶ 100. Member-farmers receive a monthly payment based on the equity the cooperative receives less undisclosed costs. *Id.* ¶¶ 105-06. The Mailbox Milk Price, published monthly by the USDA Agricultural Marketing Service, is the weighted average of price paid to dairy farmers by state, calculated as price received for milk sold less costs. *Id.* ¶ 167. The price paid to a member-farmer need not match the FMMO or the Mailbox Milk Price, nor does the algorithm to calculate actual payment need to be disclosed. *Id.* ¶ 100. Plaintiffs allege that Defendants coordinate de-pooling as part of a conspiracy to drive down raw milk prices paid to members. *Id.* ¶¶ 194-95.

## II.      PROCEDURAL HISTORY

On April 4, 2022, Plaintiffs filed suit under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, against Defendants DFA, Select Milk, and GSA, alleging a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by depressing payments to member-farmers through sharing pricing information, selective de-pooling of milk, and coordinating price decisions. *Id.* ¶¶ 2, 225. On May 31, 2022, Defendants filed the instant Motion to Dismiss for failure to state a claim and failure to file a timely claim. ECF No. 38 at 11, 23. Plaintiffs filed a response on June 30, 2022, ECF No. 45, and Defendants filed a reply on July 14, 2022. ECF No. 47. United States Magistrate Judge Stephan Vidmar subsequently issued an order staying discovery pending the Court's ruling on the Motion to Dismiss. ECF No. 50.

## III.     LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move for dismissal if the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not impose a probability requirement, but it demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. Although the court must accept the truth of all properly alleged facts and draw all reasonable inferences in the plaintiff's favor, the plaintiff still "must nudge the claim across the line from conceivable or speculative to plausible." *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The factual allegations in the complaint against a defendant "must be enough to raise a right to relief above the speculative level." *Christy Sports, L.L.C. v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009) (citation omitted); *see also Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) ("[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims.").

The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," because "courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Id.* at 556. The court's role when reviewing "a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

## IV.   DISCUSSION

Defendants request that the Court dismiss Plaintiffs' Complaint (1) as time-barred and (2) for failure to state a claim. ECF No. 38 at 1-2. The Court addresses each issue in turn.

### A.   Whether Plaintiffs' price-fixing claim is time-barred.

Claims made under Section 1 of the Sherman Act are barred by the statute of limitations after four years from when the cause of action accrued. 15 U.S.C. § 15b; *see also Zenith Radio*

*Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). Unless tolled, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio*, 401 U.S. at 338. When the claim is a continuing conspiracy to violate antitrust laws, a cause of action accrues—and the statute begins to run—with each act that injures the plaintiff. *Id.*

Although a statute of limitations bar is generally an affirmative defense that requires factual development before deciding, *see Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022) (citing *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018)), it may be resolved on a 12(b)(6) motion to dismiss when "the dates given in the complaint make clear that the right sued upon has been extinguished[,]" *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 671 (10th Cir. 2016) (citation omitted). *See also Wyo-Ben, Inc. v. Haaland*, 63 F.4th 857, 866 (10th Cir. 2023).

Defendants contend that a cause of action immediately accrues once a plaintiff feels the impact of the harmful act, ECF No. 38 at 23 (citing *Zenith Radio Corp.*, 401 U.S. at 338-39), and argue that Plaintiffs' cause of action accrued on January 1, 2015, and became time-barred on January 1, 2019, *id.* at 23-24.[3] Plaintiffs argue that their claim is timely under the "continuing violation" doctrine. ECF No. 45 at 20-21 (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *In re EpiPen Mktg., Sales Prac. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1328 (D. Kan. 2018)). They further argue that, in the event that the Court finds the cause of action accrued and

---

[3] Defendants further argue that the tiered pricing programs introduced in 2020 are "equally consistent with independent business judgment in response to oversupply and a marketing program already adopted by GSA" and cannot be used to restart the statute of limitations. ECF No. 38 at 24. However, Plaintiffs provide this information in their complaint as a supporting example to prove conspiracy and only briefly mention it again in their response. *See* ECF No. 1 ¶ 159; ECF No. 45 at 21 n.126. The Court does not rely on this information in its determination.

is time-barred, the limitations period should be equitably tolled based on fraudulent concealment. *Id.* at 21-24; *see also* ECF No. 1 ¶ 223.

### 1.  Whether the limitations period has expired.

As previously stated, unless tolled, a federal antitrust claim generally "accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp.*, 401 U.S. at 338. "In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.* In the Tenth Circuit, the "continuing conspiracy" exception hinges on whether the "wrongful conduct was a new and independent act that injured plaintiff anew, rather than merely a reaffirmation of a previous [act]." *Kaw Valley Elec. Co-op., Inc. v. Kan. Elec. Power Co-op., Inc.*, 872 F.2d 931, 933-34 (10th Cir. 1989) ("The exception thus has two requirements that are not entirely consistent: the acts in question must be distinct from the acts outside the limitations period, but they must continue the same conspiracy."); *see also Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) (noting that the plaintiff is equally entitled to sue based on the most recent alleged harmful conduct as they are on the first impact of the continuing conduct).

The Tenth Circuit applies a two-prong analysis to clarify this conflicting standard: "1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." *Kaw Valley*, 872 F.2d at 934; *see also Champagne Metals v. Ken Mac Metals, Inc.*, 458 F.3d 1073, 1088 (10th Cir. 2006); *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1248 (10th Cir. 2016); *In re EpiPen*, 336 F. Supp. 3d at 1329. As to the first prong, a new and independent

act requires efforts to enforce the ongoing conspiracy. *See Champagne Metals*, 458 F.3d at 1089 (citing IV Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 210 (2d ed. 2003)); c*ompare Kaw Valley*, 872 F.2d at 934-35 (finding that the exception did not apply where an electric cooperative's decision to exclude non-members was final due to the wording in a formal resolution passed by its board and because each subsequent request and denial for power flowed from the single decision without further action), *with Champagne Metals*, 458 F.3d at 1089-90 (applying the exception where defendants perpetuated a group boycott through additional acts of threat and intimidation), *and Auraria Student Hous.*, 843 F.3d at 1248 (finding new acts in furtherance of the conspiracy for each year the university's anticompetitive residency requirement was applied and enforced). As to the second prong, new and accumulating injury occurs when a new act inflicts harm that is not merely an "unabated inertial consequence" of a pre-limitations period action. *Kaw Valley*, 872 F.2d at 933 (citation omitted); *compare id.* at 934 (finding that since the cooperative's decision to exclude non-members was final, later applications were "mere futile requests" and not a new harm), *with Champagne Metals*, 458 F.3d at 1090 (finding that each act of pressure to enforce the boycott inflicted a new injury by denying the plaintiff access to the market), *and Auraria Student Hous.*, 843 F.3d at 1248 (finding a new and accumulative injury each year the defendant enforced policies on a new group of students).

Here, the Complaint alleges that Defendants engaged in a conspiracy to depress prices paid monthly to member dairy farmers beginning on or around January 1, 2015. ECF No. 1 ¶¶ 3, 166. Cooperative members received monthly payments based on their product supply, but calculations for the received prices and deducted expenses were allegedly opaque. *Id.* ¶¶ 105-06. Based on publicly available data, Plaintiffs show an average annual increase in sales price compared to a stable or lower corresponding average price paid to members. *Id.* ¶ 116. Plaintiffs

allege this decrease in distribution to members continued from approximately 2015 up to at least 2020, *id.* ¶ 172. Plaintiffs filed their Complaint on April 4, 2022. ECF No.1.

The initial date of alleged injury, January 1, 2015, is clearly outside of the four-year limitations period. However, the Court finds that the Complaint plausibly alleges a continuing violation. First, once Defendants allegedly decided to depress prices, the conspiracy would not perpetuate but for continued actions to calculate prices and payouts at reduced rates that renew a commitment to continue the anticompetitive conduct—each month, Defendants committed a new and independent act when they calculated new milk prices, calculated payments to members, and paid out lower prices as part of an ongoing conspiracy. Second, rather than a mere passive consequence of a single decision, each monthly payment created a new and accumulating injury that resulted from the alleged acts. Accordingly, the Court finds that the Complaint plausibly alleges a continuing conspiracy to violate the antitrust laws.

A statute of limitations issue may only be resolved on a 12(b)(6) motion to dismiss when "the dates given in the complaint make clear that the right sued upon has been extinguished." *Sierra Club*, 816 F.3d at 671. Here, the dates given in the Complaint do not make clear that the right sued upon has been extinguished. Specifically, the Complaint plausibly alleges a depressed payout to Plaintiffs as recently as 2020 as part of a continuing violation. ECF No. 1 ¶ 172. Plaintiffs filed their Complaint on April 4, 2022—well within the four-year limitations period. Therefore, the date of accrual is a plausibly alleged question of fact sufficient to survive Defendants' Motion to Dismiss on statute of limitations grounds. *See Sierra Club*, 816 F.3d at 671.

However, even if the continuing violation exception did not apply, the Court would still find that the Complaint survives Defendants' statute of limitations challenge based on fraudulent concealment.

### 2. Whether the limitations period should be tolled due to fraudulent concealment.

When a cause of action is time-barred, the equitable principle of fraudulent concealment may toll the limitations period unless Congress expressly forbids such tolling. *See Pub. Serv. Co. of N.M. v. Gen. Elec. Co.*, 315 F.2d 306, 310, 311-12 (10th Cir. 1963) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946) (citing *Bailey v. Glover*, 88 U.S. 342, 348 (1874))). The doctrine of fraudulent concealment applies to antitrust actions. *Id.* at 311-12. The asserting party must show

> (1) the use of fraudulent means by the party who raises the ban of the statute; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action.

*King & King Enters. v. Champlin Petroleum Co.*, 657 F.2d 1147, 1154 (10th Cir. 1981) (quoting *King & King Enters. v. Champlin Petroleum Co.*, 446 F. Supp. 906, 910-11 (E.D. Okla. 1978)).

Defendants argue that the Complaint fails to plead fraud with particularity. ECF No. 38 at 24-26 (citing *In re Urethane Antitrust Litig.*, 409 F. Supp. 2d 1275, 1285 (D. Kan. 2006)).

Plaintiffs argue that determining fraudulent concealment is a question for the trier of fact. ECF No. 45 at 23 (citing *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09–cv–230, 2014 WL 2610613, at *23 (D. Vt. June 11, 2014)); *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979)). Plaintiffs further argue that "Defendants have the burden, as the moving parties, to demonstrate conclusively that the Plaintiffs, through the exercise of reasonable diligence,

would have discovered adequate grounds for filing suit." *Id.* (quoting *Allen*, 2014 WL 2610613, at *23). Plaintiffs appear to argue that the burden of persuasion shifts to Defendants once Plaintiffs have provided evidence in support of their fraudulent concealment claim, *see id.* at 23-24 (citing *Allen*, 2014 WL 2610613, at *23), and argue that this question is not appropriately determined at the motion to dismiss stage, *id.* (citing *In re EpiPen*, 336 F. Supp. at 1330).

In their Reply, Defendants argue that Plaintiffs bear the burden of proving fraudulent concealment. ECF No. 47 at 11. They also appear to argue—without citation to authority—that fraudulent concealment is not a question of fact for the jury and ask the Court to determine fraudulent concealment as a matter of law. *Id.*

Generally, allegations of fraud—including fraudulent concealment—must be pleaded with particularity. Fed. R. Civ. P. 9(b); *Dummar v. Lummis*, 543 F.3d 614, 621 (10th Cir. 2008) ("Allegations of fraudulent concealment, like other types of fraud, must be pleaded with particularity."). However, pursuant to Rule 8(c)(1), statute of limitations is an affirmative defense that a plaintiff need not anticipate in the complaint, nor, once raised, must the plaintiff reply. *See Fernandez*, 883 F.3d at 1298-99 (citations omitted) (noting that the purpose of Rule 8(c) is to give opposing parties notice of any issues raised); *see also Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971) (same). As an affirmative defense, a court may dismiss a claim on statute of limitations grounds "only when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez*, 883 F.3d at 1299 (citations omitted); *see also Dummar*, 543 F.3d at 619, 622 (noting that when "the answer is apparent on the face of the complaint, [an affirmative defense] may be resolved on a motion to dismiss"). Accordingly, Rule 9(b) does not require plaintiffs to plead with particularity the circumstances constituting fraudulent concealment when that doctrine is raised

solely to defeat a statute of limitations affirmative defense. *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1235 (D. Kan. 2010) (rejecting the defendants' argument that Rule 9(b) required the plaintiffs to plead with particularity the circumstances constituting fraudulent concealment in order to defeat a statute of limitations affirmative defense).

Although a plaintiff need not anticipate or address the statute of limitations defense at the pleading stage, the burden of proving fraudulent concealment is ultimately on the party asserting it. *King & King Enters.*, 657 F.2d at 1154-55; *see also Fernandez*, 883 F.3d at 1299 ("[Fraudulent concealment] is one of the unusual circumstances where the burdens of pleading and persuasion are not on the same party."). Therefore, on a 12(b)(6) motion, if the Complaint concedes one of the three elements of fraudulent concealment, then equitable tolling will not apply.[4] *See Dummar*, 543 F.3d at 619, 622 (denying an assertion of fraudulent concealment because plaintiff did not plead an element that overlapped with those of the underlying cause of action).

### a. Fraudulent means

The first element of fraudulent concealment requires Plaintiffs to show "the use of fraudulent means by the" Defendants. *King & King Enters.*, 657 F.2d at 1154. The Tenth Circuit requires a plaintiff to show "that he exercised due diligence and that some affirmative act of

---

[4]     Defendants rely on outcomes from *In re Urethane*, a series of cases where statute of limitations issues were decided prior to *Herrera*, *Fernandez*, and *Sierra Club*. *See* ECF No. 38 at 26 (citing *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1069-70 (D. Kan. 2009); *In re Urethane*, 409 F. Supp. 2d at 1285). The Tenth Circuit, cognizant of its precedent, shows in its more recent opinions that an affirmative defense is not generally a reason for granting a motion to dismiss. *Herrera*, 32 F.4th at 991 (only dismissing on a statute of limitations defense when the dates alleged clearly show the claim is time-barred); *Fernandez*, 883 F.3d at 1299 (refusing to dismiss when complaint does not admit all elements of an affirmative defense); *Sierra Club*, 813 F.3d at 671 (dismissing a claim because the complaint clearly admitted to dates outside of the statute of limitations and the continuing violation exception did not apply). Further, in *In re Urethane*, the plaintiffs had multiple opportunities to plead their case, presumably to an extent sufficient to determine whether the claim survives an affirmative defense. *See In re Urethane*, 663 F. Supp. 2d at 1078. The case at bar has an undeveloped record and only initial pleadings. Given that an affirmative defense need not be anticipated in the complaint, Plaintiffs' general allegation of meetings and communications may not meet the particularized standard required for fraudulent concealment, but a deficiency does not extinguish the Plaintiffs' cause of action at this time.

fraudulent concealment frustrated discovery notwithstanding such diligence." *Id.* In the antitrust context, an affirmative act can include conduct that is part of the alleged antitrust violation. *See id.* at 1156 ("The evidence pertaining to price fixing points to the concealment of those activities.").

Defendants assert that failure to disclose is not a sufficiently affirmative act. ECF No. 38 at 25 (citing *King & King Enters.*, 446 F. Supp. at 913). They argue that public statements "[a]ttributing lower milk prices to market factors" is not an affirmative act of concealment. *Id.* (citing *In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022-23 (D. Minn. 1997); *King & King Enters.*, 446 F. Supp. at 912; *In re Aluminum Phosphide Antitrust Litig.*, 905 F. Supp. 1457, 1470 (D. Kan. 1995)). They further argue that Plaintiffs' "vague claims of 'secret meetings' and 'surreptitious communications'" are insufficient to satisfy Rule 9(b)'s particularity standard. *Id.* at 26 (citing *In re Urethane*, 409 F. Supp. 2d at 1285).

Plaintiffs argue that they have plausibly alleged that Defendants engaged in affirmative acts of concealment by way of "publicly, affirmatively, and falsely stat[ing] that these price declines have been due to market oversupply, foreign milk production, and decreased fluid milk consumption." ECF No. 45 at 21-22 (quoting ECF No. 1 ¶ 220). Plaintiffs cite three examples contained in the Complaint of alleged affirmative acts with the specificity of time, place, and contents, *see Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000); *see also Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1277 (10th Cir. 2023), all committed with the alleged purpose of overstating the competitiveness of the dairy market and failing to disclose the market's true condition: (1) May 2016 testimony at a House Agricultural Subcommittee on oversupply in the United States' dairy market; (2) a June 2016 newspaper article restating Defendants' comments on oversupply; (3) a March 2018 statement made by a spokesperson on

economic conditions and oversupply depressing dairy prices. ECF No. 45 at 21-22 (citing ECF No. 1 ¶¶ 220-21). They further argue that failure to disclose is a sufficiently affirmative act of fraudulent concealment where a fiduciary duty is owed. *Id.* at 23 (discussing *Allen*, 2014 WL 2610613, at *21); *see also id.* at 23 n.139 (citing, *inter alia*, *King & King Enters.*, 446 F. Supp. at 912).

As an initial matter, the Court agrees with Plaintiffs that where a fiduciary duty is owed to the party asserting fraudulent concealment, plaintiffs may use failure to disclose to prove an affirmative act to fraudulently conceal. *See King & King Enters.*, 657 F.2d at 1155 (quoting *King & King Enters.*, 446 F. Supp. at 911). If the dairy cooperatives owe a fiduciary duty to their members, a plausible allegation of failure to disclose is then sufficient to show that Defendants took affirmative acts to fraudulently conceal the alleged price-fixing scheme from Plaintiffs. However, whether a fiduciary duty exists is a mixed question of fact and law premature for resolution at the motion to dismiss stage. *See Viviani v. Coffey & Assocs., Inc.*, Case No. CIV-22-00090-PRW, 2023 WL 2432026, at *5 n.31 (W.D. Okla. Mar. 9, 2023) (declining to decide whether fiduciary duty existed at motion to dismiss stage because under Oklahoma law "whether a fiduciary duty exists is in part a question of fact"); *In re Spring Corp. ERISA Litig.*, 388 F. Supp. 2d 1207, 1228 (D. Kan. 2004) (finding that determining fiduciary status was premature at the motion to dismiss stage).

Regardless, the Court finds that the Complaint otherwise alleges affirmative acts of concealment—specifically, the May 2016 testimony at a House Agricultural Subcommittee on oversupply in the United States' dairy market; the June 2016 newspaper article restating Defendants' comments on oversupply; and the March 2018 statement made by a spokesperson

on economic conditions and oversupply depressing dairy prices. ECF No. 1 ¶¶ 220-21. Consequently, the Complaint does not concede the first element of fraudulent concealment.

### b. Successful concealment

Neither party addresses the second element—successful concealment from the injured party. *See* ECF No. 38 at 24-27; ECF No. 45 at 20-24; ECF No. 47 at 10-12. As such, the Court finds that the second element is neither contested nor conceded. And in any event, the Court finds that the Complaint plausibly alleges successful concealment. *See* ECF No. 1 ¶¶ 216-23.

### c. Inquiry notice and exercising of due diligence

The third element of fraudulent concealment requires Plaintiffs to ultimately show that they "did not know or by the exercise of due diligence could not have known that [they] might have a cause of action." *King & King Enters.*, 657 F.2d at 1154. *See also Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1280 (10th Cir. 2014) ("Once a plaintiff has inquiry notice that would suggest to a reasonable person that he has been injured, the plaintiff has a duty to commence a diligent investigation concerning that injury."). The due diligence to discover injury does not equate to being certain of injury—rather, due diligence simply means that one could have discovered the injury based on generally available information. *See Dummar*, 543 F.3d at 620; *see also Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1197-98 (10th Cir. 1998) (finding that a *Wall Street Journal* article is sufficient to make a party exercising due diligence aware of their injury); *Kroenlein Tr.*, 764 F.3d at 1280 (finding on summary judgment that the plaintiff should have been reasonably aware an injury may have occurred once discrepancies between statements, sales, and invoices could not be easily explained away by a seasonal market).

Defendants argue that Plaintiffs did not plead "any facts" showing they exercised due diligence in discovering the allegations within their cause of action and instead rely on

16

conclusory statements. ECF No. 38 at 26 (citing to *King & King Enters.*, 657 F.2d at 1154-55, to note that asserting fraudulent concealment requires a showing of due diligence).[5] Defendants further argue that prior lawsuits against DFA, including *Sweetwater Valley Farm, Inc. v. Dean Foods Co.*, No. 2:08-MD-2-1000, 2008 WL 5190885 (E.D. Tenn. Aug. 4, 2008) and *Allen v. Dairy Farmers of America, Inc.*, No 5:09-CV-230, 2011 WL 1523763 (D. Vt. Apr. 13, 2011)—which are discussed in the Complaint, ECF No. 1 ¶¶ 119-31—should have put Plaintiffs on notice of their claim.[6] *See* ECF No. 47 at 11-12 (citing *In re EpiPen*, 336 F. Supp. 3d at 1330 (where Congressional findings made the plaintiffs aware of their injury); *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1388 (10th Cir. 1985)).

Plaintiffs argue that whether and when they had injury notice is for a jury to determine. ECF No. 45 at 23 (citing *Allen*, 2014 WL 2610613, at *23). They further argue that, in any event, the Complaint alleges that Plaintiffs "'had neither actual nor constructive knowledge of the facts constituting their claim for relief' and that they 'did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint.'" *Id.* at 24 (quoting ECF No. 1 ¶ 216).

As the Tenth Circuit has observed: "It is settled law in the majority of circuits that the issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury." *Maughan*, 758 F.2d at 1387 (citations omitted). At the

---

[5]       Defendants also cite to *Crowe v. Servin*, 723 F. App'x 595, 597 (10th Cir. 2018) for the proposition that some facts need to be pled in order to show due diligence and to *Staley v. Gilead Scis., Inc.*, No 19-cv-02573-EMC, 2021 WL 4972628, at *19 (N.D. Ca. Mar. 12, 2012) for the same. As demonstrated above, Plaintiffs do allege facts supporting their diligence.

[6]       Defendants argue that Plaintiffs, as sophisticated business owners, incorrectly rely on the complexity of milk's price structure to support claims of fraudulent concealment. *See* ECF No. 38 at 25-26 (citing to several non-binding opinions). Plaintiffs allege a lack of transparency in cooperative member payments and state that cooperatives have access to market information that their members do not have. ECF No. 1 ¶¶ 105-07. Both raise questions of fact not appropriate to determine at the motion-to-dismiss stage.

motion to dismiss stage, the Court need only find that the Complaint does not admit the elements of an affirmative defense that Defendants assert. *See Sierra Club*, 816 F.3d at 671.

The Court finds that the Complaint plausibly alleges that Plaintiffs were not on notice that they had a duty to inquire into a potential injury until sometime in 2020 when the COVID-19 pandemic made the alleged price-fixing apparent, at which point they proceeded to bring the current cause of action in a timely fashion. *See* ECF No. 1 ¶ 172. Consequently, the Complaint does not concede the third element of fraudulent concealment.

Because none of the elements of fraudulent concealment are clearly conceded on the face of the Complaint, Plaintiffs' Complaint survives Defendants' Motion to Dismiss on statute of limitations grounds.

**B.    Whether Plaintiffs state a claim for violation of Section 1 of the Sherman Act.**

Section 1 of the Sherman Act prohibits any agreement that restrains interstate or foreign commerce. 15 U.S.C. § 1. To prove a Section 1 Sherman Act violation, a plaintiff must show that defendants "(1) participated in an agreement that (2) unreasonably restrained trade in the relevant market."[7] *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1016 (10th Cir. 1998). Any combination of concerted, multilateral action that has the *purpose and effect of displacing market prices* with the will of the defendants is unreasonable *per se*. *See Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940) ("Any combination which tampers with price structures is engaged in an unlawful activity."); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1477 (10th Cir.

---

[7]    Otherwise reasonable restraints on trade, such as a contract to purchase advertisement space at a volume discount, can be deemed unreasonable restraint if there is an ancillary anticompetitive effect when faced with market realities, such as foreclosing the option to purchase the same commodity from a competitor due to limited purchase capacity. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 614 (1953) (applying a Rule of Reason standard). Plaintiffs allege a *per se* violation and attempt to preserve a Rule of Reason argument in the alternative. ECF No. 1 ¶ 225. Because the Court finds the allegation of a *per se* violation plausible and the Defendants do not address any Rule of Reason analysis in their Motion, *see* ECF No. 45 at 4 n.13, the Court need not address whether the Complaint adequately alleges violations under a Rule of Reason theory.

1985) ("The relevant consideration is not whether a specific price is set, but whether a dealer's independent judgment is eliminated through a coerced agreement.") (citation omitted).

Plaintiffs allege Defendants violated Section 1 of the Sherman Act by engaging in an "agreement, understanding, and/or conspiracy to fix, reduce, stabilize, or maintain at artificially depressed values the sums paid for raw Grade A milk in the Southwest[.]" ECF No. 1 ¶ 225. The violation described is horizontal price-fixing, which is *per se* unreasonable. *See Socony-Vacuum*, 310 U.S. at 223. Therefore, to survive a motion to dismiss, Plaintiffs must demonstrate a prima facie case that Defendants participated in (1) any combination of agreement or concerted multilateral action that (2) had the anticompetitive effect of price tampering. *See Law*, 134 F.3d at 1016; *World of Sleep*, 756 F.2d at 1477.

Defendants invoke the Capper-Volstead Act, which creates an exception to antitrust statutes in certain instances of agricultural agreements and cooperatives. ECF No. 38 at 9-10. For reasons set out below, the Court finds that the immunity granted by Capper-Volstead does not extend as far as Defendants' alleged actions, and that Plaintiffs sufficiently plead each part of their horizontal price-fixing claim.

### 1.  Whether the Capper-Volstead Act grants immunity to Defendants for the alleged conduct.

Defendants argue that their conduct is legal because the Capper-Volstead Act, 7 U.S.C. § 291, "create[es] an exemption from antitrust liability to allow farmers to communicate and coordinate about collectively marketing, handling, processing, and preparing their products[.]" ECF No. 38 at 1-2, 5, 9-10. Defendants recognize that an agreement to fix payments to member-farmers is outside of the Capper-Volstead exemption, but they ask the Court to view its Sherman Act analysis within the context of a "regulatory overlay" permitting certain anticompetitive acts

under the Capper-Volstead Act. *Id.* at 10-11 (citing *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1181 (10th Cir. 2019)). When considering parallel conduct and supporting factors, Defendants ask the Court to set aside from consideration any actions that are permitted by the Capper-Volstead Act. *See id.* at 19, 20-21; *see also* ECF No. 47 at 3, 8.

Plaintiffs question whether the Capper-Volstead Act immunizes Defendants' actions because (1) payments made to farmers fall outside the scope of the Act and (2) even if the action did fall within the general scope of the Act, the Act does not immunize cooperative conduct when it is not in furtherance of its members' "mutual benefit." ECF No. 45 at 12; *see also* ECF No. 1 ¶ 48-49, 228. Plaintiffs *Llacua* on the grounds that the regulations explicitly permitted the defendants' alleged acts. ECF No. 45 at 12-13.

To enable small agricultural producers to aggregate and reap the market benefits inherent to larger, more competitive businesses, the Capper-Volstead Act carves out an exemption to the Sherman Act so that small producers that might otherwise be competitors can cooperatively represent a larger market share. *Md. and Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 466 (1960) (recognizing that the purpose of the Capper-Volstead Act is "to make it possible for farmer-producers to organizer together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise *carry on like a business*") (emphasis added). The Capper-Volstead Act specifically permits producers to form cooperatives and act collectively when "processing, preparing for market, handling, and marketing" their products "for the mutual benefits of their members." 7 U.S.C. § 291. The rights recognized by Capper-Volstead Act "cannot be deemed to authorize any combination or conspiracy with other persons in restraint of trade that these producers may see fit to devise." *United States v. Borden Co.*, 308 U.S. 188, 204-05 (1939) (holding that the Act protects forming a collective but not conspiring

"to maintain artificial and non-competitive prices to be paid to all producers for all fluid milk produced in [the state]"); *see also Md. and Va. Milk Producers*, 362 U.S. at 467, 472 (declining to extend immunity under the Act to actions outside of its objective); *Bell v. Fur Breeders Agric. Co-op.*, 348 F.3d 1224, 1231 (10th Cir. 2003) (recognizing that the Capper-Volstead Act does not exempt all actions of an agricultural cooperative from antitrust law).

When the law so clearly articulates what actions it permits and prohibits, viewing alleged conduct within the context of a permissive regulatory overlay, as Defendants suggest, ECF No. 38 at 10-11, is unnecessary to aid in the Court's analysis. While forming an agreement with a competing cooperative to market or sell dairy may be permitted under Capper-Volstead, as Defendants argue, *id.* at 19-20, an agreement to depress prices paid to members, as Plaintiffs allege, is not, *see Borden*, 308 U.S. at 205. The objective of Capper-Volstead is to allow agricultural cooperatives to operate for the mutual benefit of their members, and actions outside of that objective are subject to antitrust law. *See Md. and Va. Milk Producers*, 362 U.S. at 467-78. In analyzing alleged parallel conduct and supporting factors, the Court must consider the conduct in context, as a whole, such that conduct on its own may be permissible and at the same time be considered in a larger context to infer an impermissible antitrust conspiracy. S*ee King & King Enters.*, 657 F.2d at 1153 (citing *Cont. Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962)). While Capper-Volstead does permit many of Defendants' actions, such as meeting monthly to jointly exchange data, *see* ECF No. 1 ¶ 218; ECF No. 38 at 10-11, it does not permit other collective actions, such as conspiring to depress payments to members, ECF No. 1 ¶ 225. In viewing all alleged conduct as a whole, if taken as true and in light most favorable to Plaintiffs, the Court finds that Plaintiffs plausibly allege conduct—conspiracy to depress payments to members—that is not the type the Capper-Volstead Act is intended to protect. *See*

*Md. and Va. Milk Producers*, 362 U.S. at 466-67; *Borden Co.*, 308 U.S. at 205-06; ECF No. 1 ¶ 225.

For these reasons, the Court will not apply Capper-Volstead immunity to Defendants' alleged conduct at the motion-to-dismiss stage.

> **2.  Whether Plaintiffs plead an agreement or concerted multilateral action between Defendants.**

To satisfy the first element of a Section 1 violation—that Defendants participated in an impermissible agreement—"the facts showing such an agreement can be direct or circumstantial." *Llacua*, 930 F.3d at 1174, 1178; *see also Interstate Circ., Inc. v. United States*, 306 U.S. 208, 221 (1939). The facts should be considered as a whole "without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont. Ore Co.*, 370 U.S. at 699.  Further, an agreement need not be express; rather, the "character and effect of a conspiracy" can be inferred "from a course of dealing and other circumstances." *E. J. Delaney Corp. v. Bonne Bell, Inc.*, 525 F.2d 296, 301 (10th Cir. 1975) (citations omitted).

Defendants argue that Plaintiffs do not identify individuals or defendants that made any specific agreement. ECF No. 38 at 13. Defendant dairy cooperatives contend they have no motive to depress payments to members because they are 100% owned and self-governed by member-farmers and, as such, depressing payment to dairy farmers does not make economic sense. *Id.* at 13-14, 16, 22. Defendants also argue that any circumstantial evidence alleged in the Complaint is equally "consistent with Defendants' independent economic interests as it is with an inference of collusion." *Id.* at 12, 15-16. Specifically, (1) the nature of pooling and jointly marketing raw milk leads to a reasonable expectation that farmers in the two cooperatives would

be paid similarly, *id.* at 16-17, and (2) similarities in production limits and changes to pooling schemes are explainable unilateral decisions that each dairy cooperative made when facing challenges in the market, *id.* at 18-20.

Plaintiffs allege three instances of parallel conduct: (1) cooperatives' pay-out rates that are within pennies of one another each month despite using different algorithms, ECF No. 45 at 4-5; ECF No. 1 ¶¶ 158, 162; (2) on the same day and in response to a GSA marketing program, both cooperatives implemented a tiered pricing program limiting payouts for raw milk production in excess of a base production rate, ECF No. 45 at 5-7; ECF No. 1 ¶ 159; and (3) both cooperatives elected not to pool Grade II-IV milk in tandem, ECF No. 45 at 7-8; ECF No. 1 ¶¶ 176-95. Alongside the alleged parallel conduct, Plaintiffs also allege several "plus factors" to support an inference of conspiracy: (1) shared motive to conspire due to the vertical integration of each Defendant, ECF No. 45 at 9-12, ECF No. 1 ¶¶ 114-15, 151, 156; (2) Defendants' opportunity to communicate milk prices, marketing, and payments in monthly meetings hosted by GSA, through shared employees, and during joint ventures, ECF No. 45 at 13-14, ECF No. 1 ¶¶ 132-41, 153-55; (3) the nature of the milk market concentrating competition across a small number of competitors and new competition having high barriers to entry, ECF No. 45 at 14-15, ECF No. 1 ¶¶ 142-43, 147-48; (4) Defendant cooperatives' monthly payments consistently being within a few pennies difference from each other, ECF No. 45 at 16, ECF No. 1 ¶ 158; (5) Defendants' engagement in similarly anticompetitive conduct in other markets, ECF No. 45 at 16-17, ECF No. 1 ¶¶ 119-41; and (6) that if the alleged depressed payments to members were based on a unilateral decision, that decision would be against each Defendant's economic interests, ECF No. 45 at 17-18, ECF No. 1 ¶¶ 150-52.

Defendants reply that the Complaint's allegations equally harm Plaintiffs and Defendants and do not make "economic sense." ECF No. 47 at 1-2. Defendants argue that this economic neutrality requires heightened pleading, specifically that Plaintiffs must allege direct evidence to a degree of particularity that indicates "who, what, where, when, or why." *Id.* (citing *Llacua*, 930 F.3d at 1175); *see also* ECF No. 38 at 13 (citing *Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, 691 F. App'x 515, 520 (10th Cir. 2017)). Defendants emphasize that "conscious parallelism" is not unlawful on its own and can be explained as a reaction to oversupply of raw milk in the market, ECF No. 47 at 4-7, and further argue that the plus factors are not sufficiently plead to "move[] the needle from parallel conduct to conspiracy[,]" *id.* at 8-10 (internal quotation marks omitted).

The absence of direct evidence is common in antitrust claims, especially at the motion-to-dismiss stage, and claims can survive solely on circumstantial evidence, such as parallel conduct, to infer conspiracy. *See Llacua*, 930 F.3d at 1178. When the alleged parallel conduct equally leads to an inference of unilateral action or concerted conduct, a plaintiff must also plead "something more," such as a "plus factor," to plausibly allege an inference of conspiracy. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553, 560 (2007); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *Llacua*, 930 F.3d at 1175, 1180 ("Where circumstantial evidence is just 'as consistent with' unilateral action as with concerted action, it 'does not, standing alone, support an inference of antitrust conspiracy.'") (citing *Matsushita Elec.*, 475 U.S. at 588). Further, the court should consider additional factors in a larger context, not on an individual basis, to determine whether a complaint plausibly pleads inference of conspiracy. *Llacua*, 930 F.3d at 1181 (citing *Twombly*, 550 U.S. at 554).

The Court finds that the Plaintiffs plausibly allege parallel conduct alongside other factors that when taken together "tend to exclude the possibility of independent action." *Cf.* *Llacua*, 930 F.3d at 1179-81 (finding no inference of conspiracy where (1) association meetings were held but no anticompetitive conduct was alleged; (2) defendants paid minimum wage to all similarly situated employees; and (3) paying more than minimum wage did not make economic sense). First, the alleged substantially similar monthly price that each cooperative pays to its members is plausibly pled parallel conduct. ECF No. 1 ¶¶ 158, 162. Second, the pled plus factors plausibly support an inference of conspiracy: (1) the plus factors provide the context of the raw milk market in the Southwest—where the two Defendant cooperatives control approximately 75% of the market, start-up costs create a high barrier to entry, and the vertical integration of processing raw milk leads to economic disadvantages for non-members; and (2) demonstrate a plausible motive for each cooperative for depressing member-farmers' monthly payments—to increase revenue of each cooperatives' vertically integrated divisions without eroding membership and access to a raw milk supply without eroding membership and raw milk supply. *See id.* ¶¶ 114-15, 142-43, 147-48, 151, 156. Depressed payments to member-farmers would make less economic sense *if* the behavior was unilateral and members received the full benefits of the revenues from the cooperatives' vertically integrated operations. The claim here alleges that member-farmers are not receiving the full benefit of participating in a cooperative, *id.* ¶ 228, and, therefore, the Complaint shows a plausible motive that necessitates multilateral conduct between Defendants.

Defendants ask the court to consider and discard each allegation of parallel conduct or supporting factor in isolation. *See* ECF No. 38 at 12, 15-20. While some parallel behaviors, such as choosing whether and when to pool raw milk, ECF No. 38 at 16-20, may be equally

explainable under market conditions, other factors are not so factually neutral, such as motive, *compare id. with* ECF No. 1 ¶¶ 114-15, 151, 156. The outcome on the merits may be that the alleged parallel conduct combined with other factors does not lead a fact-finder to conclude that Defendants engaged in anticompetitive conduct. At the motion-to-dismiss stage, however, viewing all allegations as a whole and in the context of the Southwest dairy market, Plaintiffs' Complaint contains sufficient factual matter, if accepted as true, that plausibly alleges anticompetitive conduct. *See King & King Enters.*, 657 F.2d at 1153 (citing *Cont. Ore Co.*, 370 U.S. at 699).

Defendant GSA separately argues that Plaintiffs do not allege direct evidence that it conspired or did anything more than operate in its primary capacity to market and sell pooled milk for co-Defendants. ECF No. 38 at 22. Plaintiffs counter with facts alleged in the Complaint: (1) that GSA and DFA share a mailing address and (2) a GSA Board Member who was also President of Select Milk at the same time gave testimony to the effect that all the cooperatives and GSA worked together and met monthly to discuss, among other topics, dairy prices and member payments. ECF No. 45 at 18-20; ECF No. 1 ¶¶ 29, 132-34, 149, 157-59. Not all defendants need to participate in all aspects of the allegations so long as each defendant has some role in the conspiracy. *In re Processed Egg Prods. Antitrust Litig.*, 902 F. Supp. 2d 704, 710, 715 (E.D. Pa. 2012); *see also In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 803 (N.D. Ill. 2017) (holding that not all allegations against all defendants need to be the same). While GSA may not have the same motive as its co-defendants, Plaintiffs allege specific facts that, if true, plausibly allege GSA facilitated meetings between co-Defendants in furtherance of an anticompetitive conspiracy, making them similarly culpable.

**3. Whether Plaintiffs sufficiently plead an anticompetitive effect on interstate commerce caused by Defendants' alleged actions.**

Well-established law identifies horizontal price-tampering agreements as having an inherently anticompetitive effect and, therefore, as *per se* illegal. *See Law*, 134 F.3d at 1017; *World of Sleep*, 756 F.2d at 1477; *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235-36 (1948); *Socony-Vacuum*, 310 U.S. at 223; *F.T.C. v. Super. Ct. Trial Laws. Ass'n*, 493 U.S. 411, 435 (1990). "Once a practice is identified as illegal *per se*, a court need not examine the practice's impact on the market or the procompetitive justifications for the practice advanced by a defendant before finding a violation of antitrust law." *Law*, 134 F.3d at 1016. Therefore, to satisfy the second element of a Section 1 violation—that Defendants agreement had an anticompetitive effect—a complaint simply needs to plead facts sufficient for the court to reasonably infer that the anticompetitive act and effect occurred. *Law*, 134 F.3d at 1016; *see also Twombly*, 550 U.S. at 555, 570.

Defendants argue that allegations about differences between mailbox prices and revenues is based on national DFA revenues, not regional Southwest revenues. ECF No. 38 at 21 (citing ECF No. 1 ¶¶ 172-75). Further, Defendants argue that the Complaint fails to sufficiently describe the relationship between milk pooling and mailbox prices. *Id.* at 19. Defendants also appear to contest whether prices paid to farmers were depressed. *See id.* at 15-16.

Plaintiffs allege in their Complaint that the "monthly rate that DFA and Select Milk pay their member-farmers is always within pennies per hundredweight." ECF No. 1 ¶ 158; *see also* ECF No. 45 at 4. They rely on a series of figures and charts to show trends in dairy prices and payments during the class period: (1) the difference between mailbox prices and component value of milk and statistical uniform prices demonstrates that the commodity value of milk in

New Mexico was greater than the mailbox price, ECF No. 1 ¶¶ 167-69; (2) uniform statistical prices decreased swiftly from the years prior to the class period and remained low during the class period, *id.* ¶ 171; and (3) during the class period, when statistical prices remained depressed, the percentage payout to member-farmers decreased at the same time that DFA's earnings increased, *id.* ¶¶ 172-74. *See also id.* ¶ 227 (alleging anticompetitive effects, including restrained competition for the purchase of raw milk in the Southwest, that artificially effect raw milk prices throughout the United States and deprive producers of a free market). Plaintiffs acknowledge that they only provide publicly available information. *See id.* ¶¶ 116, 175 (noting similar information is not publicly available from Select Milk); *id.* ¶ 173 (noting that only national figures are available for DFA's revenue); *id.* ¶ 103 (clarifying that FMMO No. 126 is used where information on DFA's Southwest region is unavailable publicly).

Despite the complexities of dairy pricing as summarized above and opacity of payments to member-farmers, the Court can infer, assuming all facts as alleged are true, that: (1) de-pooling milk may positively impact a cooperative's sale price of raw milk, but, when compared to the monthly mailbox price, that benefit does not necessarily lead to an increase in amount paid to members, ECF No. 1 ¶¶ 167-69, 181-82; and (2) consistently similar monthly payments to DFA and Select Milk's members are plausibly artificial because, absent some interference, it is reasonable to expect each cooperative to pay their members different prices considering the fluctuations in uniform statistical prices, the different algorithms used to calculate member payments, and the increase in DFA's revenue. *See id.* ¶¶ 171-75. The Court finds that Plaintiffs plausibly allege the effects of horizontal price-tampering sufficient to satisfy the second element of a violation of Section 1 of the Sherman Act.

In sum, the Court finds that the Plaintiffs plausibly plead that (1) Defendants participated in concerted actions that (2) resulted in depressed prices sufficient to state a claim under Section 1 of the Sherman Act.

## V.    CONCLUSION

For the foregoing reasons:

1.    Defendants' Motion to Dismiss Plaintiffs' Complaint, ECF No. 38, is **DENIED**;

2.    The stay of discovery is **LIFTED**;

3.    Defendants' shall have fourteen days from the date of this order within which to file an Answer to the Complaint.


_____
**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE