# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| OTHART DAIRY FARMS, LLC, *et al.*, | Case No. 22-cv-00251-SMD-DLM |
| Plaintiffs, | |
| v. | |
| DAIRY FARMERS OF AMERICA, INC., *et al.*, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH DAIRY FARMERS OF AMERICA, INC. AND SELECT MILK PRODUCERS, INC., <u>AND APPROVAL OF A CLAIMS PROCESS AND NOTICE PLAN</u>**

## I.    INTRODUCTION

Plaintiffs Othart Dairy Farms, LLC, Pareo Farm, Inc., Pareo Farm II, Inc., Desertland Dairy, LLC, Del Oro Dairy, LLC, Bright Star Dairy, LLC, and Sunset Dairy, LLC, (together, "Plaintiffs"), on behalf of the putative class ("the Class" or "Settlement Class" as defined below), have reached settlements resolving the case with Dairy Farmers of America, Inc. ("DFA") and Select Milk Producers, Inc ("Select") in the above-referenced matter (the "Action" or the "Lawsuit"); the settlements also resolve the Action as to Greater Southwest Agency, Inc. ("GSA"). The settlements with DFA and Select provide for substantial recovery for this class of dairy farmers, with (1) monetary recovery of $24.5 million and $9.9 million, respectively, bringing total monetary recovery for the Class to $34.4 million, and (2) significant non-monetary relief. These settlements were reached after hard-fought, arm's length negotiations with sophisticated counsel representing all parties and are in the best interests of the Class.

Plaintiffs therefore move the Court for an order preliminarily approving the settlement agreements between Plaintiffs and DFA and Select (the "Settlement Agreements"), certifying the proposed Settlement Class, and appointing Lockridge Grindal Nauen PLLP, Hagens Berman Sobol Shapiro LLP, and Scott+Scott Attorneys at Law as class counsel and Plaintiffs as class representatives for the Settlement Class.[1] Plaintiffs also submit for the Court's approval a notice plan providing notice of the DFA and Select Settlement Agreements and the Fairness Hearing at which the Court will consider whether to approve the Settlement Agreements. Finally, Plaintiffs seek the Court's approval to engage the necessary administrators to effectuate notice and claims distribution, including appointing A.B. Data Ltd. as the Notice and Claims Administrator for the Settlement Agreements and The Huntington National Bank as the escrow agent to provide escrow services.

At the Fairness Hearing, Plaintiffs will request entry of a final order and judgment ("Final Order") consistent with the DFA and Select Settlement Agreements and this Motion, including dismissing with prejudice all claims against DFA, Select, and GSA[2]; granting Class Counsel's request for payment of attorneys' fees, expenses, and service awards; and retaining jurisdiction for the implementation and enforcement of the Settlement Agreements.

## II.    BACKGROUND

### a.  Summary of Allegations

Plaintiffs allege that the two largest dairy cooperatives in the Southwest United States, DFA and Select, conspired to suppress pay to Southwest Area dairy farmers in violation of the Sherman Act. Plaintiffs further allege that DFA and Select implemented their conspiracy, in part,

---

[1]  The DFA and Select Settlement Agreements are attached as Exhibits 1 and 2, respectively, to the Declaration of B. Clark in Support of this Motion ("Clark Decl.").

[2]  As more fully explained below, as a result of this lawsuit GSA has been disbanded and both settlement agreements grant GSA a release of liability.

through the following means: (a) unlawfully sharing pricing information through, *inter alia*, their various commercial joint ventures and GSA; (b) driving down take-home pay for dairy farmers through selective, and increasingly frequent, non-pooling of milk; and (c) unlawfully coordinating pricing and pricing-related decisions. As a result of these alleged actions, Plaintiffs and other Class members were allegedly artificially underpaid for the raw Grade A milk they produced during the Class Period.

These allegations are based on a comprehensive investigation by Plaintiffs' counsel, which included assessment of: the history of the dairy industry and dairy production in the United States; the history and structure of DFA, Select, and GSA (the latter being co-owned by DFA and Select and, based on Plaintiffs' counsel's investigation, one of the primary mechanisms through which DFA and Select purportedly effectuated their alleged conspiracy); federal milk policy and pricing; the conduciveness of the Southwest dairy market to antitrust violations; the alleged economic impact of DFA, Select, and GSA's actions on Southwest dairy farmers; factors supporting bringing this suit as a class action; and coordination with and analysis by Plaintiffs' economic experts. Plaintiffs' lengthy complaint is supported by specific allegations developed through that investigation, alleging that Defendants entered into an illegal agreement in violation of the Sherman Act, 15 U.S.C. § 1, under both a *per se* and rule of reason analysis.

Defendants have steadfastly denied liability and mounted a vigorous defense in all phases of the case and continue to deny any wrongdoing.

The previously assigned district judge denied Defendants' motions to dismiss on March 11, 2024. ECF No. 71 (Strickland, J.). Shortly thereafter, Plaintiffs served discovery on all Defendants. At a status conference on April 17, 2024, and in a further written order entered on June 4, 2024, Magistrate Judge Martínez *sua sponte* bifurcated discovery into separate class and

merits phases. ECF Nos. 100 & 117. The parties proceeded with discovery, but after reaching several impasses, in particular, on the line between what constitutes class versus merits discovery, Plaintiffs moved for relief seeking, *inter alia*, rescission of the discovery bifurcation order. ECF No. 150. Magistrate Judge Martínez granted Plaintiffs' motion, in part, on January 8, 2025, ordering the rescission of bifurcation, and further ordering all of Plaintiffs' then-pending discovery requests withdrawn. Magistrate Judge Martínez further ordered Plaintiffs to serve renewed discovery after the February 13, 2025 status conference, which Plaintiffs promptly did. ECF No. 175. During this period, the case was reassigned to this Court. ECF No. 176.

#### b. Summary of the Settlement Agreements with DFA and Select

The settlement discussions with DFA and Select were undertaken with a deep understanding of the strengths and weaknesses of the case and the risks to Plaintiffs and other Class members. In addition, Class Counsel are highly experienced at litigating antitrust cases and specifically cases alleging price-fixing. (*See* Memorandum in Support of Unopposed Motion to Appoint Interim Co-Lead Class Counsel, ECF No. 37; Clark Decl., ¶ 20; Declaration of K. Garvey in Support of this Motion ("Garvey Decl."), ¶ 3 & Ex. A; Declaration of S. Scarlett in Support of this Motion ("Scarlett Decl."), ¶ 3).

##### i. Settlement Negotiations

In June 2024, shortly after discovery opened, Plaintiffs' counsel contacted counsel for Select with an "icebreaker" settlement proposal, seeking monetary relief, non-monetary relief, and discovery cooperation in the case. Clark Decl., ¶ 6. Counsel for Select did not substantively respond, and all Parties engaged in discovery throughout 2024. After the Court rescinded discovery bifurcation in early January 2025 (ECF No. 175), Plaintiffs' counsel reached out again to counsel for Select, and separately to counsel for DFA. Clark Decl., ¶ 6. Counsel for both Defendants responded and suggested an attempt at global resolution. Clark Decl., ¶ 6. Counsel for the Parties,

plus in-house representatives from both DFA and Select, participated in an in-person meeting on April 29, 2025, to discuss the possibility of settlement. Clark Decl., ¶ 7. Over the following weeks, counsel for the Parties continued to negotiate. Ultimately, Plaintiffs and DFA signed a term sheet on June 13, 2025, and Plaintiffs and Select signed a term sheet on June 27, 2025. Plaintiffs and DFA, and Plaintiffs and Select, executed their respective Settlement Agreements on July 3, 2025. Clark Decl., ¶ 8. The proposed Settlement Agreements also resolve this case against GSA, which is co-owned by DFA and Select.

The Settlement Agreements were reached only after substantial fact discovery and preparation for the commencement of class certification motion practice, which would have been both costly and risky for all parties given the uncertainties inherent in class certification proceedings.

### ii. Class Definition

The Settlement Class definitions in the DFA and Select agreements are identical and are co-extensive with the class in the operative complaint. The Settlement Class Definition is:

> All dairy farmers, whether individuals or entities, who produced Grade A milk and sold Grade A milk independently or directly or through an agent to Defendants, DFA and Select, within DFA's Southwest Area region, composed of all of New Mexico, most of Texas (except the far eastern part of that state), the eastern portion of Arizona, the Oklahoma panhandle, and southwestern Kansas, from January 1, 2015 through June 30, 2025. The following persons are excluded from the Class: (a) Select and any of its management officers, management, employees, subsidiaries or Affiliates, legal counsel, heirs or assigns; (b) DFA and any of its management officers, management, employees, subsidiaries or Affiliates, legal counsel, heirs or assigns (c) any entity in which any Defendant has a financial interest; (d) all government entities; (e) any judicial officer presiding over this action and the members of his or her immediate family and judicial staff; and (f) Defendants' co-conspirators identified in this Action.

### iii.  Monetary Terms

Pursuant to the Settlement Agreements, DFA will pay a total of $24.5 million ("DFA Settlement Amount"), and Select will pay a total of $9.9 million ("Select Settlement Amount"). Ex. 1, DFA Settlement Agreement, ¶¶ 1(w), 9; Ex. 2, Select Settlement Agreement, ¶¶ 1(w), 9. Subject to Court approval, each settlement agreement permits Plaintiffs to withdraw from escrow up to $250,000 in non-refundable class notice and administration costs. DFA Settlement Agreement, ¶ 6(d); Select Settlement Agreement, ¶ 6(d). Each Defendant must deposit the Settlement Amount into an escrow account within twenty-one (21) business days after entry of the preliminary approval order. DFA Settlement Agreement, ¶ 6(e); Select Settlement Agreement, ¶ 6(e). These are all-in settlement numbers, meaning that they include all amounts associated with the resolution of this Action, including attorneys' fees, administration costs, expenses, class member benefits, service awards, and other costs of any kind approved by the Court. DFA Settlement Agreement, ¶ 1(w); Select Settlement Agreement, ¶ 1(w). The DFA and Select Settlement Amounts, totaling $34.4 million, represent a significant and guaranteed recovery to Settlement Class members (providing this Court grants final approval). There is no right of reversion in either Settlement Agreement, thereby further benefitting the Class.

### iv.  Non-Monetary Consideration

DFA and Select have also agreed to provide considerable non-monetary consideration as part of the Settlement Agreements. Most notably, DFA and Select agreed to dissolve GSA, which Plaintiffs allege was one of the primary mechanisms through which the alleged conspiracy was effectuated. GSA was dissolved as a direct result of this Lawsuit.

In addition, DFA agrees to the following non-monetary relief: (1) to maintain its current antitrust training program for its employees involved in the marketing of raw milk or in the setting of member milk pay prices; (2) to refrain from sharing non-public member milk pay price

information between Select and DFA; (3) to promote existing educational information and facilitate learning and know-how for its Southwest Area members, including, but not limited to, (a) periodic virtual (e.g., via WebEx) webinars and/or tutorials for DFA members to learn about information that is available on a DFA website (and a recording of such presentations made available through a DFA website), to occur at least twice a year for the next two years and to remain available for viewing online for a period of two additional years, (b) making annual meetings available virtually (e.g., via WebEx) for DFA Southwest Area members for the next three years, and (c) providing information for DFA Southwest Area members on how they can direct to knowledgeable DFA employees any questions about their milk checks and other payments from DFA to DFA Southwest Area members. DFA Settlement Agreement, ¶ 10.

Similarly, Select agrees to the following non-monetary relief: (1) to institute an antitrust training program for its executives involved in the marketing of raw milk or in the setting of member milk pay prices; (2) to refrain from sharing non-public member milk pay price information between Select and DFA; (3) to provide educational information and opportunities for its members that include an annual web-based presentation for at least the next three years that provides information about milk checks and an opportunity for members to obtain answers to questions about payments. Select Settlement Agreement, ¶ 10.

### v. Cooperation

Plaintiffs reached a settlement with DFA first, and, in doing so, anticipated the need to continue extensive litigation with Select. Therefore, DFA's ongoing litigation cooperation with Plaintiffs regarding Plaintiffs' case against Select was an additional material component to the DFA Settlement Agreement. The details surrounding DFA's cooperation are contained within the long-form agreement DFA Settlement Agreement, ¶ 11. Generally, the cooperation entails: (1) declarations and/or affidavits and/or testimony regarding the admissibility of its documents; (2)

making available two Southwest Area management employees for interviews; (3) providing 30(b)(1) and 30(b)(6) depositions; (4) providing up to two employees to testify at trial; (5) providing document custodians and reasonable discovery productions; (6) producing documents from centralized files; (7) producing structured data relating to Southwest Area farmer pay prices between January 1, 2010 to March 11, 2024; (8) producing data necessary to provide notice to the Settlement Class; (9) continuing with reasonable negotiation about discovery; and (10) providing a privilege log for documents being withheld.

DFA's agreement to cooperate with Plaintiffs' ongoing litigation provided significant benefits to the Class in the event they had continued litigating their claims against Select. Indeed, the extensive cooperation with DFA helped Plaintiffs to negotiate a settlement agreement with Select on favorable terms. Because the Select Settlement Agreement fully resolves the case, the cooperation contained in the Select agreement is not as extensive. However, in the event that the Select Settlement Agreement is approved by the Court, but the DFA Settlement Agreement is not, then Select agrees to meet and confer on Plaintiff's reasonable requests for production of documents and witnesses necessary to prosecute the case regarding DFA. The Select Settlement Agreement further provides that the release for GSA provided in the agreement does not prohibit, in any way, the taking of discovery from GSA necessary to prosecute this case against DFA.

### vi. Release of Liability

Both Settlement Agreements provide releases and discharge DFA, Select, and GSA from any and all claims arising out of or relating to or referred to in the Action or arising from the factual predicate of the Action, whether known or unknown. DFA Settlement Agreement ¶ 16; Select Settlement Agreement ¶ 15.

### III.    ARGUMENT

Settlement is strongly favored as a method for resolving disputes. *See Amoco Prod. Co. v. Fed. Power Comm'n*, 465 F.2d 1350, 1354 (10th Cir. 1972); *Sears v. Atchison, Topeka & Santa Fe Ry., Co.*, 749 F.2d 1451, 1455 (10th Cir. 1984); *Trujillo v. Colo.*, 649 F.2d 823, 826 (10th Cir. 1981); *City of Gallup, New Mexico v. Hotels. Com, L.P.*, No. 2:07-CV-00644-JAP/CG, 2013 WL 12201049, at *1 (D.N.M. Oct. 4, 2013) (finding settlements particularly favored in complex class actions). When evaluating the fairness and adequacy of a proposed settlement, courts account for the "important public policy concerns that support voluntary settlements." *Trujillo*, 649 F.2d at 826. This is particularly true in large, complex class actions, such as this case. *Acevedo v. Sw. Airlines Co.*, No. 1:16-cv-00024-MV-LF, 2019 WL 6712298, at *2 (D.N.M. Dec. 10, 2019) (internal citations omitted) (noting that in complex class actions, settlement "minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources").

Before approving a proposed settlement, courts must assess if the settlement is "fair, reasonable, and adequate," pursuant to Rule 23(e)(2). Preliminary approval review is "not as stringent" as that which is applied for final approval. *Ross v. Convergent Outsourcing, Inc.*, 323 F.R.D. 656, 659 (D. Colo. 2018) (quoting *In re Motor Fuel Temperature Sales Pracs. Litig.*, 286 F.R.D. 488, 492 (D. Kan. 2012)). "Preliminary approval of a class action settlement, in contrast to final approval, is at most a determination that there is . . . 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness." *In re Crocs, Inc. Sec. Litig.*, No. 07-cv-02351-PAB-KLM, 2013 WL 4547404, at *3 (D. Colo. Aug. 28, 2013) (quoting *Davis v. J.P. Morgan Chase & Co.*, 775 F. Supp. 2d 601, 607 (W.D.N.Y. 2011)). Courts should grant preliminary approval if the settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, and does not improperly grant preferential

treatment to class representatives." *In re Motor Fuel Temperature Sales Practices Litig.*, 286 F.R.D. at 492.

On final approval of a class action settlement, Tenth Circuit courts consider the following factors:

> (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable.

*Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984); *see also Tennille v. W. Union Co.*, 785 F.3d 422, 434 (10th Cir. 2015). Courts "consider these factors in depth at the final approval hearing [but] they are a useful guide at the preliminary approval stage as well." *In re Motor Fuel Temperature Sales Pracs. Litig.*, 286 F.R.D. at 502-03; *see also Brown v. JBS USA Food Co.*, No. 22-CV-02946-PAB-STV, 2025 WL 103888, at *3 (D. Colo. Jan. 15, 2025) (same). Each of the Rule 23 and Tenth Circuit factors are discussed below and support a finding of preliminary approval.

### a. The Agreements Were Negotiated at Arm's Length

Tenth Circuit courts "often examine whether the parties 'have vigorously advocated their respective positions throughout the pendency of the case.'" *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1241 (D.N.M. 2012) (quoting *Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 284 (D. Colo. 1997)). Here, all parties are represented by sophisticated counsel who have litigated many antitrust and complex class action cases across the country. Negotiations between the parties took place over many months and consisted of joint and separate settlement discussions between Class Counsel, DFA, and Select. During negotiations, the parties engaged in robust discussions about the strengths and weaknesses of the case, zealously representing the

interests of their clients. The negotiations were adversarial throughout and Class Counsel held the interests of the class paramount. Plaintiffs initiated settlement discussions first only with Select in June 2024, then again with both DFA and Select, initially separately, after the Court's recission of the discovery bifurcation order in January 2025. These conversations took months to bear fruit and required an in-person meeting of counsel on April 29, 2025 and the exchange of dozens of emails, telephone calls, and videoconferences over nearly six months. Clark Decl., ¶ 7. The arm's length negotiations, conducted in good faith by highly experienced counsel, resulted in the instant Settlement Agreements.

### b.  The Relief Provided to the Class Is Adequate

Rule 23(e)(2)(C) calls on the court to consider the adequacy of the relief for the class. When addressing adequacy, the Tenth Circuit considers the relief provided by the proposed settlement in relation to the cost and risk involved in pursuing litigation. *See Anderson Living Tr. v. Energen Res. Corp.*, No. CV 13-909 WJ/CG, 2021 WL 3076910, at *4 (D.N.M. July 21, 2021). Here, the settlement between Plaintiffs, DFA, and Select would result in a substantial $34.4 million recovery for the Settlement Class, minus costs, fees, and service awards. Plaintiffs also obtained valuable non-monetary relief for the Settlement Class. Notably, as a direct result of this case, GSA was dissolved.

In reaching the proposed Settlement Agreements, the Parties considered the stage of litigation, the complexity of the issues, and the "serious questions of law and fact, which could significantly impact this case if litigated." *Anderson Living Tr.*, 2021 WL 3076910, at *4 (citing *Lucas v. Kmart Corp*., 234 F.R.D. 688, 693 (D. Colo. 2006)). For example, the Parties disagree about the central allegations in this case: whether Select and DFA, through their joint ventures including GSA, conspired to fix, depress, and stabilize the payments made to raw Grade A milk producers in the Southwest. To prove their respective positions, the Parties would almost certainly

file opposing expert analyses at multiple stages of the litigation. Settlement now obviates the need for experts and protracted litigation.

In addition to avoiding risks to all Parties should litigation proceed, the proposed Settlement Agreements would save the Parties significant expense and lead to quicker recoveries for the Settlement Class. *See Anderson Living Tr.*, 2021 WL 3076910, at *4 (finding a proposed settlement adequate in part because "more litigation would lead to greater expense and delayed recovery for the class members."). Expert fees and other costs in complex class actions such as the instant case are usually in the range of $5 million to $10 million. Clark Decl., ¶ 9. Had the case settled later in the litigation, those costs would be reimbursed from the Settlement Class's recovery amount, decreasing the pro rata recovery per class member. The proposed Settlement Agreements deliver relief sooner and have the potential to maximize the Settlement Class's net recovery.

"The very essence of a settlement agreement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Acevedo*, 2019 WL 6712298, at *3, report and recommendation adopted, No. 1:16-CV-00024-MV-LF, 2020 WL 85132 (D.N.M. Jan. 7, 2020) (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982)). The proposed Settlement Agreements represent hard-fought compromises between the Parties. The relief afforded to Plaintiffs and the Settlement Class outweighs the "mere possibility of a more favorable outcome after protracted and expensive litigation over many years in the future." *In re Syngenta Ag Mir 162 Corn Litig.*, No. 14-MD-2591-JWL, 2018 WL 1726345, at *2 (D. Kan. Apr. 10, 2018). The relief provided to the class is therefore adequate.

### c. Plaintiffs' Counsel Believes the Settlement Is Fair and Reasonable

"Counsels' judgment as to the fairness of the agreement is entitled to considerable weight." *Lucas*, 234 F.R.D. at 695 (quoting *Marcus v. Kansas Dept. of Revenue*, 209 F. Supp. 2d 1179, 1183 (D. Kan. 2002)). Class Counsel here are highly experienced in complex class action and

antitrust cases, have been involved with the case since its inception, and unanimously support the Settlement Agreements. *See, e.g.*, *id.* (finding unanimous approval by experienced counsel supports settlement approval). Under the Settlement Agreements, a total recovery of $34.4 million will provide tangible benefits to the Settlement Class. In addition, Select and DFA will implement several non-monetary forms of relief. *See* Select Settlement Agreement ¶ 10; DFA Settlement Agreement ¶ 10. Counsel for the Class consist of a well-respected local firm, as well as three national plaintiffs' antitrust class action firms, all of which believe these settlements are in the best interests of the class and are fair, reasonable, and adequate in light of the strength of the claims and the risks and expense of continued litigation. Clark Decl., ¶ 20; Baker Decl., ¶ 4; Scarlett Decl., ¶ 3; Garvey Decl., ¶ 4. As such, under Rule 23(e)(2) and factors specific to the Tenth Circuit, preliminary approval of both Settlement Agreements should be granted.

## IV.    THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS

Approval of a class action settlement is appropriate if the District Court concludes that the class meets the requirements of Federal Rule of Civil Procedure 23 and that the settlement would be fair, adequate, and in the best interests of the class. *See, e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig. (In re GM Trucks)*, 55 F.3d 768, 785 (3d Cir. 1995) (relying on the language of Rule 23(e)), modified on other grounds by *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). This Court should approve of the Motion for Preliminary Approval of the Settlement, in part, because the Settlement Class meets the requirements of Rule 23.

### a.    The Settlement Class Satisfies Rule 23(a)

Certification of a class is proper if: (1) the class is so numerous that joinder would be impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the

representative parties will fairly and adequately protect the interests of the class. F.R.C.P. 23(a)(1)-(4). Each of the Rule 23(a) factors is present here.

### i. Numerosity

Rule 23(a)(1) requires that a class be sufficiently large in number to warrant a class action such that a joinder would be impractical. The Tenth Circuit does not have a certain number threshold for numerosity to be met. *See Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006). The court may make "common sense assumptions" to determine if numerosity is met. *Neiberger v. Hawkins*, 208 F.R.D. 301, 313 (D. Colo. 2002) (citation omitted). Indeed, class actions have been viable with as few as 17 to 20 identified class members. *See Rex v. Owens ex rel. Oklahoma*, 585 F.2d 432, 436 (10th Cir. 1978). The instant case involves roughly 480 potential Settlement Class members. As such, the numerosity requirement is met.

### ii. Commonality

Rule 23(a)(2) requires that the class have common questions of law or fact. "Commonality requires only a single issue common to the class[.]" *Lopez v. City of Santa Fe*, 206 F.R.D. 285, 289 (D.N.M. 2002). "In the antitrust context, courts have generally held that an alleged conspiracy or monopoly is a common issue that will satisfy Rule 23(a)(2) as the singular question of whether defendants conspired to harm plaintiffs will likely prevail." *D&M Farms v. Birdsong Corp*., No. 2:19-CV-463, 2020 WL 7074140, at *3 (E.D. Va. Dec. 2, 2020) (citing *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 300 (D.D.C. 2007)).

Common questions in this case include: whether Defendants agreed to artificially fix, depress, and stabilize payments made to Southwest dairy producers; whether such an agreement had an impact on Settlement Class members; and the amount of damages allegedly incurred. Answers to any of these questions would apply to the whole Settlement Class. Thus, the commonality requirement is met.

### iii.  Typicality

Rule 23(a)(3) requires that the class representatives' claims be "typical" of class members' claims. "The typicality requirement ensures that absent class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest." *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d at 1222. Typicality can be met even if the fact situations of class members differ from those of the named Plaintiffs, so long as the claims are based on the same legal or remedial theory. *Id.* at 1223 (quoting *DG v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010) (citing *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988))).

Plaintiffs' claims here are typical of the claims of the members of the Class because Plaintiffs are dairy farmers who produced Grade A milk in the Southwest and, independently or directly or through an agent, sold fluid Grade A milk to Defendants and their alleged co-conspirators in the Southwest. Therefore, Plaintiffs' claims arise from the same common course of conduct giving rise to the harm claimed by the members of the Class. The relief sought by Plaintiffs to address that alleged harm is common to the Class. As such, the typicality requirement is satisfied.

### iv.  Adequacy

Rule 23(a)(4) requires representative parties, such as Plaintiffs, to fairly and adequately protect the interests of the class. Such a requirement protects the interests of unnamed class members. *See In Re Thornburg Mort., Inc. Sec. Litig.*, 912 F. Supp. 2d at 1223 (citing *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 379 n.5 (1996)). Tenth Circuit courts address the adequacy of the class by considering: "(1) whether the named plaintiffs and their counsel have any conflicts with other class members; and (2) whether the named plaintiffs and their counsel will vigorously prosecute the actions of the [case]." *Id.* (citing *Rutter & Wilbanks Corp. v. Shell Oil*

*Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002)). The qualifications and experience of Class Counsel can assist in informing the court's analysis. *Id.* (citing *Lopez*, 206 F.R.D. at 289).

Here, the named Plaintiffs have no material conflicts with other prospective Class members. They share the harms alleged in this case, namely that they received allegedly artificially suppressed payments for the raw Grade A milk they produced in the Southwest. The alleged harms they share have a common locus, resulting from the purported actions of Select, DFA, and GSA. The named Plaintiffs are highly motivated to prosecute this case and receive compensation for the alleged harms incurred to them and the Class. Class Counsel, having brought many antitrust cases to culmination in the past, demonstrated their ability to vigorously prosecute the case. The adequacy requirement is met here.

### b.  The Requirements of Rule 23(b)(3) Are Satisfied

In addition to the certification of the class being proper, the court must also find that common issues predominate the class and that a class action is the superior method of adjudicating this controversy. F.R.C.P. 23(b)(3); *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 449 (D. Kan. 2006) ("*Urethane I*"). Both of those factors are present here, rendering a class action the superior method of adjudicating this case.

### i.  Predominance of Common Issues

Questions of law and fact common to the Settlement Class predominate over any questions only affecting individual Class members or Plaintiffs. The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at 623. To satisfy this test, Plaintiffs must demonstrate the following elements: (1) a violation of the antitrust laws; (2) the resulting impact of the violation; and (3) measurable damages. Each of those elements are met in this case.

### 1.  Violation of the Antitrust Laws

In antitrust price-fixing cases, "courts have regarded the existence of a conspiracy as the overriding issue . . ." when determining whether class members share common issues of law and fact. *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014) ("*Urethane II*") (citations omitted). Injuries stemming from the conspiracy predominate over individualized issues. *Id.* (citing *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 796 (10th Cir. 1970) ("[W]here the question of basic liability [in antitrust cases] can be established readily by common issues, then it is apparent that the case is appropriate for class action [under Rule 23(b)(3)].")). The central issue in the instant case is whether the Defendants conspired to artificially fix, depress, and stabilize the prices of raw Grade A milk paid to producers in the Southwest Area, in violation of antitrust laws. That common issue predominates over any individualized or corollary issues that may also be present.

### 2.  Impact of the Unlawful Activity

At this stage, "Plaintiffs need only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir. 2002) (citation omitted). In other words, evidence common to all class members can be used to show class-wide injury. *See, e.g.*, *In re Telescopes Antitrust Litig.*, 348 F.R.D. 455, 469-70 (N.D. Cal. 2025) (finding "for the purposes of class certification" common evidence about price-fixing could be used to infer class-wide impact). Such common evidence is present here.

As a result of Defendants' alleged violations of antitrust laws, Plaintiffs and the Settlement Class were allegedly paid lower prices for Grade A milk than they would have been paid absent the alleged conspiracy. *See* Class Action Compl. ¶ 214, ECF 1. At a bare minimum, all Plaintiffs and Settlement Class members were supposedly compensated less for their product than they

would have been. The alleged impact felt by Plaintiffs and the Settlement Class, regardless of any variations in magnitude, was a direct result of Defendant's actions. As such, the alleged impact is common to Plaintiffs and the Settlement Class.

### 3. Measurable Damages

No precise damages formula is required at this stage. Rather, if "plaintiffs can establish that the defendants conspired" to engage in price-fixing, then "even where there are individual variations in damages, the requirements of Rule 23(b)(3) are satisfied." *Urethane II*, 768 F.3d 1245, 1255 (10th Cir. 2014) (quotation and alterations omitted); *see also Urethane I*, 237 F.R.D. at 452 (holding that a regression analysis is a viable method for calculating damages using common evidence). Plaintiffs believe they can do so here. Accordingly, common issues predominate this inquiry.

### ii. Superiority of a Class Action

Rule 23(b)(3) also requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In this case, a class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all allegedly damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. No other Settlement Class members have filed analogous antitrust claims against these Defendants, which demonstrates a lack of interest in controlling the litigation through separate actions. *See Cisneros v. EP Wrap-It Insulation, LLC*, No. CV 19-500 GBW/GJF, 2021 WL 2953117, at *4 (D.N.M. July 14, 2021) (finding a class action a superior form of resolution in part because there was no indication that any class member had an individualized interest in litigating the claims at issue). The relatively small damages suffered by individual Class members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it

would not be feasible for Class members to seek redress for the violations of law alleged herein. Furthermore, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## V.    APPROVAL OF THE NOTICE PLAN

Plaintiffs also respectfully request the Court's approval of the Class Notice Plan. Plaintiffs seek to retain A.B. Data to administer the Class Notice Plan and the Settlement Agreements. Settlement Class Counsel has engaged A.B. Data as a settlement administrator in numerous other class action cases and has found A.B. Data to be reliable and efficient. As discussed in detail below, A.B. Data has developed a multi-method campaign for the Class Notice Plan based on similar notice campaigns previously approved in similar class actions. Ultimately, "[c]ourts have 'great discretion and flexibility in determining what is the best notice procedure to utilize under the circumstances of the case at hand.'" *Brokop v. Farmland Partners Inc.*, No. 18-CV-02104-DME-NYW, 2022 WL 194477, at *2 (D. Colo. Jan. 21, 2022) (citation omitted).

Plaintiffs additionally request that the Court allow Settlement Class Counsel to withdraw up to $250,000 from each of the Settlement Funds to pay for Class Notice.[3] *See* Settlement Agreements ¶ 6.

---

[3] Counsel expects the cost of sending class notice and administering claims will be much less than $500,000, but request approval of these amounts as provided in the Settlement Agreements.

a. **The Content and Form of the Proposed Notice Documents are Fairly Balanced, Easy to Read, and Contain all the Rule 23 Notice Requirements.**

Notice to a Settlement Class under Rule 23(b)(3), whether litigated or by virtue of settlement, requires that:

> [t]he notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the certified class; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). The manner of the notice is reasonable "if it may be understood by the average class member." 4 Newberg on Class Actions, § 11.53 (4th ed. 2002).

The Class Notice documents conform to the seven plain language requirements of Rule 23(c)(2)(B). They provide the following information to the Settlement Class: (1) the nature of the action and the Settlement Agreements; (2) the definition of the Settlement Class; (3) the Settlement Class's claims, issues, and defenses; (4) that any Settlement Class member may enter an appearance through an attorney if the member so desires; (5) that members of the Settlement Class may exclude themselves from the Settlement Class or object to the Settlement Agreements; (6) the time and manner for requesting such exclusions or submitting an objection; and (7) the binding effect of a class judgment on Settlement Class members under Rule 23(c). *See* Hanson Decl. ¶ 14. As such, the Class Notice documents provide the required information to the Settlement Class about the Court's class certification order and the Settlement Agreements. Moreover, the Class Notice documents avoid legalese in favor of modern language and direct Settlement Class members to a toll-free number and the case-specific website maintained by A.B. Data for purposes of providing information about the case to the Settlement Class. *Id*.

### b. The Proposed Class Notice Plan Provides the Best Notice Practicable Under the Circumstances of this Case.

Notice to the Settlement Class must be the "the best notice that is practicable under the circumstances" and be distributed to "all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see LaVigne v. First Cmty. Bancshares, Inc.*, 330 F.R.D. 293, 296 (D.N.M. 2019) (approving of class notice when reasonable effort was expended to identify class members). Such notice may be by "United States mail, electronic means, or other appropriate means," including by publication. Fed. R. Civ. P. 23(c)(2)(B); *see DeJulius v. New England Health Care Emps. Pension Fund*, 429 F.3d 935, 944 (10th Cir. 2005) (holding notice by publication permissible if class members not reasonably identifiable). Additionally, the Settlement Class is entitled to receive notice of the Settlement Agreements in a reasonable manner. *See* Fed. R. Civ. P. 23(e)(1)(B). This requirement is satisfied by providing the best notice practicable under the circumstances to the Settlement Class. *See Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. Appx. 752, 764 (10th Cir. 2020) (finding notice reasonable when it "adequately apprised putative class members of the nature of the claims at issue.") (citing *Tennille*, 785 F.3d at 437).

The proposed Class Notice Plan satisfies the best practicable notice criteria. It provides reasonable notice to the Settlement Class in the best manner possible under the circumstances of the litigation, and it comports with due process. Moreover, the Class Notice documents—consisting of the long-form, short-form, and publication notice—comply with the requirements of Rule 23(c)(2)(B). *See* Hanson Decl., Ex. 1 (long-form notice), Ex. 2 (short-form notice), and Ex. 5 (publication notice). The Class Notice documents define the Settlement Class, describe the nature of the action, summarize the Class's claims, and provide potential Class members notice that:

- The distribution of the proceeds from the Settlement Agreements will be made after final approval as soon as the claims process is complete and any appeals are resolved;

- Settlement Class Counsel will be seeking 33⅓% of the gross settlement recovery as a fee, reimbursement of expenses, service awards of $100,000 per Class Representative, and the procedures for objecting thereto;

- The date, time, and place for the final approval hearing (once that is set by the Court), and the fact that Settlement Class members do not need to enter an appearance through counsel but may do so if they choose.

### i. Direct-mailed notice to potential Settlement Class members with known street addresses.

Plaintiffs propose sending paper copies of the long-form notice to potential Settlement Class members with mailing addresses that are reasonably accessible based on data Defendants will produce to Plaintiffs as provided in the Settlement Agreements. *See* DFA Settlement Agreement ¶ 11; Select Settlement Agreement ¶ 11. The long-form notice will be sent to approximately 500 potential Settlement Class members via first-class mail. A.B. Data will track mail that the U.S. Postal Service returns as undeliverable, and, where feasible, will resend using address information provided by third parties.

### ii. Direct-email notice to potential Settlement Class members with known email addresses.

Plaintiffs propose emailing the short-form notice to potential Settlement Class members with email addresses that are reasonably accessible based on data that Defendants will provide Plaintiffs as part of the Settlement Agreements. *See* DFA Settlement Agreement ¶ 11; Select Settlement Agreement ¶ 11. The short-form notice will be sent to approximately 600 addresses of potential Settlement Class members in this matter (which represent around 480 unique farms). Hanson Decl. ¶ 8. The email notice will provide potential Settlement Class members with an electronic link to the case-specific website maintained by A.B. Data where they can obtain more detailed information, including the Court's Preliminary Approval Order, the long-form notice, the Settlement Agreements, and other case documents. Hanson Decl. ¶ 9. A.B. Data implements

certain best practices to increase deliverability, bypass SPAM and junk filters, and verify which emails were not successfully delivered.

### iii. Publication notice campaign.

For those potential Settlement Class members whose mailing addresses and email addresses are not readily accessible, A.B. Data will supplement the direct mail and email notice through publication of the short-form notice in trade journals targeting dairy industry professionals such as *Southwest Farm Press*, *Dairy Herd Management*, *Progressive Dairy*, and *Hoard's Dairyman*. *See* Hanson Decl., ¶ 16. A sample banner advertisement is attached as Exhibit 5 to the Hanson Declaration filed contemporaneously herewith.

### iv. Website and toll-free telephone number.

To provide detailed information about the case to potential Settlement Class members, A.B. Data will continue to maintain, operate, and monitor the case website: www.SWDairyLitigation.com. *See* Hanson Decl., ¶¶ 18-20. The website will provide, among other things, all relevant documents including the Court's order on settlement class certification, the Settlement Agreements, the long-form notice, the Court's preliminary approval order, important dates, and any pertinent updates concerning the litigation or approval of the Settlement Agreements. *Id*. Additionally, A.B. Data will continue to operate the case-specific toll-free number: 1-866-830-4604. *Id*. The website and call center will be available in both English and Spanish. *Id*.

## VI.    APPROVAL OF THE SETTLEMENT ADMINISTRATOR AND ESCROW AGENT

Plaintiffs move the Court for an order appointing the necessary administrators to implement Class Notice. First, Plaintiffs respectfully request the Court to appoint A.B. Data as the

administrator of the Class Notice Plan and the Settlement Agreements. A.B. Data is an experienced national class action notice provider and settlement administrator. *See* Hanson Decl., ¶ 2.

Second, Plaintiffs respectfully ask the Court to appoint The Huntington National Bank as the escrow agent for the Settlement Agreements, to maintain the Settlement Amounts as called for in the Settlement Agreements (*see* DFA Settlement Agreement ¶¶ 8, 13; Select Settlement Agreement ¶¶ 8, 12), and to provide escrow services for the Settlement Agreements. The Huntington National Bank's qualifications are attached as Exhibits A and B to the Declaration of Huntington National Bank filed contemporaneously herewith.

## VII.    FAIRNESS HEARING

The last step in the settlement approval process is the Fairness Hearing. There, the Court may hear all the evidence necessary to evaluate the proposed Settlement Agreements. Proponents of the Settlement Agreements may explain and describe the terms and conditions of the Settlement Agreements and offer arguments in support of the Settlement Agreements' approval. Additionally, members of the Settlement Class, or their counsel, may be heard regarding the proposed Settlement Agreements, if they choose. Plaintiffs propose the following schedule of events necessary for disseminating Settlement Class Notice and notice of the Fairness Hearing to the Settlement Class:

| DATE | EVENT |
|---|---|
| 10 days after the filing of this Motion for Preliminary Approval | Defendants DFA and Select each shall file via ECF confirmation of its provision of notice to government regulators pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715(d) |
| 14 days after the entry of the Preliminary Approval Order | Settlement Administrator to commence direct mail and email notice, and commence implementation of publication notice plan |
| 14 days before the last day for Settlement Class Members to request | Class Counsel to file petition seeking payment of attorneys' fees, expenses, and named representative service awards |

| exclusion from the Settlement Class | |
|---|---|
| 60 days after the commencement of the Notice | Last day for Settlement Class Members to: (1) request exclusion from the Settlement Class; (2) file claim or audit request forms, (3) file objections to the Settlement, (4) file objections to the motion for an interim payment of attorneys' fees, current and ongoing expenses, and service awards; or (5) file notices to appear at the Fairness Hearing |
| 7 days after last day to request exclusion from the Class | Settlement Class Counsel to provide DFA and Select with a list of all persons and entities who have timely and validly requested exclusion from the Settlement Class |
| 14 days before the Fairness Hearing | Class Counsel shall file a motion for Final Approval of the Settlement Agreements and all supporting papers, update the Court regarding the status of the claims process, and Class Counsel and Defendants may respond to any objections to the proposed settlements.<br><br>Class Counsel shall file an update with the Court regarding any objections to the request for an interim payment of attorneys' fees, current and ongoing expenses, and service awards. |
| 40 days after the last day to request exclusion from the Settlement Class or as soon thereafter as may be heard by the Court | Hearing regarding (1) Final Approval of the Settlement Agreements,[4] (2) motion for payment of attorneys' fees, current and ongoing expenses, and service awards, and (3) status of claims process. |

## VIII.    CONCLUSION

Class Counsel, Select, DFA, and GSA, after hard-fought and arm's-length negotiations, have reached settlement agreements that provide significant financial and non-monetary relief to the Settlement Class. Settlement Class Counsel respectfully requests that the Court enter an Order:

---

[4] Under CAFA, the Court may not issue an order giving final approval of a proposed settlement earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with notice of these proposed Settlement Agreements. *Id.* at § 1715(d). Under the Settlement Agreements, within ten days of the filing of this motion, DFA and Select will serve upon the appropriate state officials and the appropriate federal official the CAFA notice required by Section 1715(b). This schedule will allow the Court to schedule a Fairness Hearing as DPPs propose in the schedule above, in conformance with CAFA's requirements.

(1) preliminarily approving of the settlements with Select and DFA; (2) certifying the Settlement Class; (3) appointing Settlement Class Counsel; (4) appointing Plaintiffs as Settlement Class Representatives; and (5) ordering a stay of all proceedings against Select, DFA, and GSA except those proceedings provided for or as required by the Settlement Agreements.

Dated: July 24, 2025                                    Respectfully submitted,

*/s/ Brian D. Clark*
Brian D. Clark (*pro hac vice*)
W. Joseph Bruckner (*pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
bdclark@locklaw.com
wjbruckner@locklaw.com

Stephen J. Teti (*pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
265 Franklin St., Suite 1702
Boston, MA 02110
Telephone: (617) 456-7701
sjteti@locklaw.com

Steve W. Berman (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Shana E. Scarlett (*pro hac vice*)
Abby R. Wolf (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
abbyw@hbsslaw.com

Elaine T. Byszewski (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
elaine@hbsslaw.com

Karin E. Garvey (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
kgarvey@scott-scott.com

Patrick J. McGahan (*pro hac vice*)
Michael P. Srodoski (*pro hac vice*)
Zachary Kranc (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
pmcgahan@scott-scott.com
msrodoski@scott-scott.com
zkranc@scott-scott.com

Mark T. Baker (Bar No. 16831)
**PEIFER, HANSON, MULLINS & BAKER, P.A.**
20 First Plaza, Suite 725
Albuquerque, NM 87102
Telephone: (505) 247-4800
Facsimile: (505) 243-6458
mbaker@peiferlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 24. 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to counsel for all parties that have appeared in this case.

/s/Brian D. Clark
Brian D. Clark